**UNITED STATES of America,**

**v.**

**Mamdouh Mahmud SALIM, Defendant.**

**No. 01 CR. 002DAB.**

United States District Court,
S.D. New York.

Sept. 25, 2003.

James B. Comey, United States Attorney for the Southern District of New York, New York, New York, Robert B. Buehler, Jonathan S. Kolodner, Assistant United States Attorneys, of counsel, for U.S.

Richard B. Lind, New York, New York, for Defendant.

*OPINION*

BATTS, District Judge.

*TABLE OF CONTENTS*

I. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .259
 A. The Government's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .259
 B. Defendant's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .273
 C. Other Reliable Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .288

II. FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .290
 A. The Government's Theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .290
 1. Existence of a Hostage Taking Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . .290
 2. Conduct Consistent with GX 75–79 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .291
 3. Inconsistencies Between the Government's Theory and Defendant's
 Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .293
 a. The Role of Khalfan Khamis Mohamed . . . . . . . . . . . . . . . . . . . . . . .294
 b. Other 98–CR–1023 Co-defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . .297
 4. Other Deficiencies in the Government's Case . . . . . . . . . . . . . . . . . . . . . .299
 B. Defendant's Theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .301

III. CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .304
 A. Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .305
 B. Permanent Bodily Injury—U.S.S.G. § 2A2.1(b)(1)(A) . . . . . . . . . . . . . . . . . . . .306

C. "Official Victim" Enhancement—U.S.S.G. § 3A1.2 ........................306
D. Restraint of Officer—U.S.S.G. § 3A1.3 ....................................309
E. Recruitment and Supervision—U.S.S.G. § 3B1.1(c)........................310
F. Obstruction of Justice—U.S.S.G. § 3C1.1 ...............................311
 1. Materiality ..............................................................312
 2. Willfulness ..............................................................314
G. Acceptance of Responsibility—U.S.S.G. § 3E1.1 .........................315
H. Upward Departure: U.S.S.G. § 2A2.1 .....................................317
I. Terrorism Enhancement—U.S.S.G. § 3A1.4.................................318
 1. Sentencing Commission's Authority to Promulgate U.S.S.G. § 3A1.4.....319
 2. Hearing Requirement .........................................................323
 3. Standard of Proof for U.S.S.G. § 3A1.4 ...................................323
 4. Factual Determinations Under U.S.S.G. § 3A1.4 in light of Apprendi and McMillan.......................................................................324
 5. Governmental Bias ...........................................................327
 6. The Rule of Lenity .........................................................329
 7. Definition of "Terrorism" ...................................................330

IV. APPLICATION OF U.S.S.G. § 3A1.4 TO SOLELY DOMESTIC CONDUCT.....331
A. Plain Language Analysis ....................................................336
B. Legislative History ........................................................339
 1. Legislative History of Section 730 of AEDPA and 18 U.S.C. § 2332b.....340
 a. Creation of 3A1.4 ......................................................340
 b. House Bill H.R. 104–896 and Senate Bill S.104–390 ................340
 c. House Bill H.R. 104–1710 ...............................................344
 d. Senate Bill—S.735 .......................................................344
 e. Revised H.R. 104–1710 ...................................................346
 f. H.R. 104–2703 ...........................................................347
 g. Conference Bill .........................................................348
 2. Analysis of Legislative History ...........................................349
 a. International focus in original drafts of the provisions that eventually became 18 U.S.C. § 2332b and U.S.S.G. § 3A1.4.....349
 b. Rejection of draft sentencing enhancement provisions that would have swept in solely domestic acts of terrorism..................350
 c. Placement of "Federal crime of terrorism" within § 2332b..........351
 d. Conference Committee Report...............................................352
 e. USA PATRIOT Act .........................................................352
C. The Whole Act Rule .........................................................353
D. The Title of Section 2332b ................................................354

V. CONCLUSION.................................................................354

The Court writes at this juncture to inform counsel and Defendant of the Court's ruling on certain sentencing issues, including the Guidelines calculation in this matter.[1]

On April 3, 2002, pursuant to a plea agreement with the Government, Defendant pleaded guilty to Counts Three and Four of a ten-count, superseding indict-ment (Indictment S1 01–CR–002 (DAB)) relating to the stabbing of Corrections Officer Louis Pepe ("Officer Pepe") at the Metropolitan Correctional Center (the "MCC"). (Plea Transcript of April 3, 2002, hereinafter "Plea Tr."). Count Three of the Indictment charged that Defendant and others had conspired to murder federal officials at the MCC in viola-

---

1. Although not required to provide advance notice (*United States v. Rivera*, 96 F.3d 41, 43 (2d Cir.1996)), the Court herein does so.

tion of 18 U.S.C. § 1114; Count Four charged that Defendant had attempted to kill Officer Pepe, in violation of 18 U.S.C. § 1117. (Indictment S1 01–CR–002 DAB). The plea agreement did not set forth stipulations by the parties with respect to the application of the Sentencing Guidelines. Instead, the Government's position on the application of the Sentencing Guidelines to Defendant's case was set forth in an attached letter, (hereinafter the *"Pimentel* letter"), sent to defense counsel pursuant to the Second Circuit Court of Appeals suggestion in *United States v. Pimentel,* 932 F.2d 1029, 1034 (2d Cir.1991).

In the *Pimentel* letter, the Government notified Defendant that, pursuant to Section 3D1.2 of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), the Government would argue that the Court should "group" the two counts to which Defendant pleaded guilty. (*Pimentel* letter at 2). According to the Government, Section 2A2.1 of the Guidelines applied to the crime charged in Count Three,[2] and because the "object of the attempted murder would have constituted first-degree murder," Defendant's Base Offense Level should be 28. *Id.*

The Government further notified Defendant of its position that the following sentence enhancements were appropriate: (1) a four-level sentence enhancement because of the permanent bodily injury to Officer Pepe pursuant to U.S.S.G. § 2A2.1(b)(1)(A); (2) a three-level enhancement because Defendant attacked Officer Pepe while Pepe was performing his official duties as a corrections officer pursuant to § 3A1.2(a); (3) a two-level enhancement because Officer Pepe was physically restrained during the attack pursu-

ant to U.S.S.G. § 3A1.3; (4) a 12–level enhancement and an increase in Defendant's Criminal History Category from I to VI, because the attack on Officer Pepe was committed to promote a federal act of terrorism pursuant to U.S.S.G. § 3A1.4; and (5) a two-level downward adjustment, assuming Defendant allocuted to the satisfaction of the Court pursuant to § 3E1.1(a). (*Pimentel* letter at 2–3). The Government concluded that the resulting applicable Guidelines Offense Level was 47, with a Criminal History Category of VI. *Id.*

On July 11, 2002, the United States Probation Department sent to the parties a draft Pre–Sentence Report ("PSR"). In a letter dated July 29, 2002, (hereinafter "Def. July 29, 2002"), Defendant contested numerous factual statements contained in the draft PSR, and also challenged: (1) the three-point increase pursuant to U.S.S.G. § 3A1.2 for an attack on an official victim, (2) the three-point, victim restraint enhancement pursuant to U.S.S.G. § 3A1.3, and (3) the twelve-level upward adjustment and Criminal History increase under the "terrorism" enhancement pursuant to U.S.S.G. § 3A1.4. (Def. July 29, 2000.) The Government submitted a responsive Memorandum on August 16, 2002 (hereinafter "Gov. Aug 16, 2002"). Defendant submitted a reply on August 26, 2002 (hereinafter "Def. Aug 26, 2002").

On August 15, 2002, the United States Probation Department sent to the Court and the parties a revised PSR that recommended a total Offense Level of 47 and a Criminal History Category of VI, and a sentence of life imprisonment. (PSR at 23.)

---

**2.** In the *Pimentel* letter, the Government contended that Section 2A1.5 applied to Count Three, but that since the conspiracy charged in Count Three resulted in an attempted mur-

der, pursuant to U.S.S.G. § 2A1.5(c)(2) the applicable Guideline was Section 2A2.1. (*Pimentel* letter at 2).

This Court held a pre-sentence *Fatico* hearing, *United States v. Fatico,* 603 F.2d 1053 (2d Cir.1979), at which the parties presented evidence and arguments on the challenged sections of the PSR. The transcript of the hearing, spanning ten days of testimony and argument, is hereby incorporated into this Opinion; in addition, relevant sections are set forth below.[3]

Defendant's testimony and arguments at the *Fatico* hearing differed in substance from statements in his July 29, 2002 objections to the PSR. In a letter submitted September 12, 2002, (hereinafter, "Gov. September 12, 2002"), the Government informed the Court of additional arguments it intended to make, including additional sentence enhancements and new arguments, based on Defendant's testimony. In a letter dated September 17, 2002, (hereinafter, "Def. September 17, 2002"), Defendant submitted revisions to his letter of July 14, 2002, in response to the Court's inquiry into the status of arguments that were made in Defendant's July 29, 2002 letter, but were contradicted by Defendant at the *Fatico* hearing. Also on September 17, 2002, the Government submitted to the Court and defense counsel copies of expert reports from FBI laboratories, detailing blood, fingerprint, and chemical analysis (hereinafter, "Gov. September 17, 2002").

On December 19, 2002, this Court ordered the parties to brief a question pertaining to the application of U.S.S.G. § 3A1.4.[4] Pursuant to the Court's Order, the Government submitted a Memoran-

dum of Law on January 31, 2003, (hereinafter "Gov. January 31, 2003"); Defendant responded on February 21, 2003,[5] (hereinafter "Def. February 21, 2003"); the Government replied on February 28, 2003, (hereinafter "Gov. February 28, 2003"). In addition, on March 3, 2003, (hereinafter "Def. March 3, 2003") Defendant submitted a two-paragraph "sur-reply" to address issues that the Defendant claims were raised for the first time by the Government on February 28, 2003.

On April 11, 2003, pursuant to its authority under 18 U.S.C. § 3664(d)(6), the Court appointed Conrad Berenson, Ph.D., M.B.A., and Professor Emeritus, to act as Special Master to assist the Court in determining the appropriate amount of restitution in this case, and ordered the Government to provide to the Special Master all information necessary for determination of a recommended restitution amount. (Order, April 11, 2003 at 2–3.)

By letter dated May 9, 2003, the Court requested from the Government materials, admitted into evidence or referred to at the *Fatico* hearing, which had not been received during the hearing. Specifically, the Court requested and received from the Government: 1.) Copies of two videotapes of 10–South of the MCC, referred to and admitted into evidence as GX 222 and GX 223 during testimony by Agent Foelsch at the *Fatico* hearing, (Tr. at 323–28); 2.) A copy of all 10–South visitor log pages containing entries for the period from September 1 through the *entirety* of

---

**3.** The following, including facts referred to in the Discussion, constitutes the Court's Findings of Fact and Conclusions of Law. For the purposes of this Opinion, references to the Fatico hearing are denoted by "Tr.". References to transcripts of proceedings in 98–CR–1023 are denoted by "98–CR–1023 Tr.".

**4.** The Order directed the parties to brief the question whether Defendant's conduct, a sole-

ly domestic crime, fell within the definition of the term "Federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g).

**5.** On February 24, 2003 Defendant submitted corrections to his February 21, 2003 brief, which the Court hereby incorporates into the February 21, 2003 brief.

November 1, 2000—portions of which were admitted into evidence as GX 251A and 251B (*Id.* at 509), and 251A–1 and 251A–2, (*Id.* at 536); 3.) Photographs depicting various views of the recreation rooms on 10–South of the MCC.

## I. FACTUAL BACKGROUND

In January 1999, Defendant and others were indicted on numerous charges alleging a global terrorist conspiracy to murder United States citizens, including charges relating to the August 7, 1998, bombings of United States embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. The case, *United States v. Bin Ladin, et al.,* 98 Cr. 1023(LBS) (hereinafter "98–CR–1023"), was assigned to United States District Judge Leonard B. Sand. During those proceedings, Defendant was housed with the other 98–CR–1023 defendants in the maximum security wing of the MCC.

On November 1, 2000, Defendant stabbed corrections officer Louis Pepe in the left eye with a sharpened comb. (Plea Tr. at 32.) The Indictment in 98–CR–1023 was superseded to include the charges related to the MCC attack. These charges were severed by Judge Sand and subsequently returned as a multi-count Indictment before this Court on January 3, 2001.[6] On April 3, 2002, Defendant pleaded guilty to conspiring to murder Officer Pepe in violation of 18 U.S.C. § 1117 and attempting to kill Officer Pepe in violation of 18 U.S.C. § 1114. (*Id.* at 36.)

A. The Government's Case

In its pre-hearing submissions and at the *Fatico* hearing, the Government argued Mr. Salim and unspecified others had developed and acted on an elaborate plan to secure the release of himself and others through the taking of hostages. (Gov. August 16, 2002 at 40; Tr. at 1008.) According to the Government, Defendant's attack on Officer Pepe on November 1, 2000 was only one step in this plan, which was ultimately frustrated by Officer Pepe's resistance and the response of other corrections officers at the MCC. (Tr. at 1008.)

At the *Fatico* hearing the Government presented the testimony of seven witnesses,[7] numerous pieces of forensic evidence, and crime scene photographs.

The Government's first witness, Christine Dynan, an administrator at the Metropolitan Correctional Center, testified that, while on duty there, Officer Pepe was equipped with a walkie-talkie that automatically alerted the MCC Control Center whenever the walkie-talkie was in a horizontal position for longer than 10 seconds. (*Id.* at 11.) Dynan also testified about the layout and general policies and procedures of the MCC. (*Id.* at 7–62.) Specifically, Dynan testified that inmates at the MCC were rotated between cells every 21 days. (*Id.* at 32.) Reviewing the MCC's recorded logs of inmate rotations, (GX 250A, GX 250B), Dynan testified that on October 25, 2000—six days before the attack on Officer Pepe—Defendant had been moved from Cell One to Cell Six, where he was joined by inmate Khalfan Khamis Mohamed.[8] (Tr. at 34.)

---

**6.** The charges in 98–CR–1023 against Mr. Salim are currently pending.

**7.** The Government called as witnesses Metropolitan Correctional Center personnel Christine Dynan, Gautam Patel, Roderick Jenkins, and Glenn Carrino, Attorney Paul McAllister, and FBI Agents Joseph Foelsch and Peter Kohn.

**8.** Dynan testified that on November 1, 2000, the six cells on 10–South housed a maximum of eight inmates, with Cells 1 and 6 capable of housing two inmates. (Tr. at 20.) On November 1, 2000, eight inmates were housed on 10–South. *Id.*

Ms. Dynan also testified about the Commissary policies at the MCC. She identified several government exhibits that were received into evidence by the Court (*Id.* at 61): purchase receipts from the MCC Commissary that had been provided to Defendant (GX 83, 85–89, 90, 95–99) and to Khalfan Khamis Mohamed (GX 84, 91, 92, 94), one of Defendant's co-defendants in 98–CR–1023. (Tr. at 62–65.) Dynan also testified that keys to doors not controlled by electronic locks were held by staff members at the MCC. (*Id.* at 15.)

The Court received into evidence GX 10, a floor plan of Unit 10–South of the MCC (hereinafter, "10–South".) (*Id.* at 21.) Referring to GX 10, Dynan testified that there were two attorney-inmate visit rooms on the North side of 10–South that were set up for non-contact visiting. (*Id.* at 25.) Ms. Dynan testified that the attorneys would be locked in one room; then the inmate would be locked in the inmate room. (*Id.*) According to Dynan, the two rooms were separated by a screen, through which the attorneys and inmate could communicate but not touch or pass objects. (*Id.*)

Two of the Government's other witnesses, Specialist Jenkins and Lieutenant Carrino, are Federal Bureau of Prisons officers. On November 1, 2000, both responded to an alarm on 10–South. (*Id.* at 76.) Jenkins, Carrino, and other responding corrections officers passed through the outer door to 10–South, but were prevented from entering 10–South because the inner door to the unit was locked. (*Id.* at 77.) Specialist Jenkins testified that, during this time, officers attempted unsuccessfully to reach Officer Pepe by banging on the door, and by calling on the radio and the telephone. (*Id.* at 78.) Eventually, corrections officers secured a key and gained access to 10–South through the inner door. (*Id.* at 126.) Specialist Jenkins

testified that he and the other officers waited 15 minutes before emergency keys were available to allow him to enter 10–South. (*Id.* at 99–100.)

Specialist Jenkins testified that, while waiting to enter the unit, he looked through a window and saw Defendant peek out from behind a pillar within 10–South. (*Id.* at 81.) After Jenkins gained entry to 10–South, he saw Defendant running away from him, toward the south end of the unit. (*Id.* at 85.) Jenkins testified that, as he proceeded toward Cell Six in pursuit of Defendant, he visually confirmed that each of the cell doors was closed and locked. (*Id.* at 106–07.) Jenkins testified he picked up a Plexiglass shield that was usually used to soundproof the recreation rooms, and proceeded to the South end of the unit. (*Id.* at 86.) As Jenkins approached Defendant's cell, he saw Defendant fumbling with keys, trying to get into Cell Six of 10–South; Defendant then entered Cell Six. (*Id.* at 87.)

Specialist Jenkins testified that at this point, Defendant's cellmate, Khalfan Khamis Mohamed, lunged out of a corner of the corridor, with a plastic, bear-shaped honey jar, filled with red liquid, in his hand. (*Id.* at 88.) Jenkins testified that Mohamed tried to spray the liquid at his face, but that Jenkins used the plastic shield for protection and pinned Mohamed against the wall with it. (*Id.* at 89.) Jenkins testified he glanced over at Cell Six and saw Defendant beginning to come out of the cell to attack him, and that Jenkins kicked the door closed with his foot, while still holding Mohamed pinned to the wall with the Plexiglass shield. (*Id.*) Jenkins testified that through the window of Cell Six he saw Officer Pepe standing inside the cell, and so he released the door, allowing it to open. (*Id.*) When Defendant tried to lunge out at Jenkins again, Jenkins punched him in the face. (*Id.* at 91–92.)

According to Specialist Jenkins, additional correctional staff became involved at this point—after Jenkins had singlehandedly: 1.) pinned Mohamed to the wall using the Plexiglass shield, 2.) seen Mr. Salim attempting to leave Cell Six and kicked the unlocked door of Cell Six closed, trapping Mr. Salim inside the cell, 3.) observed Officer Pepe injured in Cell Six and allowed the door to Cell Six to reopen, and 4.) knocked down the attacking Defendant with a punch to the face. (*Id.* at 89–92.) Specialist Jenkins testified that after MCC personnel restrained Defendant and Mohamed, he saw Officer Pepe being escorted from 10–South. (*Id.* at 93.) Jenkins said he saw that Officer Pepe's face and clothing were bloody, and that he had a handcuff on his right arm. (*Id.*)

Lieutenant Glenn Carrino, a Bureau of Prisons Lieutenant on 10 South of the MCC on November 1, 2000, testified that at approximately ten o'clock in the morning on that day, while he was on the third floor of the MCC, a body alarm went off on 10–South. (*Id.* at 122.) Carrino testified that he and others responded to the tenth floor, but could not get through the second door to 10–South. (*Id.* at 123.) He testified that, while he was waiting to enter 10–South, the telephones were ringing incessantly on the floor. (*Id.* at 149.) Carrino testified that "approximately 5 minutes or more" elapsed between the time he responded to the alarm and the point at which the officers entered Unit 10–South. (*Id.* at 126.)

Lieutenant Carrino testified that, after gaining entry to 10–South he proceeded toward Cell Six, that along the way he picked up one side of a plexiglass shield, and that Specialist Jenkins had picked up the other side. (*Id.* at 143–44.) Lieutenant Carrino testified that "[a]s we were going down the hall, we saw in the end of the hall, an inmate come out in front of us. At that point in time Jenkins said let's pick up the shield, there is a plexiglass shield against the wall." (*Id.* at 127.) However, Lieutenant Carrino also acknowledged that, in a post-incident report, he had written that Jenkins had handed him a plexiglass grill cover, and that at sentencing proceedings held for Khalfan Khamis Mohamed, he had testified that his written statement in the report had been correct. (*Id.* at 147.) Ultimately, Carrino testified that he couldn't remember whether Jenkins had handed him the shield, or whether Jenkins had shared it with him. (*Id.*)

Lieutenant Carrino testified that as he approached Cell Six after gaining entry to 10–South, Khalfan Khamis Mohamed "lunged forward in a crouch position" toward him and "started squirting a substance out of a honey jar, a honey bottle." (*Id.* at 127.) [9] Carrino testified that "we took the shield; Jenkins had one end, I had the other. We went straightforward against the wall and pinned Inmate Mohammad against the wall, and the plexiglass shattered, and then we took him down to the ground." (*Id.* at 129.)

Lieutenant Carrino also testified that any time an inmate on 10–South was moved from a cell, the MCC's policies and practices required that the inmate be handcuffed and that three correction officers be present on the floor. (*Id.* at 119, 153–4.) Lieutenant Carrino testified that this policy was not followed on the morning of November 1, 2000. (*Id.* at 152–53.)

The Government offered into evidence a crime scene photo showing an electrical

---

**9.** Carrino initially testified that he wasn't certain if the liquid hit the plexiglass shield. (Tr. at 155.) However, after acknowledging that, at a sentencing hearing in 98–CR–1023, he

had testified that some of the liquid sprayed by Mohamed had hit the shield, Carrino testified that it "could have" hit the plexiglass shield. (*Id.* at 155–56.)

junction box with its cover partially pried open. (GX 20.) Carrino testified that on the morning of November 1, 2000, before the attack on Officer Pepe, he had conducted a routine inspection of Unit 10–South, including an inspection to ensure that the electrical wires and junction boxes were intact. (Tr. 121–22.) During this inspection, Carrino saw that the electrical junction box pictured in GX 20, outside Defendant's cell, was intact and undamaged. (*Id.* at 140.) Lieutenant Carrino further testified that, in routine inspections of 10–South, he would ensure that nothing had been damaged or tampered with.[10] (*Id.* at 137.) Carrino testified that the night after the attack on Officer Pepe, he conducted another routine inspection and saw that the cover on the junction box outside Defendant's cell had been pried down and that a screw was missing.[11] (*Id.* at 140.)

A crime scene photo taken shortly after Officer Pepe's stabbing showed an up-ended blue plastic storage bin beneath the junction box. (GX 18.) Lieutenant Carrino testified that the blue bin was a commissary bucket, and was sturdy enough to support a person.[12] (Tr. 183.) However, Lieutenant Carrino testified that he did not recall seeing the blue bucket beneath the junction box when he was struggling with Khalfan Khamis Mohamed. (*Id.* at 186.)

Lieutenant Carrino also testified that there were three videotape recorders at the guard's station on 10–South but that, although the recorders were used to record the images from the video monitors on the floor, no videotapes were made the morning of November 1, 2000. (*Id.* at 140–42.) Furthermore, there were no policies or procedures for making video recordings of the monitors on 10–South, and he knew the video machines were not working for months prior to November 1, 2000. (*Id.* at 142.)

Lieutenant Carrino also testified that immediately after Defendant was subdued, Carrino saw Officer Pepe, his face covered with blood, in the doorway of Cell Six. (*Id.* at 133.) Carrino said he saw Officer Pepe had a black object protruding from his left eye, and also had a handcuff attached to one of his arms. (*Id.* at 134–35.) Lieutenant Carrino testified that he and others led Officer Pepe out of Cell Six and out of 10–South, to the MCC hospital on the second floor. (*Id.* at 135.)

Gautam Patel is a physician's assistant, who was working at the medical facility at

---

10. Lieutenant Carrino testified his inspections included checking the grills in the recreation area. He explained:

> There's grills in front of the glass. There's glass in the visiting areas, but in the recreation area, it's all mesh, all wire mesh, even the doors are wire mesh. So I make sure all of the area is okay. (Tr. at 137.)

11. At the *Fatico* hearing, (Tr. at 321), the Court admitted into evidence an FBI Fingerprint Examination report, (GX 3517–Y), which stated that

> Six latent fingerprints and one latent palm print of value are present or were developed on Q80 and Q81, two lifts, and Q83, junction box cover. No latent prints of value are present on Q82, lift. The latent

fingerprints and the latent palm print are not the fingerprints or palm print of KHALFAN KHANIS MOHAMMED, or MAMDOUN MAHMUD SALIM. GX 3517–Y.

Later in the *Fatico* hearing, the Government stated that the parties had stipulated that fingerprints had been lifted from the junction box, and that

> there were ... two or three latent prints recovered from the junction box. They were submitted for analysis. Certainly there was no match between either [Defendant] or [Defendant's cellmate]. (Tr. at 396.)

12. Lieutenant Carrino admitted he had never stood on one of the buckets himself, but testified that he had "seen another officer using it, standing on it." (Tr. at 185.)

the MCC on November 1, 2000. (*Id.* at 199–201.) Mr. Patel testified that he responded to the body alarm on 10–South, (*Id.* at 201), and that he arrived at 10–South about 7 to 10 minutes later. (*Id.* at 223.) Mr. Patel testified that he and other MCC staff members waited for 10 to 15 minutes in the corridor outside the inner door to 10–South, while someone got a key. (*Id.*)

Paul McAllister was Defendant's attorney in 98–CR–1023, until he was replaced in November 2000. (*Id.* at 474.) McAllister testified that in the fall of 2000, Defendant had expressed dissatisfaction directly to McAllister and Charles Adler, co-counsel representing Defendant, about the representation Defendant was receiving from Adler and McAllister. (*Id.* at 476.) McAllister testified that Defendant had communicated his dissatisfaction with counsel on the record to Judge Sand three times. (*Id.*) In addition, McAllister testified that Defendant had sent a number of letters, (GX 4–9), to Judge Sand, with copies sent to McAllister and Defendant's other attorneys, requesting that Judge Sand replace Defendant's attorneys. (Tr. at 476–77.) McAllister testified that he, Defendant and Charles Adler had also appeared at a conference before Magistrate Judge Eaton in late October 2000, at which Defendant repeated his complaints, expressed dissatisfaction about his attorneys, and requested substitute counsel. (*Id.* at 478–79.) In addition, McAllister testified that Defendant had declined to meet with Adler and McAllister three times in October of 2000.

McAllister testified that on November 1, 2000, he went to meet Defendant on 10–South at the MCC:

THE COURT: ... Mr. McAllister, how did it come about that you decided to go to the MCC on November 1st?

THE WITNESS: Well, it was an ongoing thing. I had either met with or attempted to meet with Mr. Salim periodically and there wasn't anything exceptional about that date. It was just one of a number of dates that I was seeking to meet with him to prepare for trial.

THE COURT: All right. Was there any indication from Mr. Salim that he would be interested in meeting with you that day?

THE WITNESS: No, No. There wasn't any indication that he would be interested, but my colleague, Mr. Adler, and I had decided that in Mr. Salim's interest we should certainly at least attempt to prepare for trial rather than just ignoring the fact that the trial was about to commence fairly soon.

(*Id.* at 481.)

McAllister testified that he arrived at the MCC at approximately 8 a.m. (*Id.* at 480.) McAllister testified that, after making his way through security, he was led to the recreation room on 10–South by Officer Pepe. (*Id.* at 485.) McAllister said that he had "small talk" with Officer Pepe, and then that Pepe indicated he would go to Defendant's cell to see if Defendant was willing to visit with McAllister. (*Id.* at 486.) Officer Pepe returned "shortly thereafter" and told McAllister he had "good news" for McAllister, that Defendant was "considering or probably willing" to meet with McAllister and Adler. (*Id.* at 486–87.) Officer Pepe went back to Defendant's cell a second time, then returned to say that Defendant was praying and that Officer Pepe didn't want to interrupt him at that time. (*Id.* at 487.) McAllister testified that "somewhere around that time," Charles Adler, Defendant's co-counsel in 98–CR–1023, arrived. (*Id.*) McAllister testified that Officer Pepe went a third time to Defendant's cell, and when he returned,

Officer Pepe said that Mr. Salim did wish to meet with us but that he wanted to do something on the computer first. And Officer Pepe said that he had asked Mr. Salim whether or not Mr. Salim would be willing to meet with us with Mr. Salim being on the side of the cell with the computer and Mr. Adler and myself being locked on the other side of the mesh in order to save time so that Mr. Salim wouldn't be doing whatever he was going to do on the computer and keep us waiting. I guess Officer Pepe asked us whether it was all right with us because it's rather cramped and uncomfortable and we said it was all right to meet under those conditions.

(*Id.* at 488.)

McAllister testified that meetings he participated in with Defendant were rarely held in the attorney-inmate meeting rooms; instead they were usually held in one of two recreation rooms on 10–South. (*Id.* at 485, 489.) Moreover, Mr. McAllister testified that November 1, 2000 was the first and only time that he had a "non-contact" meeting with Defendant; in the approximately three times he met with Defendant in the attorney-inmate meeting rooms, he was placed on the same side of the mesh divider as Defendant. (*Id.* at 489.)

McAllister testified that he and Charles Adler agreed to meet Defendant in the attorney-inmate rooms, and Officer Pepe locked them in one side of the room. (*Id.* at 490.) McAllister testified that, from the attorney-inmate room wherein he and Adler were locked, he could see into a recreation room on 10–South. (*Id.* at 491.) McAllister testified that at some point while he was waiting in the attorney-inmate room, he saw Wadih El–Hage, another defendant in 98–CR–1023, meeting in the recreation room with his attorneys, Mr. Schmidt and Mr. Dratel. (*Id.* at 492.)

From the attorney-inmate room, McAllister testified he could also see the guard station, (*Id.* at 490), as well as video monitors above the guard station. (*Id.* at 493.)

McAllister testified that eventually, Officer Pepe brought Defendant into the other side of the attorney-inmate room, and then locked Defendant into the room. (*Id.* at 495.) McAllister testified that, as Pepe and Defendant approached, Defendant was wearing an orange jumpsuit, and was carrying materials, including a legal folder and a dictionary. (*Id.* at 494.) McAllister could not recall specifically whether Officer Pepe or Defendant had carried the materials in. (*Id.*)

McAllister described the meeting with Defendant in the attorney-inmate room:

There was very little conversation. Mr. Salim appeared to be upset and frustrated. And he had placed the disk in the computer, and then he gestured physically something like this, like look at this, indicating that the disk was not performing. It wasn't launching. And, as I said, he appeared to be upset over there. And he was sort of displaying for us the nature of his complaint or one of his complaints which involved the computer and the disks and the way they functioned.

Q: And how much did Salim actually say to you during this period when he was trying to use the computer?

A: Very little. In fact, I think Charles Adler had asked what the number was on the disk, and Mr. Salim initially displayed it to him. But it was impossible to read the numbers through the mesh. So then Mr. Salim told Mr. Adler so he could write it down what the numbers on the disk—what they were so that Mr. Adler could then lodge a complaint with your office concerning this.

(*Id.* at 497–98.)

McAllister further testified that the meeting was largely nonverbal, and that

Defendant did not sit down throughout the meeting:

Q: Is it fair to say that [Defendant] did not talk to you throughout that entire meeting?

A: That's fair to say. He really didn't communicate verbally throughout that meeting.

Q: In fact, throughout that meeting, he stood throughout that entire 15 or 20 minutes?

A: Yes, he did. I think he did.

Q: Was there a chair in that room?

A: There was a chair in that room. He sat on it when he removed his jumpsuit before leaving the cell, if I recall correctly, although I'm not certain of that. But the fair answer to your question is, he certainly stood, if not all the time, most of the time, and very possibly all the time. Certainly when we were having whatever communication we were having, he certainly wasn't seated then.

Q: The only communication you had with him was regarding the CD–ROM?

A: Nonverbal.

Q: That wasn't verbal?

A: No.

Q: He didn't say the CD–ROM is not working or anything like that?

A: Not that I recall.

Q: He basically tried to push the CD–ROM in and it wouldn't work, correct?

A: Exactly. And he gestured as if to say nonverbally, as if to say, look at this.

(*Id.* at 538–39.)

McAllister testified that within ten or fifteen minutes, Defendant told Officer Pepe that he wished to leave his half of the attorney-inmate visit room. Officer Pepe asked whether the visit was over, and Defendant answered that it was not, that Defendant needed to return to his cell to get another disk to work with the comput-er. (*Id.* at 498.) After Defendant indicated he needed to go back to his cell:

I noticed that [Defendant] slipped off his jumpsuit and balled it up and had it in his hands. At some point he passed his material through the slot, and I believe that Officer Pepe placed that on the desk at the officers' station . . .

(*Id.* at 499.)

McAllister testified that, after Officer Pepe let Defendant out of the cell, Pepe "busied himself for a few moments at the officers' station," during which time Defendant stopped briefly to speak with El–Hage and his lawyers. (*Id.*) Within a few moments, Officer Pepe approached Defendant and indicated they would go back to Defendant's cell. (*Id.* at 500.) During this time, Defendant was not handcuffed. (*Id.*)

McAllister testified that, after Defendant left with Officer Pepe, he and Charles Adler waited for Defendant and Officer Pepe to return for "a significant amount of time." (*Id.* at 501.) McAllister testified:

And then ultimately the phone on the officers' station desk began to ring and ring and ring, and Officer Pepe was not returning to answer it. So we were somewhat concerned about what was going on. And then ultimately we looked at the monitors that I've described and we saw a great deal of activity, assembling of the guards, apparently, down in the common area of 9 South. And we witnessed a lot of activity down there.

(*Id.* at 501–02.)

McAllister testified that after approximately 15 minutes, he saw corrections officers enter 10–South. (*Id.* at 502.) McAllister testified that, when the corrections officers entered, they "rattled each door, and that all of which appeared to be locked." (*Id.* at 503.) The corrections officers then left McAllister's line of sight. (*Id.* at 504.) McAllister testified that

eventually he saw two officers dragging a person he believed to be Defendant, with a "very significant amount of blood that was being trailed." (*Id.* at 505.) McAllister testified that, after this, he saw Officer Pepe being escorted out of the unit by four people. (*Id.* at 506.)

McAllister testified that he met frequently with Defendant at the MCC, and that in approximately 40 of the 100 times he had visited the 10–South Unit at the MCC, he had seen Defendant walking around the Unit unrestrained and accompanied only by Officer Pepe. (*Id.* at 514–515.) McAllister testified that he could not remember a time when he saw an inmate on 10–South moved by more than one officer (*Id.* at 516), and that in none of the roughly ten meetings he participated in with all five 98–CR–1023 co-defendants (hereinafter, the "co-defendants") and their attorneys were the co-defendants restrained. (*Id.*) McAllister also testified that on one day, he observed three inmates in the hallway, unrestrained, while they were changing cells. (*Id.* at 517.)

Special Agent Joseph Foelsch of the Federal Bureau of Investigation was the Case Agent on the investigation of the attack. (*Id.* at 248.) He arrived at 10–South on November 1, 2000, after conducting some interviews at Bellevue Hospital, where Officer Pepe was taken after the attack. (*Id.*) Agent Foelsch testified that while he was at Bellevue Hospital he received from doctors a plastic comb, modified and sharpened into a knife, that had been recovered from Officer Pepe's skull. (GX 100.) Foelsch said he also received from the doctors a small piece of plastic that appeared to have broken off the comb inside Officer Pepe's head. (Tr. at 330.) A photograph, (GX 100P), depicted the knife soon after it was removed from Officer Pepe's skull. (Tr. at 330.)

Another photograph, (GX 22), showed a white hairbrush on a brown linoleum floor, covered with blood. Analysis of the blood found on the hairbrush showed that the DNA in the blood corresponded to Officer Pepe's blood. (Gov. September 17, 2002, Exhibit B at 4.) Agent Foelsch testified that the brush, (GX 125) was sharpened and had been photographed at the crime scene. (Tr. at 265–66.)

Agent Foelsch testified that crime scene evidence that was in plain view in Cell Six shortly after the attack was seized by investigators, and that later in the evening of November 1, 2000, a search warrant was issued, pursuant to which hundreds of documents and other items in Cell Six were seized, (*Id.* at 250), then placed into approximately ten blue plastic bins. (*Id.* at 286–90.) The documents and seized items were stored in an evidence room at 26 Federal Plaza. (*Id.* at 286.) Agent Foelsch testified that a third search was conducted on November 2, 2000 pursuant to a search warrant, and that during this search he and other investigators seized some 35 cardboard file boxes of documents relating to the Defendant's legal case in 98–CR–1023, which had been kept in a storage and supply space on 10–South of the MCC. (*Id.* at 293.) These documents were also transported to the FBI Evidence Room at 26 Federal Plaza. (*Id.* at 294.)

Agent Foelsch testified that on November 5, 2000, as he and an Arabic translator began to review the contents of a blue bin containing materials seized from Cell Six, he discovered handwritten notes, (GX 75–82), near the top of the bin. (Tr. 298.) One note, (GX 75), hand-written in English, reads:

We are the Muslims who were accused falsely of bombing the embassy in Africa.

We have captured the tenth flr. in MCC and we hav several lawyers and

officals. They are undr our full control. We were forced to resort to the solution after we were deprived of our legal rights.

We request the immediat release of (_____) and send them outside the (U.S.). If the goverment worry about the safty of its citizines it has to comply with all our demands, otherwise it will be responsible for any consequences.

(GX 75, *errors and omissions in original*.)

The Court received into evidence several photos of paper with notes and checklists written in Arabic, (GX 76–82), which were discovered by Agent Foelsch in his review of evidence on November 5, 2000. (*Id.* at 301.)

One of the exhibits, (GX 76P–1),[13] was a photograph of a piece of paper with handwritten Arabic text and numbers including the following:

the work spoils for the others

the work after the sentence is better somewhere

the relief is coming

for the [U/I][14] to be patient for the benefit in the future

not to be drifted after the zealous

work is allowed not a duty

180 storages

a woman

more than one guard

cooling is the basis at the confrontation

ounce

[U/I]

thickness

(GX 76T–1.)

Government Exhibit 76P–2,[15] a photograph of the back of GX 76P–1, showed handwritten Arabic text and numbers including the following:

Winning the War Against Azthma & Allergy Dr. Allan Cutler [preceding written in English]

\* \* \* \*

residences-door 39

Kazman al-thafri = as said

Notes=the hunt [U/I] everything except opening cans/boxes

1293, 1292=placing things on the counter

[U/I]:-Fortification after being exposed

Impractical:-table, door [U/I], brooms and similar items, fire extinguisher

— The room of the lieutenant

— custodial room

The hunt [U/I]:-Placing boxes near the door

-Tying one hand to the door of the [U/I]

[U/I]Untying the knot [U/I] leaving a note on the door stating it is open, and he is in the bathroom

[U/I]

[written in pen]

in an official trip to prove my innocence of the charges unjustly and unfairly framed upon me by the Americans. And he needs to listen to defense witnesses.

Please facilitate his mission and cooperate with him.

[Arabic numerals] 9753232 9822290

[written on the left side of the document]

Dividing the work of hunting:

Preparation

---

**13.** As translated, GX 76P–1 was moved and received into evidence as GX76T–1.

**14.** In GX76T–1, as in other exhibits set forth herein, sections of written text that were un-intelligible to the translator are omitted, with the place marked by "[U/I]."

**15.** As translated, GX 76P–2 was moved and received into evidence as GX 76T–2.

Attack

Questioning

Cooling

*Having a sufficient number It is possible to spare the guard for the purpose of hunting. Since the present is sufficient whereas the absent is on credit

*Scenario [U/I]

*[U/I] scenario after [U/I] roof

*Not to rely on the hunt because it's hypothetical First to work when [U/I] presence of a sufficient number

The employees are better than the lawyers and the prisoners.

(GX 76T–2.)

Government Exhibit 77P–1,[16] a photograph of another piece of paper, depicted handwritten Arabic text and numbers including the following:

In the name of God

1) correctness/safety of action/work (before [crossed out], during video, camera, eyewitnesses, destroying [U/I]—after talk)

2) Informing all of the plan and its steps.

3) Division of labor and role sharing

4) Time calculation for all stages

5) Cooling methods

6) Fortification methods

7) Arming in the beginning of the action then in its progress

8) subversion (after causing the utmost injury to human lives) [utmost utilization of cutting off electricity]

9) Describing the zero hour and who determines that [crossed out]

10) [crossed out]

11) Informing prior to being exposed and after executing the utmost damage

12) Demands to the media as a whole, however with the administration they would be through certain stages.

13) [crossed out] Specifying the demands and their time arrangements

14)

3) All [U/I]

2) All cameras and lamps and the windows' glass

1) Erasing all computers

5) Burning all counters

3) All instruments/appliances and the refrigerator and like

4) All alarm, fire and [U/I] sets

6) All TV and telephone lines

(GX 77T–1.)

Government Exhibit 77P–2,[17] a photograph of handwriting on the back of 77P–1, showed Arabic text and numbers including the following:

*Duty of the guard*

1. Handling and identifying the keys, and that we want to get out.

2. Keeping an eye on the back

3. The video and stopping it (it may not exist)

4. Exits and whether there are keys to them.

5. Electricity and its distribution

6. Calling upon others

7. Opening 46 and answering the telephone (it should be known whether to dial 111 or 333)

8. Luring the hunt and opening the door for it.

9. Informing the bottom/lower that the path is "clear" before going down.

10. [*crossed out*] Informing the inquiring people that whom they inquire about

---

**16.** As translated, GX 77P–1 was moved and received into evidence as GX77T–1.

**17.** As translated, GX 77P–2 was moved and received into evidence as GX77T–2.

came in the morning and left. (I said that until the matter gets revealed)

11. [*crossed out*] he should say he is under [U/I] and that a gun is pointed at his head and he doesn't know how he got hold of the gun [U/I] and they have all hostages

[1. and 2. crossed out]

3. Bringing chains and fire extinguishers and locking the bathroom door

10) Civilian hunt [circled] lured not attacked

8) The party [U/I] for negotiations

8) Relying on God is very important and I think we will test [U/I]

Getting rid of some prisoners

7) [crossed out] with Odeh 2=6 in fact [U/I]

1) [crossed out] working with Abu Dhahr is better and easier than Somo [U/I]

[2.—4. crossed out]

5) [crossed out] There is no bathroom in 9 and it is possible to use [U/I]

6) [crossed out] Inquiring from al-Saleh about Mamdouh on Saturday and Sunday and to confirm [U/I]

(GX 77T–2.)

Government Exhibit 78P–1,[18] another photograph of a piece of paper discovered by Agent Foelsch, contained handwritten Arabic text and numbers including the following:

After the completion:

1. Media (before going down)
2. Fortification
3. Negotiations
4. Sabotage—1

5.

(GX 78T–1.)

Government Exhibit 78P–2,[19] a photograph of the back of GX 78P–1, depicted a note written in Arabic that said merely, "In the name of." (GX 78T–2.)

Government Exhibit 79P–1,[20] a photograph of another piece of paper, depicted notes written in Arabic:

In the name of God

— The guard

— The lieutenant

— Opening for the brothers/closing window 3, 2

— Quick arming (fire extinguisher, brooms)

— One rick [U/I] then the rest

— Arming (table, fire extinguisher, pipe 1, the counter, lieutenant (fire extinguisher), safe deposits, electricity room, brooms, the door of [U/I]

— Keeping an eye

— Hunt [civilian lured]

— The mirror

= The guard

= Taking things from the room (the luggage, the knives, the paper for the window)

= Quick arming from electricity

= [crossed out]

(GX 79T–1.)

Government Exhibit 79P–2,[21] a photograph of the back of GX–79, depicted notes written in Arabic:

In the name of God

[crossed out] 1935, 6822, 5149

[crossed out] 6541, 4687, 9444, 4322

---

**18.** A translation of GX 78P–1 was moved and received into evidence as GX78T–1.

**19.** A translation of GX 78P–2 was moved and received into evidence as GX78T–2.

**20.** A translation of GX 79P–1 was moved and received into evidence as GX79T–1.

**21.** A translation of GX 79P–2 was moved and received into evidence as GX79T–2.

— Triangle—the neighbors, [crossed out] the priest, I am Dabdouba

— Control

— Taking the boxes

— Covering the windows

— Arming (electricity, the counter, the lieutenant, the green, the table, the big and the small fire extinguishers)

— Rick the Imam

— The Completion

— Preparing the hunting boxes

— Keeping the eye

= Warning against [U/I]

= Making eyeglasses

1) Odeh (1) 1
2) Owhali (2)

_____

 (3) Dabdoub

(GX 79T–2.)

The Court received into evidence Government Exhibit 80P,[22] (Tr. at 309), a photograph of a scrap of a newspaper weathermap of the New York–Connecticut–New Jersey area, also containing a hand-drawn map with the following notations, written in Arabic:

names or numbers

a bridge

street

2 tunnel

7 kilometers

Avenue

3 bridges

United Nations

the Garden

(GX 80T.)

The Court received into evidence GX 81, a photograph of a sheet of paper with a table printed thereupon, with entries in one column headed "Video# or Title" and entries in an adjacent column headed "Search Location or General Summary." (Tr. at 309.) The Court also received into evidence GX 81–P2, a photograph of the back of the paper depicted in GX 81, which contained a note handwritten in English, "deprive (of our legal rights)." (*Id.* at 309.)

Agent Foelsch testified that the handwriting on GX 75 and 76 was analyzed by an expert. (*Id.* at 456.) Agent Foelsch testified that the handwriting analysis of GX 75 showed that 98–CR–1023 co-defendant Odeh had written the portions that were printed, while analysis of the parts written in "script" came back inconclusive. (*Id.*) The handwriting in English on the top of GX 76 was also analyzed, but came back inconclusive. (*Id.*) Agent Foelsch testified that the documents written in Arabic were not submitted for analysis because there was no one in the United States who could analyze Arabic handwriting. (*Id.* at 459.)

Agent Foelsch testified that a fingerprint analysis performed by the FBI on GX 75–81 showed that Defendant's fingerprints were the only ones on GX 75–81 that were identified. (*Id.* at 319.)[23] Agent Foelsch testified that he had been at the crime scene when photographs were taken by investigating officers of bloodied lengths of plastic wrap that had been

**22.** A translation of GX 80P was moved and received into evidence as GX 80T.

**23.** As an attachment to its letter dated September 17, 2002, the Government submitted a copy of the FBI laboratory fingerprint analysis that was admitted as GX 3517–Y at the *Fatico* hearing. (Tr. 321.) The analysis indi-

cated Defendant's fingerprints were found on the ransom note, (GX 75), and also on GX 76, GX 77, and 78. The documents tested negative for fingerprints of any other 98–CR–1023 co-defendant. (Gov. September 17, 2002, Exh. D.)

twisted into "ropes," (GX 164), and that in photos appeared on Defendant's bed in Cell Six, (GX 33), on the bed of Defendant's roommate, (GX 32), and wrapped around the leg of one bed in Cell Six, (GX 40). (Tr. at 272–73.) Agent Foelsch also testified that, at the crime scene he had seen approximately five or six bear-shaped honey containers in Cell Six of the type sold at the MCC Commissary, (GX 152), and testified that crime scene photos (GX 39, 42, 48) showed a honey bear lying in Cell Six, and two honey bears, received into evidence as GX 130, lying outside of Cell Six. (Tr. at 280–83.)

Agent Foelsch also testified that a red-capped bottle, like one filled with Keefe's Louisiana Hot Sauce and moved into evidence by the Government, (GX 167), appeared in a crime scene photo taken in Cell Six. (GX 42, Tr. at 279.) Agent Foelsch further testified that the hot sauce bottles contained a chemical called capsaicin,[24] which was also found in honey bears found at the crime scene, (Tr. at 280), as well as in samples taken from brownish-red stains that were found on the walls of 10–South and in Cell Six. (*Id.* at 268, 281.) [25]

Agent Foelsch further testified about crime scene photos showing pieces of plexiglass on the floor of 10–South near Cell Six:

> Q: Can you tell or show the judge where on [GX] 18 and 19 there are hot sauce smears on the Plexiglas shield.
>
> A: I cannot see any on Government Exhibits 18 and 19.

Q: Is it fair to say that no hot sauce was discovered on 18 and 19, correct?

A: Could you rephrase that question?

Q: I'm sorry. No hot sauce was ever discovered on the Plexiglas shield, correct?

A: I disagree with that.

Q: When was that discovered?

A: I've seen photographs that show droplets of the rust-colored liquid that was consistent with the hot sauce in the past.

Q: But they are not on—can you show us where they are on Exhibits 18 and 19?

A: No, sir, I cannot.

Q: Also I will show you 21, which is also a shot of part of the Plexiglas shield. Does it appear anywhere in that photograph, by that I mean hot sauce smears or stains?

A: I am going to Exhibit 21. On the right-hand side towards the center of the sound barriers, it looks like a piece of wood, the gray-colored piece of wood, right at the tip of it there seems to be some of the Plexiglas still attached. This is Government Exhibit 21. There appears to be some rust—I don't know if that is rust-colored or blood-colored.

Q: Okay.

A: And on Government Exhibit—if you want me—on Government Exhibit 22?

Q: Yes.

A: There seems to be one probably very small splash. Right at the edge of the white-colored weapon that had been manufactured, there seems to be a

**24.** Agent Foelsch testified that capsaicin "is the main ingredient in a hot pepper." (Tr. at 268.)

**25.** In 98–CR–1023 proceedings, the FBI Case Agent who led the investigation of Officer Pepe's stabbing testified that he did not take any samples from the pieces of the plastic shield that were carried by Specialist Jenkins and/or Lieutenant Carrino, and that nothing in his report or observations indicated hot sauce had been recovered from the pieces of plastic. (98–CR–1023 Tr. at 7909, 7917.)

white-colored splash or a rust-colored splash.

Q: On the what?

A: It's on the wood. It is on the gray wood almost right even with the white weapon.

Q: But it's not on the glass, is that fair to say? You don't see it on the glass.

A: I do not see any on the Plexiglas, no.

(*Id.* at 393–94.)

Agent Foelsch testified that on November 1, 2000, MCC personnel provided to FBI Agent Wilfred Baptiste a surveillance videotape, (GX 223), of Unit 10–South. (Tr. at 323.) After reviewing the videotape at the FBI building, Agent Baptiste informed FBI agents investigating at the MCC that the tape did not show the incidents of November 1, 2000. (*Id.* at 323.) The videotape, (GX 223), was then returned to the MCC. (Tr. at 323.) A second surveillance videotape, (GX 222, the "Stone tape"), was picked up from the MCC by FBI Agent David Stone; however this videotape was found to be of a period of time that was not relevant to the investigation. (Tr. at 324.) On November 7, 2000, Agent Foelsch again retrieved the first tape, (GX 223, the "Baptiste tape") from the MCC. (Tr. at 324.)

The Stone tape depicted video footage shot by cameras on 10–South, with rotating views of different cells and areas on 10–South. (*Id.* at 327.) Agent Foelsch testified that the Stone tape had multiple date and time stamps at the bottom of the screen, with at least one stamp superimposed over another. (*Id.*) Agent Foelsch theorized that the date and time had been incorrectly programmed on the MCC video recording device, and that the recording device had superimposed a date and time over the top of the date and time stamp imprinted by the video camera. (*Id.* at 328.) The top stamp showed that the year was 1996, and although agents at the FBI laboratory had attempted to determine the date and time printed by the camera, they were unable to do so.[26] (*Id.*)

Agent Foelsch testified that the Baptiste tape showed rotating views of the 9–South floor of the MCC,[27] and also views of the recreation rooms, attorney visiting rooms, and landings on 10–South. (*Id.* at 325.) Agent Foelsch further testified that the time and date stamp on GX 223 indicated that it had been made on October 31, 2000 at approximately ten o'clock.[28] (*Id.* at 326.) Aside from the Stone tape and the Baptiste tape, Agent Foelsch testified that he knew of no other videotapes that had been made of the events concerning the attack on Officer Pepe. (*Id.* at 329.)

Special Agent Peter Kohn was a member of an FBI team assigned to process the scene of the attack on Officer Pepe— including photographing and collecting physical evidence. (*Id.* at 585–86.) Agent Kohn testified that when he arrived at Cell Six, after the attack on Officer Pepe, the lights in Cell Six were not working; they could not be turned on with the light switch. (*Id.* at 591.) Agent Kohn testified

---

**26.** On cross-examination at the *Fatico* hearing, Agent Foelsch testified that at a prior hearing in 98–CR–1023, he had testified that the time period depicted on the Stone tape, (GX 222), was between 11 pm and 1 am. (Tr. at 360.) Although Agent Foelsch was unable to testify with certainty about what date GX 222 was made. (*Id.* at 378.)

**27.** Agent Foelsch testified that, in contrast to 10–South, 9–South of the MCC had many tiers. (Tr. at 325.)

**28.** Agent Foelsch concluded that, because there was sunlight shining through the windows in the tape, the tape had been at around ten in the morning, and not ten in the evening, on October 31, 2000. (Tr. at 326.)

that electricians from the Bureau of Prisons were called and worked inside and outside Cell Six to attempt to fix the lights. (*Id.*) When the light switch was turned on, "you could hear a fizzing electrical noise," and the lights didn't work. (*Id.* at 589.) Agent Kohn could not verify how the electrician was able to fix the lights. (*Id.* at 591.)

On these facts and on additional evidence from the *Fatico* hearing, the Government proposes a Sentencing Guideline Offense Level of 53,[29] a Criminal History Category of VI, and a Guidelines sentence of life imprisonment. (*Pimentel* letter at 3; Gov. August 16, 2002 at 2.)

## B. Defendant's Case

Defendant's explanation of the events of November 1, 2000 and the reasons for those events differ significantly from the theory offered by the Government. In a pre-hearing submission, defense counsel contested significant portions of the factual sections of the PSR, as well as the Government's characterization of his intent at the time of his attack on Officer Pepe. Among other arguments, counsel argued that the evidence did not support the conclusion that, in attacking Officer Pepe, Defendant was acting upon a plan to take hostages, that the evidence showed instead that De-

fendant was attempting to escape from the MCC. (Def. July 29, 2002 at 16–17.)

However, at the *Fatico* hearing, in lengthy testimony on direct examination, Defendant revealed that he attacked Officer Pepe to get Pepe's keys, so that Defendant could attack his attorneys, who were on 10–South at the time. (Tr. at 833.) Defendant testified that on November 1, 2000, his motivation was to attack his attorneys to make them understand there was no way for them to continue representing him, so that they would withdraw from the case. (*Id.* at 630.) Ultimately Defendant withdrew completely the explanation contained in his July 29, 2002 letter (the "escape" theory), (*Id.* at 1083), and on September 17, 2002, submitted an Amended Letter in Opposition to the PSR, which was corrected to conform to his new theory (the "attorney attack" theory.)

Defendant testified that as 98–CR–1023 developed, he became increasingly frustrated with what he perceived to be the poor quality of his legal representation, and that he was unable to obtain from Judge Sand an order appointing substitute counsel, or to convince his lawyers to quit the case.[30] (Tr. at 645–793)

According to the Defendant, a detailed outline of his legal defense strategy had

---

**29.** In addition to the Guideline Offense Level of 47 sought by the Government in its *Pimentel* letter, the Government sought post-hearing offenses level increases of: 1.) two levels pursuant to U.S.S.G. § 3B1.1(C) for the recruitment and supervision of Mohamed; 2.) a two-level enhancement pursuant to U.S.S.G. § 3C1.1 for obstruction of justice; 3.) no decrease for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. In addition, the Government argued that if the Court believed Defendant's intent in attacking Officer Pepe on November 1, 2000 was to allow him to attack his attorneys, an upward departure pursuant to U.S.S.G. §§ 2A2.1 and 5K2.0 would be warranted, because Defendant "created a substantial risk of death or serious

bodily injury to more than one person." (September 12, 2002 letter; Tr. at 983–1077.)

**30.** Defendant's troubles with his attorneys allegedly began shortly after his extradition from Germany to the United States for the 98–CR–1023 proceedings. He said he felt well-represented by German lawyers while being held in Germany, and had wanted to maintain contact with his counsel there after he was extradited to the United States. However, Defendant testified that, after he was extradited, and without his knowledge, his assigned U.S. counsel allegedly had rebuffed the German lawyers' attempts to contact him. (Tr. 647–649.)

been intercepted by the U.S. Government and turned over to the prosecution because his U.S. lawyers had failed to assert that the papers were privileged.[31] (*Id.* at 657–60.) Defendant catalogued numerous other sources of his frustration, including two allegedly botched attempts at investigating and interviewing potential witnesses in London and Germany, and a filing deadline in 98–CR–1023 that his counsel had failed to meet. (*Id.* at 677–80.)

Defendant testified that he wrote a letter, dated February 22,[32] (GX 4), to Judge Sand, complaining about his representation by Paul McAllister, and requesting substitute counsel. (GX 4.) In the letter, Defendant stated:

> For the last 14 months my lawyer Mr. Paul J. McAllister failed to solve my sufferings & my problems with FBI, Pros., & Prison. The most important thing, he also failed to handle my case properly. I continued delaying writing this letter to your honour, hoping that he will improve his performance. yet, I didn't see any progress It became almost impossible to work together. So, I decided to kindly request to substitute him as soon as possible since the time is becoming closer to trial.

(GX 4, errors and omissions in original.)

Defendant testified that Judge Sand held a hearing regarding this letter, but did not grant Defendant's application for a new attorney. (Tr. at 676.) Defendant tes-

tified that Judge Sand advised him it was up to Defendant to solve his problems with his attorneys. (*Id.*)

Defendant testified that GX 80, a map of Manhattan drawn in pencil on a scrap of a newspaper weather map, had been drawn by Defendant in the summer of 1999,[33] and that at the time Defendant had considered escaping the MCC and going to the United Nations building in New York City to seek refugee status. (*Id.* at 665; 667.) Defendant testified that by November 1, 2000, he had abandoned this plan. (*Id.* at 667.)

In late May to June of 2000, Defendant was housed with Mohamed Sadeek Odeh, a co-defendant in 98–CR–1023. (*Id.* at 684.) Defendant testified that at that time Odeh was, like Defendant, also unhappy with his own attorneys, and had allegedly written the block-letter portions of GX 75.[34] (*Id.*) Defendant testified that he wrote the portions written in script. (*Id.*) Defendant said that the notes were "merely some thoughts," that he thought the note had been destroyed, and that because the note was a draft—with misspellings and corrections—it would have been unsuitable for real hostage negotiations. (*Id.* at 690.)

Defendant also testified that although he had planned to take lawyers hostage at one time, and that the ransom note, (GX 75), referred to lawyers, the "lawyers" referred to in GX 75 were any lawyers on 10–South who were *not* representing any co-defendants. (Tr. at 962.) Defendant

---

**31.** Defendant was further upset that, despite his repeated requests, his U.S. lawyers had failed to try to secure Defendant's important religious possessions, including his watch and his Koran. (Tr. at 653.)

**32.** The date on GX 4 does not indicate a year.

**33.** Defendant moved into evidence DX AA, which Agent Foelsch confirmed was an enlargement of the backside of GX 80. (Tr. at 605.) Later, Defendant also moved into evidence a photocopy from the archives of the

Daily News, with text identical to that printed on DX AA. The text was dated June 1999. (*Id.* at 662.) Corroborating Defendant's claim that he drew on the weather map, (GX 80), in 1999, (*Id.*), text on DX BB referred to the date "1999" in an advertisement for a luncheon. (*Id.* at 663.)

**34.** The note was handwritten in two different scripts; one script was in block letters; the other was in "cursive," connected letters.

said that, for religious reasons it was not possible for him to take hostage any of those lawyers, "[i]n Islam it is not permissible for me to attack any lawyer as long as he represents me or representing someone sitting with me in the same room. That would be infidelity in Islam." (*Id.*)

Defendant testified that he was rotated into a cell with Wadih El–Hage, another of the 98–CR–1023 co-defendants in August 2000. (*Id.* at 692.) However, shortly thereafter, he was sanctioned and was moved into Cell Four, an individual cell.[35] (*Id.* at 693.)

Defendant testified that while he was confined in Cell Four, he wrote the notes and lists, (GX 76–79), that were discovered by Agent Foelsch. (Tr. at 695–97.) Defendant provided explanations of and corrections to the meanings of numerous entries and list items: An entry on GX 76 referred to "woman"—Defendant explained that this meant if hostages were taken, none among them should be a woman. (*Id.* at 711–12); "Jabara" on GX 76 was a reference to a children's story that Defendant had written to himself with reference to his own children, (*Id.* at 717), and said it also meant "bear"; "Abu Dhar" on GX 77 was a reference to a guard on 10–South who had a bad back, (*Id.* at 732); "closing window on 3/2" on GX 79 was a notation that Defendant would need to cover the windows of the cell doors where inmates not involved in 98–CR–1023 were held, so that they could not see what was going on. (*Id.* at 735–36.) Defendant also testified that during his confinement in Cell Four he began fashioning knives from a comb (GX 100), and a hairbrush, (GX 125), by scraping them on the bottom of a cement bed in Cell Four. (Tr. at 740.)

Defendant explained that, while in Cell Four, he thought carefully and concluded that the only way a hostage-taking plan could take place would be if all five 98–CR–1023 defendants were outside of their cells. (*Id.* at 967.) Defendant testified that an entry on GX 76, that was translated as "Scenario [U/I]" was written in Arabic to mean "Scenario of the lawyers," and that the next entry, translated to read "[crossed out] Scenario after [U/I] roof" was written in Arabic as "second scenario after the return from the roof." (*Id.* at 966.) Defendant testified he had written these two entries on finding that there were two situations in which all five co-defendants would be out of their cells. (*Id.* at 967.) First, once a week at five in the morning, the five co-defendants were taken to the roof of the MCC, and although handcuffed, might be able to overpower the one or two guard(s) that accompanied them. (*Id.*) Defendant said he crossed out "after the return" from the "roof scenario" entry because he realized that the five co-defendants could attack a guard either on the way to the roof, or on their return from the roof. (*Id.*) Defendant testified that the second possible situation in which all five co-defendants would be out of their cells was when they and their attorneys met together in one of the recreation rooms on 10–South. (*Id.* at 968.) Defendant testified that after the meetings concluded and the lawyers had left, all five defendants would be in the recreation room together, and a guard would come to take them back to their cells. (*Id.* at 968–69.) At that point, the co-defendants could overpower the guard.[36]

---

**35.** Defendant was sanctioned for an angry outburst in response to a strip-search that Defendant felt had been "impolite." (Tr. at 692.)

**36.** Defendant testified that he planned that the first person to come out would be El–Hage, because El–Hage had a damaged arm, and so if the guard was able to handcuff him before the other four co-defendants attacked

On September 12, 2000, Defendant was moved out of Cell Four and into Cell Six with Mohamed Sadeek Odeh. (*Id.* at 747.) Defendant testified that while confined with Odeh, he asked Odeh to assist with the plan to take over the MCC. (*Id.* at 748.) According to Defendant, the discussion with Odeh about his plan proceeded over two to four days. (*Id.* at 768.) Defendant testified that Odeh was unwilling to help him, unlike in May to June 2000, when Defendant said he and Odeh had drafted GX 75 (the ransom note.) (*Id.* at 748–55.) Defendant testified that this time Odeh was so forceful in his opposition to Defendant's plan that Odeh convinced Defendant that the hostage-taking plan had no chance of success. (*Id.* at 755.)

Defendant testified that when he first began to speak to Odeh about the hostage-taking plan, Odeh cautioned him that "you have to understand that now you are in America and not in the remote parts of Africa," that the security in American prisons was "much stricter than you think," and that even if Defendant were able to take hostages and lock all the doors in the MCC, "there will be forces that will surround this building with laser weapons" and "they would come and attack you with gas through the ventilation that is here so that everybody on the floor would be asleep because of it." (*Id.* at 748–49.)

Defendant testified that he told Odeh that he planned to get the help of the rest of the co-defendants, and that he was asking Odeh to join him in the plan. (*Id.* at 749.) According to Defendant, Odeh agreed to hypothesize that Defendant would be able to lock all the doors to the MCC and fully restrain all the hostages and then asked Defendant what the next step would be. (*Id.* at 751.) Defendant testified "I told him that is it. We have finished with what we wanted. We would

the guard, he would "lose only one hand."

call them, I said, and we will ask them to release us," and if they didn't respond, "we would threaten to harm the hostages." (*Id.*) Defendant testified that Odeh then asked "who would be released, to which Defendant responded, "I." (*Id.*) Defendant testified:

> And he said, No. Why not me? I said, Okay. You and I. He said, Then who would be restricting the hostages? I said, The rest of our brethren. Friends. He asked me, you think they will agree with that after all this trouble that they would agree that you and I would leave the prison and they would stay back? But anyway, he said, Let me suppose with you something that is one of your best wishes. I will give up leaving. You go by yourself. He said, Let's suppose now that us four love you so much and we are ready to sacrifice our lives for you so that you can leave. And he said, Okay. Now you are ready to leave? I said yes. So he said, Now tell me, how are you going to get out and how are you going to escape?

(*Id.*)

Defendant testified he replied that he would leave the other co-defendants to "do what you have to do," but that Odeh asked "how do we know what happened to you?" (*Id.*) Defendant said he told Odeh he would communicate with him by walkie-talkie, but Odeh reminded him a walkie-talkie had a limited range—and so Defendant told him that instead he would take one of the hostages with him to use as protection. (*Id.* at 752.) Defendant testified:

> He said, Do you know that there are rifles? He said that these rifles work by laser. He said, do you know that if you want, they can make a hole in the bottom part of your ear so that they can really aim at that bottom of the ear and

(Tr. at 968.)

make a hole in it? You will find out that you will be gone only a few steps and the matter will be over. But he said, Let me again suppose with you that you have gotten everything you wished for. That you would be walking, that you would be going forward, that everybody stood back not attacking you because everybody was afraid that you would harm the hostage. He asked me, Now where would you go with this man that is going with you?

(*Id.* at 753.)

Defendant said he told Odeh that he would return to his wife and children in Sudan. Defendant testified:

He said, how will you go, on foot? I said, No. I will demand of them to get me there or I will harm the hostage. And he said, The plane then would be ready to leave at your request and at the time you request it. I said, They will need a little bit of time, but if they delay I will threaten them. He said, You don't have to threaten them. The plane is ready to take off.

(*Id.*)

Defendant testified that Odeh reminded him that he had only one hostage, and while getting onto the plane he might be vulnerable to attack from the opposite direction, and then said:

But they are good people. Let's suppose they will let you go, they will not harm you, and they will not take any measures because you only have one person. . . . Now not only you have only one person, they will be giving you a plane and they will be giving you a pilot.

(*Id.*)

Defendant testified that Odeh reminded him that the flight to Sudan might be twenty hours long, and that during this time, Defendant would need to be at "full power, full attention," and that Defendant would be unable to eat or sleep or use the bathroom because he would be guarding the hostage. (*Id.* at 754.) Defendant testified:

He asked me, Is this enough for you? Would you like me to go on discussing this with you? He said, Do you want me to discuss with you the political obstacles for you to get into any country? Will Sudan accept you and carry responsibility versus America?

(*Id.*)

Defendant said Odeh told him, "I want you to remember while you are experiencing all this that you should not forget the basics of thinking and the basics of the truth," and that Defendant should instead work toward the goal of changing his lawyers. (*Id.* at 755.) Defendant testified that after this conversation, he resolved himself to write to the judge to change his lawyers. (*Id.*) Defendant said that after this conversation, he never pursued his plan to take hostages with Odeh or any of the other co-defendants. (*Id.* at 756.)

Defendant testified that approximately one day after his conversation with Odeh, he wrote Judge Sand a letter, requesting appointment of substitute counsel. (*Id.* at 756–57; GX 5.) In a letter dated September 23,[37] (GX 5), Defendant wrote that "the time of trial is very close and my lawyers are not and will never be ready to work properly. I don't have a single drop of hope with them," and again requested substitution of counsel. (GX 5, *errors and omissions in original*; Tr. at 758.) In a letter dated October 2,[38] (GX 6), Defendant thanked Judge Sand for listening to some of Defendant's problems with his attorneys, stated that he had been unable to

---

**37.** No year appears on GX 5.

**38.** No year appears on GX 6.

disclose fully the problems he was having because Defendant wanted him "to keep neutral," and requested that Judge Sand allow him to be heard before another judge about the specific problems he was having. (GX 6, Tr. at 758.) Judge Sand referred this to Magistrate Judge Eaton.

Defendant testified that on October 6, 2000, when Paul McAllister, one of his attorneys, came to visit him, he told McAllister it would be the last day of the representation and McAllister should not visit him anymore. (Tr. at 760.)

In a letter dated October 11, 2000, (GX 7), Defendant wrote to Judge Sand, first detailing his prior requests for substitute counsel, and declaring:

To plea guilty is the same or even much better to continue with unqualified counsel. In hearing oct.2 it seemed to me that whatsoever I will proof his shortcoming the Court wishes to deny my request any way. That is why I stopped explaining more detail about how it is very very very important to subsitute counsel. I understood that another judge may have more enough time to hear from me. So, on OCT 2, immediately after returning back from hearing, I wrote you Honor asking to refer me to another judge to follow up the case and to recommend subsituting of counsel.

(GX 7 at 1, *errors and omissions in original.*)

Further along in the October 11, 2000 letter, Defendant stated that his attorneys were "NOT representing me ANYMORE." (*Id.* at 2, *errors and omissions in original.*) Defendant wrote that when Adler and McAllister attempted to meet with him, he told them he did not want any visits from them until he received substitute counsel. (*Id.* at 2.) Defendant wrote,

I affirm again and again that my Ex-counsel are not *representing* me *ANYMORE.* I can not represent myself for many reasons. So only two possible ways remain for the Court: Either to subsitute my Ex-counsel OR to leave me without representation. If the court wishes, and I do not think so, to force me continue with my Ex-counsel. Then, I am ready to Plea Guilty.

(*Id.* at 2, *errors and omissions in original.*)

In the October 11, 2000 letter, Defendant also wrote specifically about the upcoming suppression motion hearing:

. . . my Ex-counsel, as they always do, left everything to the last moment. They didn't prepare anything for Hearing Oct, 18. I have very good potential witnesses for suppression motion, yet Ex-counsel did not help me to bring them. They refused for 3 months to visit Germany. Thier investigator there is doing nothing. Yet, court insist for hearing even:

1. I have no representation (Since I released counsel & I refuse them absolutely.) They are equal to Guilty Plea.

2. I am deprived from bringing my witnesses. I am deprived from preparing for this hearing. If Court is doing that to force me to withdraw my suppression motion, I am ready to obey. I am a foreigner, Court is strong and can convict any one. . . . If after all, court still intend to run hearing on OCT 18 even I refuse my Ex-counsel, please let me not attend this Hearing and Ex-counsel are NOT my representation."

(*Id.* at 3, *errors and omissions in original;* Tr. at 759.)

In a letter dated October 13, 2000, Defendant notified Judge Sand that:

Yesterday, THU OCT 12, 2000, My Ex-counsel: Mr. Charles Adler and Mr. George Goltzer came to MCC trying to meet me. Since they are no longer rep-

resent me since OCT 6, 2000, so I refused to meet them.

(GX 8, *errors and omissions in original.*)

Defendant testified that in the letter, he stated that "The court forced me to have these lawyers represent me despite my full objection." [39] (Tr. at 838–39.) Defendant also enclosed with his October 13, 2000, letter two additional letters he had written in Arabic, as affirmations for two facts regarding his lawyers and the hearing on October 18. (GX 8, Tr. at 765.) Defendant testified that he wrote the court in Arabic because the court had not instructed his lawyers to stop meeting him, and he thought it might have been because he wrote the prior letters in English. (Tr. at 765.)

On October 18, 2000, Defendant appeared for a suppression hearing. (*Id.* at 769.) Defendant testified that he was surprised to see Adler and McAllister at the hearing, and that during the hearing, Defendant stood up "many times" to state that Charles Adler and Paul McAllister were not his lawyers, that he was unrepresented, that he wanted to represent himself, and that he wanted to cross-examine witnesses himself. (*Id.* at 769, 947.)

On October 25, 2000, Defendant was moved into Cell Six with Khalfan Khamis Mohamed. (*Id.* at 771, GX 250A, 250B.) Defendant testified that the next day, at a hearing before Magistrate Judge Eaton he argued for appointment of substitute counsel, progressing to the point of insulting them. (Tr. at 773.) Defendant testified:

I even said to Magistrate Eaton, What are these individuals waiting for? Are they waiting until I physically assault them? I didn't say physically, but I said assault. I meant would that be the only way for them to stop representing me? I insulted them saying that they were the worst attorneys. I said that they were fallible from head to toe. I said that I didn't have the least amount of hope that they could help and that I would certainly be found guilty with them.

(*Id.* at 773.)

Defendant testified that, at the hearing he told Judge Eaton twice that his lawyers went from failure to failure, that he didn't trust his lawyers, that they were the worst lawyers, and that his position was comparable to drinking poison. (*Id.* at 773–74.) Defendant testified that by the end of the hearing he had the impression that Judge Eaton would likely not rule in his favor, (*Id.* at 625, 774): "He did not make a final decision, but I had the impression, and it seemed to me that mostly he was not going to grant my request to change lawyers." (*Id.* at 625.)

A commissary request form from October 26, 2000, [40] DX KK, showed Defendant requested five bottles of hot sauce from the commissary and received two. (DX KK, Tr. at 779.) Defendant also requested

---

**39.** On cross-examination, the Government questioned Defendant about the October 13, 2000 letter:

Q: In that letter, you said to Judge Sand, "The court forced me to have the lawyers represent me despite my full objection." Isn't that what you told Judge Sand?
A: If that's written so that must be what I had said. I don't have the text in front of me.
(Tr. at 838–39.)

**40.** Defendant testified that while at the MCC, he requested items from the MCC Commissary using forms like DX KK, and that although an inmate would request items, the inmate would not always receive all items that were requested. (Tr. at 775.) The request form was dated "10/99;" however, Defendant stated that the actual date of the request was October 26, 2000. (*Id.* at 775–76.) The Government does not dispute this. (*Id.* at 778.)

five honey bears but received none on that day. (Tr. at 779.) Defendant testified that on October 27, after the hearing before Judge Eaton, his attorneys came to meet with him, but that he refused to meet with them because he was waiting for a written decision from Judge Eaton. (*Id.* at 785, 948.)

In a letter written in Arabic,[41] dated October 27, 2000, Defendant wrote that "Yesterday, Thursday 27 of October I was taken to the court before a judge for the purpose of changing the lawyers . . ." (GX 9T–1.) Defendant wrote:

It appeared to me that the judge had in-advance instructions from a source which I can't specify. He had instructions or orders not to change the lawyers. Therefore, he didn't grant me sufficient time to explain the problem and he spent most of the time on giving advises I had previously heard from others. My need to change the lawyers is greater than the need for advises.

I believe that this judge refused to appoint new lawyers for me and I had informed him then that his decision was not accurate since he didn't give enough time to express my problem with the lawyers.

(*Id.*, errors and omissions in original.)

On October 30, 2000 Defendant received a letter from Magistrate Judge Eaton,[42] advising him that his request for substitute counsel had been denied. (DX EE, Tr. at 786.) Defendant testified that at this point he "lost all hope" of being able to have substitute counsel appointed and realized he had no recourse but to carry out a physical attack on his attorneys. (Tr. at 628, 786, 788.) Defendant testified:

Q: Now, on November 1st, did you agree to meet with your attorneys?

A: (In English) Yes.

Q: And what had changed in your mind between October 27th and November 1st that caused you to want to meet with your attorneys on November 1st?

A: On October 30th, in the evening hours, I received a letter from the magistrate telling me that he will not be changing the lawyers and that he will be telling Judge Sand about it. So I lost every hope to change these lawyers. I only had one recourse, to attack them physically, and in that instance they will be resigning.

Q: Well, let's just break that up a minute. When you say to attack them, did you agree to meet with your attorneys on November 1st?

A: (In English) Yes.

Q: And what was the reason you wanted to meet with them that day?

A: (In English) To attack them.

(*Id.* at 628.)

On cross examination, Defendant testified that black and white marks, apparent in a crime-scene photograph of the underside of the desk in Cell Six, (GX 41), were made by Defendant when he began sharpening the white hairbrush and black comb after he received the letter from Judge Eaton on October 30, 2000. (Tr. at 866–67.) Defendant testified he had a brief conversation on the night of October 30, 2000 with his cellmate, Khalfan Khamis Mohamed. (*Id.* at 788.) Defendant testified that Mohamed "saw how sad [Defendant] looked" after reading the letter from Magistrate Judge Eaton, and that Defendant told Mohamed "[t]here was no hope

---

**41.** A translation of the October 27, 2000 letter was earlier admitted into evidence as GX 9T–1. (Tr. at 478.)

**42.** A photocopy of an envelope, with Magistrate Judge Eaton's return address and postmarked October 27, 2000, (DX EE), was admitted into evidence.

whatsoever left about the possibility of changing the lawyer." (*Id.*) Defendant testified that "[o]n October 30 there was not a long discussion, but I gave like an idea to Mohamed of my plan to assault the lawyers and why I wanted to assault; my desire, not the plan." (*Id.* at 794.) Defendant also testified about how he was able to convince Mohamed to help him:

Q: Did you have any further discussion that night with Mr. Mohamed, yes or no?

A: (In English) Briefly, yes.

Q: What did you say to him and what did he say to you?

A: I told him, Mohamed, you have made a big mistake in your life, because he had admitted to participation in the explosion. And I told him by doing so innocent people died. But then by his admission, the number of victims in-

creased because innocent people were arrested as well.

(*Id.* at 789.)

Defendant testified that in this conversation, Mohamed agreed "in general" to help Defendant. (*Id.* at 795.)

According to the Defendant, on the next day, October 31, 2000, he had another conversation with Mohamed. (*Id.* at 794.) Defendant testified that in that conversation, Mohamed "said that he would be ready to help me so that I can get rid of my lawyers and go back to my children, but he couldn't help me with a lot because his situation in [his] case is critical." (*Id.* at 794–95.)

Defendant testified that to convince Mohamed to help Defendant in his plan to get the keys from Officer Pepe, Defendant appealed to Mohamed's religious duty to correct his "sin" against Defendant.[43] (*Id.* at 828–30.) Defendant testified that he

---

**43.** From the *Fatico* hearing:

Q: Mr. Salim, in your conversations with Mr. Mohamed, you had conversations about religious duties, correct?

A: (In English) Yes.

Q: You had discussions with him about religious duties to try to correct sins, correct?

A: (In English) Correct.

Q: Certain religious duties cannot be corrected because they are impossible to correct, correct?

THE COURT: I don't understand the question, Mr. Lind. I think you said certain religious duties cannot be corrected because they are impossible to correct.

MR. LIND: You're absolutely right. Let me try again.

Q: There are certain sins that are virtually impossible to correct?

A: In this lifetime, yes.

Q: Such as if someone kills another person, or persons are murdered as a result of certain acts, that cannot be corrected?

A: It cannot be corrected in the sense that once a person dies, he cannot be brought back to life.

Q: You brought that up in your discussions with Mr. Mohamed, correct?

A: (In English) Yes.

Q: But there are other sins that possibly can be corrected?

A: (In English) Yes.

Q: Is it fair to say in your discussions about taking keys from an officer, you brought up with Mr. Mohamed about a sin that could possibly be corrected, correct?

A: (In English) Yes.

Q: Such as helping someone such as you, right?

A: (In English) Yes.

Q: Is it fair to say that this is the matter that you discussed with Mr. Mohamed in order to convince him to help you in your plan to take—well in the attempt to take keys from that officer?

A: Yes. Because I was in prison as a result of his fault.

Q: And you tried to make him—is it fair to say it's your opinion that that was the reason he was willing to help you because it would be a way for him to expiate a sin?

A: Yes, his sin against me.

(Tr. at 828–830.)

told Mohamed it was possible for Mohamed to correct a sin, which had resulted in Defendant being imprisoned, and that the way for Mohamed to correct the sin was to help Defendant. (*Id.*)

On November 1, 2000, Officer Pepe came to Defendant's cell to tell him his attorneys had come to meet with him. (*Id.* at 795.) Defendant testified that he had been asleep, and Officer Pepe woke him up. (*Id.*) Defendant told Officer Pepe to tell his attorneys he needed to think, and began to pray. (*Id.*)

Defendant testified that, prior to November 1, 2000, when he met with his attorneys, the meetings rarely took place in the attorney-inmate rooms on 10–South, that they usually took place in one of the recreation rooms, and that his meetings with his attorneys were always contact visits. (*Id.* at 871.) But this time, when Officer Pepe returned to ask again if Defendant wanted to meet the attorneys, Defendant said he needed to use a computer.[44] (*Id.* at 796.) Defendant testified that Officer Pepe, who knew that Defendant was "in a dispute with the lawyer," then asked whether Defendant was against the attorneys "being in the room next to you?" (*Id.* at 795–96.) Defendant testified "I told him, No as they wish, I'm going to the computer." (*Id.* at 796.) Officer Pepe

then left Defendant in Cell Six to get ready for the meeting. (*Id.*)

Defendant testified that he agreed to meet his attorneys on November 1, 2000 because he wanted to attack them. (*Id.* at 628.) At this point, while Officer Pepe was away from Cell Six, Defendant told Mohamed he intended to attack his attorneys, and that he needed Mohamed's help, but that Mohamed's only role would be to get Officer Pepe's key. (*Id.* at 796–97.) Defendant told Mohamed that, if no other officers were on the floor of the MCC, he would return to Cell Six to get the knives—and at this point, Mohamed should help him get the keys from Officer Pepe. (*Id.* at 798.) Defendant told Mohamed that if Mohamed heard Defendant singing as he returned to Cell Six, Mohamed should wet toilet paper, place it over the lens of the video camera in Cell Six and, if Officer Pepe entered the cell, grab Pepe's walkie-talkie and stand ready in case Defendant needed help getting the keys from Officer Pepe. (*Id.*) Defendant testified that he told Mohamed that aside from these tasks, Mohamed would have no other role. (*Id.* at 797.)

When Officer Pepe returned to Cell Six, he took Defendant to meet with his attorneys. (*Id.* at 799.) Defendant testified

---

44. Defendant testified:

A: I was thinking, should I assault the lawyers today or not? And before I took the decision, the officer came back again. He said, Adler is here too. When he told me that the second one came, I said, that's it, since everybody is here today, I said to myself and not to the guard. Do you want to go out and meet them, he said. I said, I want to go to the computer. He asked me, Are you against them being in the room next to you? I said, I told him, No as they wish, I'm going to the computer. In truth, that was my goal, because since October 6, I had fired them. So if I went out with the intention to meet with them, and then the occasion would not be opportune for me to

assault them, they would take that as an indication that I am meeting with them and therefore that means I have negated all my oppositions in the past. I wanted to remain in my position that they are not my lawyers, but for me not to miss the chance, I wanted to show that I wanted to meet with them, and still I would be in a position where it could be said that I did not meet with them. That is why I said, I am going to the computer and I was not—I was not with them in the same room. This all was—all this was a dialogue with myself. And with that I told Pepe, give me a few minutes so that I can get ready. So he left so that I would get ready.

(Tr. at 795–96.)

that before leaving he gathered up a number of papers, an Arabic dictionary, and a legal dictionary, so that Officer Pepe, seeing that Defendant's hands were full, would be less likely to handcuff Defendant. (*Id.*) Officer Pepe walked in front of Defendant, and carried Defendant's books and papers. (*Id.*) As Defendant and Officer Pepe walked toward the attorney-inmate visit room, Defendant noticed that Lieutenant Carrino was not in his office. (*Id.*) As Defendant and Officer Pepe passed the 10–South Property Room, Defendant spoke to the Property Officer, who said he was unable to provide Defendant with certain boxes of legal materials, because the officer was leaving shortly. (*Id.* at 800.) Defendant testified that he understood from this conversation that, once the Property Officer left, Officer Pepe would be the only guard on the floor. (*Id.*)

When Defendant arrived in the attorney-inmate visit room, he did not greet either of his attorneys, and remained standing. (*Id.* at 801.) Defendant testified that he remained standing so that he could see the video monitors, which showed views of all the cells on the floor, and which were positioned near the attorney-inmate visit room in which Defendant and his attorneys were meeting. (*Id.*) Defendant testified that, once in the visit room, he told his attorneys they were useless to him, and while fiddling with the computer, said that even their computer discs didn't work.[45] (*Id.* at 801–02.) Because he remained standing while in the room, Defendant could see the video monitors at the guard station, and when he saw that the Property Officer had left the floor he called to Officer Pepe to say that he needed to go back to Cell Six to get other materials. (*Id.* at 802.)

Officer Pepe asked whether Defendant was finished with the meeting; Defendant responded that he needed to get some things from his room. (*Id.*) Defendant handed some of his books and papers through a slot in the door to Officer Pepe to carry. (*Id.*) Officer Pepe put the books down on a counter, and while he was doing so, Defendant removed his jumpsuit.[46] (*Id.*) Defendant then walked toward Cell Six with Pepe. (*Id.*) Defendant testified that as he walked away from the attorney-inmate room, he saw on the video monitor that Khalfan Khamis Mohamed was praying in Cell Six. (*Id.* at 803.) Defendant said he realized he couldn't go immediately to Cell Six, and so stopped in the doorway to the recreation room to speak with El–Hage, who was meeting with his lawyers in the recreation room. (*Id.*) Defendant said he spoke with El–Hage and his lawyers for "maybe two minutes," until Officer Pepe told him to go. (*Id.*) As Defendant walked

---

**45.** Defendant testified:

... As I was putting in the CD, Adler asked me, he said, Why are you angry? I said, I was angry for your work that is not useful, your bad work. Even the CD doesn't work. I will solve you the problem, give me the number of the CD. Now you want to solve my problems I said?

(Tr. at 801.)

**46.** Defendant explained why he removed his jumpsuit:

From my experience with the guards, it's not only Pepe, if I have a lot of stuff, sometimes he decides not to handcuff me so that I can carry my stuff, and because I was telling him that I need to go bring some stuff and come back, if he is going to put the handcuffs on me, he has to start with me there. I mean, he would put the handcuffs there at this point, and I would go up to this room. Then he would lock the door. Then he would unlock the handcuffs and I would take my stuff and then he would cuff me again and he would come back and unlock the handcuffs again. So this is approximately four times. So I thought that if he saw my hands occupied, he would let me without handcuffs.

(Tr. at 802–03.)

back to Cell Six from the recreation room, he began singing. (*Id.* at 804.)

On arriving at and entering Cell Six, Officer Pepe bent over to put down the papers he was carrying for Defendant; at this point Mohamed grabbed Pepe's walkie-talkie. (*Id.*) When Officer Pepe turned toward Mohamed, Defendant struck him from behind on the legs, and Officer Pepe fell but then quickly got back up. (*Id.* at 805.) Defendant then sprayed hot sauce into Officer Pepe's eyes, and knocked Pepe down again. (*Id.*) Defendant attempted to grab Officer Pepe's keys, but Officer Pepe was lying on them. (*Id.*) Defendant asked Mohamed to help him turn Pepe over, but Officer Pepe struggled against them, kicking out at Defendant. (*Id.*) At this point, Defendant testified he "became crazy" and took the sharpened comb-knife (GX 100) and stabbed Officer Pepe directly in the eye. (Tr. at 805.) Defendant further testified:

> [Officer Pepe] yelled, "Finish, I will give you the key, I will give you the key."
>
> Khalfan [Khamis Mohamed] was taken aback, what I had done. He left me and fled. He did not want to stay in the cell because he was holding the guard so that I could take the key. And I had told him, I want you to help me to get the key. But I had done differently than what I had told him.
>
> When he left, I knew that I had made a mistake. But I still wanted to continue. I still wanted to get to the lawyers. Before I left, I thought that I had to do a few things before I went out. The first thing is—the first thing he would do, he would try to call some other people. Because I knew that he was not dead. I was able to speak to him and he spoke back to me. And in order for me to make sure that he would not run after me, I had to handcuff him. So I took

the handcuffs from him and I put it on I think, only God knows, in his left arm.

(*Id.* at 805–06.)

When Defendant attempted to fully handcuff Officer Pepe, Pepe began kicking again. (*Id.* at 806.) Defendant testified:

> [Officer Pepe] said, "I want to get up." And I told him, "You do not get up from where you are. Do not move. You will stay in your spot." And he agreed because he was in a weak position.

(*Id.*)

Defendant took the keys off Pepe's belt. (*Id.*) Defendant then noticed that the toilet paper had slipped off the video camera; he wet some more toilet paper and put it over the camera. (*Id.*) He then picked up Officer Pepe's walkie-talkie and separated the battery unit from the walkie-talkie. (*Id.* at 807.) He tested the three keys on Pepe's key ring on the door to Cell Six, and having found the master key, left the other two keys in Cell Six. (*Id.*) Defendant testified he locked Cell Six from the outside, with Officer Pepe trapped within. (*Id.* at 808.) Defendant testified he took the sharpened brush, tied it to his hand with a plastic rope, and walked toward the attorney-inmate room, where his attorneys were still waiting for him to return. (*Id.* at 807.)

Defendant testified that, as he proceeded toward the attorney-inmate room, he reached a pillar by the entry point to 10–South, and saw people between the outer door and the inner door through the window of the inner door to 10–South. (*Id.* at 808.) At this point, Defendant thought everything was ruined, and began to walk back toward Cell Six. (*Id.*) But Defendant testified he suddenly realized MCC staff had not yet gained access to 10–South, and so Defendant turned back around to go toward the attorneys. (*Id.*) By the time he reached the entryway to 10–South, the

inner door had opened and corrections officers were entering 10–South. (*Id.*) Defendant then turned and ran back to Cell Six and re-entered the cell. (*Id.* at 809.) Mohamed was still outside Cell Six, and when Defendant looked back out of the Cell, Mohamed was being hit by the guards. (*Id.* at 809.) Defendant grabbed two more honey bears of hot sauce and ran back out, but was immediately subdued. (*Id.* at 810.)

According to Defendant, the reason he attacked Officer Pepe was to further an attack on his attorneys, because Officer Pepe had a key to the rooms where his attorneys were. (*Id.* at 833; Def. September 17, 2002 at 16–17.) Defendant testified that he did not know Officer Pepe would be the guard on duty at the time his lawyers came to visit him on November 1, 2000.[47] (Tr. at 824.)

Defendant also explained why he felt it would not have been sufficient "to just punch" his attorneys, (*Id.* at 939), in order to get them to resign. First, Defendant testified that to punch them, he would have had to have been in the same room as his attorneys during the visit, and this "would have indicated that I changed my mind and that I wished to continue to be represented by those lawyers, which is not correct." (*Id.*)[48] Second, Defendant said if he was locked in the same room as the attorneys, neither he nor the attorneys would be able to run out of the room. (*Id.*) Defendant said he knew one of his attorneys had "received training in karate and judo." (*Id.* at 939–40.) Defendant said that "starting such a fight with them would have meant that the fight would continue until I lied down in a pool of my own blood." (*Id.* at 941.) Third, Defendant testified that if he was in the same room as his attorneys and sat with them, "according to Islam," he would have entered a contract of peace with them, (*Id.* at 962), and therefore would not even be able to punch them. (*Id.* at 941.) Defendant testified that these same reasons also explained why on November 1, 2000, he agreed to meet with his attorneys in the attorney-inmate visit room, instead of in the recreation room on 10–South. (*Id.* at 942.)

Defendant denied that he pried open the junction box, (*Id.* at 770, 908), which Lieutenant Carrino had testified he had found bent open. (*Id.* at 140.) Defendant testified that he was trained as an electrical engineer (*Id.* at 632, 908) and that he had designed junction boxes like the one pictured outside Cell Six, (*Id.* at 908), and he testified at length as to the function of

---

**47.** At the *Fatico* hearing, Defendant testified on direct examination:

Q: Did you know at the time that the officer from whom you were trying to take the keys would be Officer Pepe?
A: (In English) No.
Q: Why was that?
A: Because I did not know in advance when my attorneys would be visiting me. I didn't know whose shift it would be.

(Tr. at 824.)

**48.** Defendant testified earlier that he did not want to meet in the recreation room for a contact visit, because he did not want to give the attorneys the mistaken impression that he wanted them to continue representing him:

Q: Is it your testimony that you didn't want to sit in the same room with your attorneys because you thought that they would think you then wanted to have them continue representing you?
A: Yes. I did not want to do anything that would indicate a change in my opinion.
Q: But you were planning on attacking them when you met with them on November 1, 2000, correct?
A: If I could, yes. And if I couldn't, well, I would have waited for another opportunity.

(Tr. at 885.)

junction boxes (*Id.* at 633–34.)[49]

Defendant testified "I know what is in the junction box like everyone know what is in his pocket," (*Id.* at 908), and stated

> If I had five days, I would not open that junction box. This box has only rerouting for the wires. And I don't have a screwdriver, and I wouldn't be that stupid because the key that I have, to use that key to open that box, what would I do if it breaks while I am opening that box? The key would break.

(*Id.* at 909.)

Defendant testified that GX 75 was written between May and June 2000, while Defendant was confined with Odeh, (*Id.* at 684), and testified that the plan reflected in GX 75–80 was abandoned by Defendant prior to November 1, 2000. (*Id.* at 755–56.) Defendant admitted he assisted with writing GX 75, but testified that the note was written by *both* Defendant and Odeh, and that Defendant wrote portions in script, while the printed portions were written by Odeh. (*Id.* at 684.)

Defendant also provided an explanation for why, in his July 29, 2002, submission, he claimed his intent in attacking Officer Pepe was to escape the MCC, while his testimony at the September 2002 *Fatico* hearing was that his intent in attacking Officer Pepe was to get Officer Pepe's keys, to enable him to attack his attorneys. (*Id.* at 931–38.) Defendant testified that after Richard Lind, his defense counsel in these proceedings, sent the Probation Office his July 29, 2002 objections to the PSR, arguing, *inter alia*, that Defendant's intent in attacking Pepe was to escape from the MCC, Defendant informed Mr. Lind for the first time that what really had motivated the attack was Defendant's desire to assault his attorneys in 98–CR–1023. (*Id.* at 932.) Defendant testified that Mr. Lind was surprised at this and asked Defendant why he hadn't told Lind sooner. (*Id.*) According to Defendant, he had not told Lind the truth sooner for four reasons. (*Id.*)

First, Defendant testified he was happy with Mr. Lind's representation of Defendant in these proceedings. (*Id.* at 933.) Defendant testified that he was afraid Mr. Lind would resign from representing Defendant if Lind knew Defendant had tried to assault his former attorneys.[50] (*Id.*)

---

**49.** Defendant testified:

> The junction box is like a station that different wires is coming. We are, as engineer, design in our installation. For me I start when I was 12 year old, I start with electrical installation. Even before that I was 12 years old. I was making this installation even before I went to university, so it was my hobby.
>
> So, for example, now I have different lights in this court. Each lights needs wire, and the wire should go to the switch. If I try to take every wire to the switch, then I will have one, two, three, four, maybe six— if you count, then I will have 20 pipes or 30 pipes going on the roof. Would never do that.
>
> What we will do, we make the junction box at the right angles. For example, this light and this light want both to go together. I will take the pipe from this then to

> this. After that, another lines come from here. So lines come from north, another from east. I will put the junction box because it is right angle. From the junction box, I will run only one tube. So maybe ten tubes will come. I will not continue with ten tubes. No. I will stop here to make a station, then the wires will get out from the different tubes that come and will go with one tube, maybe a little bit bigger, and will come to the switch.

(Tr. at 633–34.)

**50.** Defendant testified on direct examination in response to a question from Mr. Lind:

> In other words, if I told you that I wanted to assault my defense attorney, you may think that what would stop me from assaulting you as well. And I was afraid that you would lose the motive to represent me and defend me. I thought that because of

Second, Defendant testified that he was afraid that revelation of his intention to attack his former attorneys would similarly compromise his relations with Mr. Haber, the attorney who was assigned to represent Defendant in 98–CR–1023 after Defendant attacked Officer Pepe. (*Id.*)

Third, Defendant testified that, knowing the prosecution and judge in this case were lawyers by profession, Defendant was afraid that knowledge of his intention to attack his attorneys would prevent him from getting "any sympathy" in this case.[51] (Tr. at 933–34.)

Finally, Defendant testified he was ashamed to reveal to the public that he had wanted to attack attorneys that had been appointed for him. (Tr. at 934.) At the *Fatico* hearing, Defendant said:

> When people attend this trial or read in the newspapers that Mamdouh wanted to assault the defense attorney, the attorney that was appointed to represent him and defend him, Mamdouh wanted to assault that attorney, it would be an act of shame and embarrassment for me.

(*Id.*)

In testimony at the *Fatico* hearing, Defendant testified repeatedly and at length whether his intent on November 1, 2000 was to influence or affect Judge Sand's determination on substitution of counsel for Defendant:

> Q: You expected that by attacking your attorneys, new attorneys would be appointed to represent you, correct?
>
> \* \* \* \*

the pride and the dignity that you do have, that you may resign as well. And if you decided to remain on my case, you may not perform well.
(Tr. at 933.)

**51.** Defendant testified that:
I would be standing before people in the legal field. You are a lawyer, the prosecu-

A: No, not like that. Because the problem did not stem from the judge. It did not stem from the magistrate judge. He had no problem giving me other lawyers, but the problem was the lawyers themselves, they didn't want to resign. Had they resigned, the court would get me new attorneys. And they were given the chance several times to resign if they had any pride and dignity. But it seems to me that the court was being polite and wise in its treatment to the attorneys. The court didn't want to force them to resign. He give them the opportunity to resign on their own.

Q: You wrote several letters to Judge Sand to try to convince him to give you new attorneys, correct?

A: That's correct.

\* \* \* \*

Q: You wrote those letters to Judge Sand because you knew that Judge Sand had to approve any attempt by you to change attorneys, correct?

A: Because I was aware that the judge had authority that was superior to mine and superior to the attorneys. And that if the judge so willed, he could have forced the attorneys to resign. But if the judge wanted to be polite and courteous, it would be up to them, not to me.

Q: So, by physically attacking Mr. McAllister and Mr. Adler, you believed that Judge Sand would have no

tor is a lawyer, the judge some day used to be a lawyer but now he or she is a judge, but all of them are legal experts. So I would not be getting any sympathy from any of you if I said I wanted to assault my defense attorney.
(Tr. at 933.)

choice but to appoint new lawyers for you, correct?

A: No, not like that.

Q: Well you wrote all of those letters to Judge Sand, didn't you?

A: Yes. But by doing so, I did not wish to force Sand. I did not assault Sand. But I wanted those two, when every attempt failed, to be convinced by the judge and the magistrate to realize the truth of the matter and to resign on their own. And in the meeting with those two attorneys and Judge Sand, after the incident, I believe that was on the 7th of November, until that point, they still insisted on representing me.

\* \* \* \*

Q: You asked Judge Sand to appoint new lawyers to represent you, correct?

A: (In English) Correct.

Q: And that is because you knew that Judge Sand had the power to appoint lawyers for you regardless of what your own lawyers wanted to do or not, correct?

A: (In English) Correct.

Q: And when you attacked your lawyers, you knew that you would force Judge Sand to have to appoint new lawyers to represent you?

A: No. I don't think the matter is that complicated. It's very easy. I was dealing with these two individuals with whom all the peaceful attempts failed, whether from me or from the judge. And as far as verbal insult, I had insulted them several times.

\* \* \* \*

Q: Judge Sand had denied all of your prior requests, correct?

A: Correct.

\* \* \* \*

Q: And you disagreed with his decisions, correct?

A: Well it did not please me the fact that he did not fire them.

Q: So you disagreed with his decisions, correct?

A: My approval or disapproval would not have meant anything. The judge's authority is superior to mine and to the attorneys. Whether I liked it or not, the judge was entitled to do what he wants.

(*Id.* at 835–38.)

On redirect, defense counsel questioned Defendant on his intent again:

Q: ... What was your motivation in attacking your attorneys?

A: I already answered this question several times, but I am going to answer it one more time. I wanted to assault my attorneys because that way they would be forced to resign.

Q: In your mind, who would make that decision?

A: They themselves, Paul McAllister and Adler. They would be the decision makers as far as resigning for that decision.

(*Id.* at 938.)

## C. Other Reliable Evidence

In view of the relevance and reliability of official transcripts of the proceedings in 98–CR–1023, the Court is entitled to consider the information contained therein.[52]

---

**52.** *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without

At a conference held on February 29, 2000, Judge Sand informed Paul McAllister and Charles Adler that he had received "a letter directly from Mr. Salim which relates to his relationship with counsel." (98–CR–1023 Tr. 2/29/00 at 4.) Judge Sand met with Defendant and his attorneys regarding the correspondence. (*Id.* at 125.)

On October 10, 2000, Judge Sand told Defendant's attorneys that earlier in the morning he had received a communication directly from Defendant, and that he would take up the matter with Defendant's attorneys. (98–CR–1023 Tr. 10/10/00 at 3.) While there was no further discussion of the matter in the public record of the proceedings,[53] during a recess Judge Sand met with Paul McAllister in the robing room with the court reporter. (*Id.* at 48.)

At a hearing conducted for Defendant's suppression motion on October 18–20, 2000, Defendant repeatedly interrupted proceedings to state that his attorneys were no longer representing him, that the proceeding was not legal, that he wanted to conduct cross examination of witnesses himself, and that he objected to evidence introduced by the Government. (98–CR–1023 Tr. 10/18/00 at 28–30, 31–32; 98–CR–1023 Tr. 10/19/00 at 65, 79, 96; 98–CR–1023 Tr. 10/20/00 at 189.) Judge Sand denied Defendant's requests for substitute counsel for this hearing, and attempts to proceed without counsel:[54]

> THE DEFENDANT: (In English) I think that this gentlemen that I don't—I

regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.")

**53.** Portions of the record in 98–CR–1023 remain sealed.

**54.** *See also* 98–CR–1023 Tr. 10/18/00 at 32; 98–CR–1023 Tr. 10/19/00 at 65, 79, 96; 98–CR–1023 Tr. 10/20/00 at 189.

know that I already withdraw this motion so you're wasting your time. They are wasting the money of the government for motion that I already withdrew it since 12 days, and the government -

THE COURT: Mr. Salim.

THE DEFENDANT: (In English)—the government.

THE COURT: Mr. Salim, you've written me a number of letters. I entered a number of orders, one of which I had delivered to you with respect to this. You have a mistaken understanding of what it is within your power to do and what it is within the Court's power to do. For example, you have appeared to believe that it was your right to discharge court-appointed counsel and compel the Court to appoint other counsel. You don't have that right. You obviously believe that you have the right to withdraw this motion on the grounds that you are not ready or on the grounds that you believe your attorneys are not ready. I made clear in the order to you that you do not have that motion [sic], that we're not going to delay further this hearing, which has already been once adjourned, which has occasioned the coming to the United States of important witnesses in Germany just because of your views. Now I have indicated to you in the orders that I would refer the matter to a magistrate, as you requested and that will occur for the limited purpose for which you have requested that,[55] but, Mr. Salim, this matter is

**55.** In his letter to Judge Sand (GX 6), dated October 2, Defendant wrote:

> Thank you for listening TODAY to some of my problems with my counsel "Attorneys."
>
> I was unable to talk about other very serious problems because they are related directly to some details of my case. I want to try to keep you neutral, as far as possible. That is why I couldn't talk about that di-

going to proceed, and it is going to proceed with respect to the pretrial matters, and it is going to proceed with respect to the trial. Very well, let's continue. That's all. Anything else you wish to communicate to me.

THE DEFENDANT: (In English) I want to hire a lawyer. I want to hire a lawyer. The courts prevent me to hire a lawyer.

THE COURT: Oh, I never.

THE DEFENDANT: (In English) Yeah.

THE COURT: You have never asked for a right -

THE DEFENDANT: (In English) A lawyer came up from Germany right here and the prosecutor went with my lawyer, they prevent this lawyer to see me. He came right here with a signed paper for me when I was in Germany.

THE COURT: We will take up that matter. When we adjourn today, we will take up that matter. I'm hearing this for the first time. But we'll proceed now.

THE DEFENDANT: (In English) Okay. You are proceeding for motion that I already withdrew it.

THE COURT: Very well. So as you see things this is a waste of time. So be it. Let's proceed.

(98–CR–1023 Tr. 10/18/00 at 28–30.)

At the beginning of proceedings the next day, October 19, 2000, Defendant again interrupted the hearing to protest that his lawyers were no longer representing him, and Judge Sand responded:

> rectly with you because you are the Judge of the case.
> I think it is time now to reveal those serious problems. So, please, choose me a Judge whom I can talk with him & that he will keep every thing sealed from Pos. & from your Hon. as well. then, he will give you his opinion or recommendation. I ap-

THE DEFENDANT: (In English) Excuse me, Judge, again today I affirm again that the lawyer here -

THE COURT: Mr. Salim -

THE DEFENDANT: (In English) Just I want to, not my lawyer -

THE COURT: I have now twice told you in a formal order that they are your attorneys. Let's proceed. Your position has been clearly known.

(98–CR–1023 Tr. 10/19/00 at 65.)

## II. FINDINGS OF FACT

The purpose of the *Fatico* hearing was to adduce facts sufficient to establish Defendant's intent in attacking Officer Pepe on November 1, 2000.

### A. The Government's Theory

The Government's theory of Defendant's intent on November 1, 2000 is that: 1.) the documentary evidence discovered in Cell Six by Agent Foelsch, (GX 75–80), describes a scheme to take hostages to free him and others, 2.) Defendant was acting on this scheme when he attacked Officer Pepe on November 1, 2000, and therefore that 3.) Defendant's attack on Officer Pepe on November 1, 2000 was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

#### 1. Existence of a Hostage–Taking Plan

Read together, translations of the contents of the lists and notes on GX 75–79 indeed suggest a plan to overpower a guard,[56] to use lawyers and MCC staff as

> preciate that this may approved as soon as possible, since the Hearing then the trial is very close.
> (GX 6, *errors and omissions in original.*)

**56.** *See* GX 76T–1, set forth *supra,* p. 266–67; GX 79T–1, set forth *supra,* p. 267–68; Tr. at 695–97; *see also supra,* p. 275.

hostages in order to take over 10–South,[57] and then to ransom the hostages for the release of unspecified prisoners held by the U.S. government.[58] Defendant's own testimony that he himself wrote GX 76–79 and that he helped write the ransom note,[59] (GX 75), and his detailed explanations of the meaning of different list entries and notations[60] combined with his description of his thoughts at the time he wrote the documents,[61] provide evidence beyond a preponderance for the Court to conclude that GX 75–79 reflected a hostage-taking scheme.

### 2. Conduct Consistent with GX 75–79

Comparing the specifics of the hostage-taking plan described in the notes and lists with the Defendant's admissions provides support for the conclusion that at some point Defendant intended to carry out the hostage-taking scheme described in GX 75–79.

Consistent with the list entry Defendant wrote on GX 79P–1, (Tr. at 697) which reads, "Taking things from the room ... the knives ...", two knives were found—one fashioned from a hairbrush (GX 125) and photographed at the crime scene (GX 22, Tr. at 266), and the other fashioned from a black plastic comb (GX 100) and recovered from Officer Pepe's eye. (Tr. at 330.) Defendant testified that he made the knives by sharpening the brush and comb on the underside of a concrete bunk while he was confined alone in Cell Four from August 2000 to September 2000, (*Id.* at 740), and on the underside of a concrete desk in Cell Six on the day before the attack on Officer Pepe. (*Id.* at 867.) De-

fendant attacked Officer Pepe with the comb-knife, (*Id.* at 805), and testified that he carried the hairbrush-knife (GX 125) with him after he stabbed Officer Pepe and ran toward the attorney-inmate visit room. (Tr. at 807.)

Consistent with the entry Defendant wrote referring to "the video and stopping it" on GX77P–2, (*Id.* at 696), Defendant testified that, just before leaving Cell Six to meet his attorneys on November 1, 2000, Defendant instructed Mohamed to cover the video camera in Cell Six. (*Id.* at 798.) Defendant also testified that, after attacking Officer Pepe, Defendant saw that the toilet paper Mohamed placed over the camera had slipped, and so he wet more toilet paper and re-covered the camera. (*Id.* at 806.)

Defendant also admitted he wrote on a list labeled "Duty of the Guard," (GX 77P–2), the entry, "Handling and identifying the keys, and that we want to get out." (Tr. at 696.) Consistent with this list entry, after stabbing Officer Pepe in the eye, Defendant took Pepe's keys. (*Id.* at 806–07.) Defendant testified that he tested the keys to find the master key, then threw the other two keys back in Cell Six. (*Id.* at 807.)

On GX–76P2, Defendant admitted he wrote:

— Tying one hand to the door of the [U/I][U/I] Untying the knot [U/I] leaving a note on the door stating it is open, and he is in the bathroom

(*Id.* at 696)

Consistent with these entries, after attacking Officer Pepe, Defendant attached

---

**57.** *See* GX 75, set forth *supra*, p. 266; GX 76T–2, set forth *supra*, p. 267–68; Tr. at 695–697, set forth *supra*, p. 275.

**58.** See GX 75, set forth *supra*, p. 266; GX 77T–1, set forth *supra*, pp. 268–69; GX 78T–1, set forth *supra*, p. 269.

**59.** *See* Tr. at 684, 695–97; *see also supra*, p. 275.

**60.** *See* Tr. at 711–12, 717, 732, 735–36, 966; *see also supra*, pp. 275–76.

**61.** *See* Tr. at 967–69; *see also supra*, p. 275.

one of Officer Pepe's handcuffs to Pepe's wrist. (*Id.* at 806.) Defendant explained that he attempted to handcuff Officer Pepe because he "did not want to give him the opportunity to communicate by phone or by walkie-talkie," but that he was unable to cuff both of Officer Pepe's hands. (*Id.* at 954.) Crime scene photos showed numerous pieces of plastic wrap that had been twisted into lengths of rope (GX 30, 32, 39, 40), and strips of white fabric (GX 27, 28, 39.) Defendant testified he made the plastic ropes and tore the pillowcases into strips sometime prior to November 1, 2000. (Tr. at 865.) When asked about the pieces of plastic wrap that were fashioned into ropes, Defendant explained: "Some of these ropes for me to use. But 90 percent of the ropes have nothing to do with the matter. With the case." (*Id.* at 865.) [62] However, Defendant admitted he tore up an extra pillowcase into narrow strips, and

he was going to use the narrow strips to tie up the guard. (*Id.* at 866.)

There is no evidence to support the Government's allegation that, consistent with the list entry "cutting off electricity" on GX 77P–1, Defendant pried open a junction box outside Cell Six. The Government's allegation is heavily dependent on the testimony of Lieutenant Carrino, who testified that the box had been intact when he checked it earlier in the morning of November 1, 2000, during a routine inspection of 10–South. (GX 140.) However, Lieutenant Carrino's recollection of events was consistently contradicted by the testimony of other Government witnesses. [63]

Moreover, Defendant denies that he tampered in any way with the junction box. (Tr. at 770, 908.) In fact, Defendant was trained as an electrical engineer (*Id.* at 632, 908), and testified:

> Lieutenant Carrino testified that he and Specialist Jenkins carried a plastic shield toward Cell Six immediately before they were attacked by Khalfan Khamis Mohamed, (Tr. at 127); however, Specialist Jenkins testified that he alone picked up the plastic shield. (Tr. at 86–89.) Lieutenant Carrino said that he and Jenkins pinned Mohamed up against a wall, then took him down and subdued him on the ground, (Tr. at 129–30); however, Specialist Jenkins testified that he alone pinned Mohamed to the wall, and other staff responded to help him restrain Mohamed. (Tr. at 92.) Lieutenant Carrino testified that all video recording machines on 10–South had been broken for months before November 1, 2000, although he had requested that repairs be made, (Tr. at 140–42); however, there are two tapes in evidence, (GX 222–23), one of which purports to be from October 31, 2000. (GX 223, Tr. at 326.) Lieutenant Carrino also testified that after gaining entry to 10–South, as he approached Cell Six on November 1, 2000 he did *not* see an upside-down storage bin that appears under the junction box outside Cell Six in crime-scene photographs that were taken by investigators after the attack on Officer Pepe. (Tr. at 186.)

**62.** On questioning about a specific strip of plastic wrap that was twisted into a rope (GX 164), Defendant said, "I am trying to see the end of it. I was using that as a belt if it has a ball at the end. And I would use it as a circle. If this fits my waist, then it is a belt." (Tr. at 865.)
Defendant also testified he wouldn't have been able to use the twisted plastic wrap ropes to tie people up, because the plastic wrap was too elastic, and would stretch. (Tr. at 957.)

**63.** Lieutenant Carrino testified that approximately five minutes elapsed between hearing the body alarm on 10–South and the point when corrections officers gained entry to 10–South (Tr. at 126); by contrast, Specialist Jenkins said that period of time was 15 minutes. (Tr. at 98.) Paul McAllister testified that corrections officers gained entry after a "significant amount of time," (Tr. at 501), which he estimated to be approximately 15 minutes. (Tr. at 502.) Gautam Patel, the medical assistant, testified the time that elapsed between him hearing the body alarm and reaching 10–South was 10 to 15 minutes, and the time between reaching 10–South and entering was another 7 to 10 minutes. (Tr. at 223.)

If I had five days, I would not open that junction box. This box has only rerouting for the wires. And I don't have a screwdriver, and I wouldn't be that stupid because the key that I have, to use that key to open that box, what would I do if it breaks while I am opening that box? The key would break.

(*Id.* at 909.)

The Government called no witness, expert or otherwise, to rebut Defendant's testimony that prying open the junction box would have been useless. Moreover, while the Government suggested that Defendant used the master key to try to open the junction box, (Id. at 908–09), the Government provided no forensic analysis to support this allegation.[64] The Government also provided no evidence to support the theory that Defendant used the sharpened hairbrush, (GX 125), to open the junction box.

Agent Kohn testified that, when he arrived at Cell Six after the attack on Officer Pepe, the lights in Cell Six could not be turned on with the light switch, that electricians from the Bureau of Prisons were called and worked inside and outside Cell Six to attempt to fix the lights, and that when the light switch was turned on, "you could hear a fizzing electrical noise," and the lights didn't work. (*Id.* at 589–91.) However, Agent Kohn could not explain why the lights were not working, (*Id.* at 591), and again there is no evidence, expert or otherwise, to refute Defendant's testimony that prying open the junction box would have been useless. Accordingly, the Court finds that the Government has not proven by a preponderance of the

evidence that Defendant tampered with the junction box outside Cell Six in connection with his attack on Officer Pepe on November 1, 2000.

However, some of the Defendant's testimony bolsters the Government's theory of the case. Consistent with individual notations on GX 75–79, Defendant admits that he made knives (*Id.* at 740, 867), used one of the knives to attack Officer Pepe, (*Id.* at 805), covered the video camera in Cell Six, (*Id.* at 806), attacked Officer Pepe on 10–South, (*Id.* at 805–06), took Officer Pepe's keys, (*Id.* at 807), and restrained Officer Pepe after stabbing him. (*Id.* at 806.)

3. Inconsistencies Between the Government's Theory and Defendant's Actions

The Government's theory that on November 1, 2000, Defendant was acting upon the hostage-taking scheme set forth in GX 75–79 is undermined by significant inconsistencies between the hostage-taking plan reflected in GX 75–79 and the available evidence of what actually took place that day.

The notes and list entries on GX 75–79 show that the plan reflected therein required the activity of more than one person. The ransom note is written on behalf of a plural group of "Muslims who were accused," and refers consistently to "we." (GX 75.) On GX 77P–2, as part of a numbered list, Defendant wrote: "9. Informing the bottom/lower that the path is 'clear' before going down." On GX 77P–1, Defendant wrote, "2) Informing all of the plan and its steps."[65] Portions of Defen-

---

**64.** For example, the Government provided no analysis of the key showing paint chips, or scrapes on the junction box consistent with the use of a key to pry it open.

**65.** In testimony, Defendant also explained numbers written on GX 77P–1:

So I wrote, "With Odeh 2," meaning both of us, if we agree, the two of us, the total number of individuals necessary to accomplish the job would be 6 or in fact 5. I wrote 6 because I thought we would need 6, but then I said in fact 5 because we were in fact

dant's testimony also support the conclusion that the plan detailed in the notes and lists involved more than one person; at the *Fatico* hearing, he testified he wrote a note on GX 77–P2 reflecting that all five co-defendants would be needed to carry out the plan set forth in the lists and notes. (Tr. at 731.)

The Government also acknowledges that the plan involved co-conspirators. The Government's alleges that Defendant *"and his co-conspirators* were engaged in a single course of conduct that was intended to culminate ... with ... the taking of numerous hostages on Unit 10–South," and that the plan was "formulated" and "created" by "Salim *and his co-conspirators,"* (Gov. August 16, 2002 at 33, *emphasis added.*) The Government alleges that according to this alleged plan, "Salim *and his accomplices* intended to threaten to harm the hostages in order to compel the United States to release various individuals from custody." (*Id.* at 40, *emphasis added.*) The Government further alleges that:

> ... the mere existence of a ransom note establishes that Salim's plan was to take hostages in an attempt to secure his *and his accomplices'* release from the MCC. In particular, the ransom note identifies ... the *hostage-takers.* The *hostage-takers* are the "Muslims" on the "tenth flr. in MCC" who were "accused of bombing the embassy in Africa"—in other words, Salim, *Mohamed, and their co-defendants.*

(*Id.* at 38, emphasis added.)

Yet in spite of the parties' agreement that the hostage taking plan reflected in the notes and lists, (GX 75–79), required concerted action by a number of people,

the Court finds no evidence in the record to suggest that on November 1, 2000, co-defendants in 98–CR–1023 acted together in furtherance of a hostage-taking scheme, and no evidence to show how, if a hostage-taking plan *was* in progress, any inmate other than Defendant and his cellmate could have known it.

### a. The Role of Khalfan Khamis Mohamed

The Government has neither argued, nor shown, that anyone aside from Khalfan Khamis Mohamed assisted in attacking Officer Pepe. Defendant testified that while Officer Pepe was away from Cell Six, Defendant told Mohamed he intended to attack his attorneys, and that he needed Mohamed's help, but that Mohamed's only role would be to get Officer Pepe's key. (Tr. at 796–97.) By Defendant's own admissions, Mohamed assisted him by covering the video camera, (*Id.* at 806), and by grabbing Officer Pepe's walkie talkie. (*Id.* at 804.) However, beyond Defendant's statements as to these two acts, there is little credible evidence that Mohamed assisted Defendant in any other actions that would have furthered the hostage-taking plan detailed in GX 75–79.

Defendant testified that, after Defendant stabbed Officer Pepe, Mohamed ran out of Cell Six. (*Id.* at 805.) Defendant's testimony is corroborated by evidence that indicates only one of Officer Pepe's wrists was handcuffed; had Mohamed stayed in the cell after Salim stabbed Pepe in the eye, he could have helped Defendant handcuff both of Officer Pepe's hands. Defendant testified that initially, he and Mohamed attempted to restrain Officer Pepe, but "although we were two and Khalfan is

---

5. There was no sixth person to add to us. Where would I get that sixth person? There were two other prisoners, but they had nothing to do with us.

(Tr. at 731.)

trying to hold him and I am trying to tie him up, and the time is going by, I got to make a decision that was wrong. I took the knife and I stabbed the guard." (*Id.* at 951.) Defendant testified further:

Q: Mr. Salim, after the point where Officer Pepe was stabbed, did Mr. Mohamed do anything in connection with an attack on the attorneys?

A: No. What happened actually was different than what we had agreed to. Because it was neither in his mind nor in mine nor in the agreement between us that I would reach a point where I would try to kill him. That is why when this happened he left the room.

Q: When this happened, what do you mean, when you stabbed Officer Pepe?

A: After I stabbed him, yes he went outside the room, but stayed close by the room.

(*Id.* at 952.)

Ultimately, Defendant testified he was only able to put one handcuff on Officer Pepe. (*Id.* at 806.) The Government's witnesses corroborated this with testimony that after the attack, when Officer Pepe was led out of the floor, he had a handcuff attached to one wrist. (*Id.* at 93, 134–35.) Evidently, Mohamed did not assist Defendant with handcuffing Officer Pepe after Defendant stabbed Pepe.

Specialist Jenkins testified that as he approached Defendant at Cell Six, he saw Defendant fumbling with keys, trying to enter the Cell, and that Defendant then entered Cell Six. (*Id.* at 87.) Both Carrino (*Id.* at 127) and Jenkins (*Id.* at 88) testified that, as they approached Cell Six, Mohamed was outside Cell Six. Jenkins also testified that he saw Officer Pepe and Salim inside Cell Six together when he looked up from struggling with Mohamed outside Cell Six. (*Id.* at 89.) Thus, the Government's evidence corroborates Defendant's testimony that Mohamed left Cell Six, and

that after Mohamed left Cell Six, Defendant locked the cell with Officer Pepe inside and Mohamed outside.

The Government has also failed to establish by a preponderance of the evidence that Mohamed possessed weapons after the attack on Officer Pepe. Defendant testified that after running outside Cell Six, Mohamed stood unarmed and outside Cell Six until corrections officers leapt on him. (*Id.* at 808–09.) The Government's evidence of Mohamed's actions after corrections officers gained access to 10–South is inconsistent. Specialist Jenkins testified that, after Jenkins gained entry to Unit 10–South and single-handedly approached Cell Six, Mohamed "lunged out" and began spraying at his face with a plastic honey-bear container filled with a red liquid. (*Id.* at 88–89.) Jenkins testified he used the plexiglass shield to avoid being hit by the liquid, (*Id.*), that he was hit by the liquid on "[t]he side of my body, my arm," (*Id.* at 109), and that he used the plexiglass shield to pin Mohammed to the wall. (*Id.* at 89.) Jenkins testified that he never passed the shield to Lieutenant Carrino. (*Id.* at 110.)

Lieutenant Carrino testified that "[a]s we were going down the hall, we saw in the end of the hall, an inmate come out in front of us. At that point in time Jenkins said let's pick up the shield, there is a plexiglass shield against the wall." (*Id.* at 127.) Carrino testified that, as they approached Cell Six, Mohamed was in a "crouched position," and as they came nearer, he "came up, started squirting liquid at us." (*Id.* at 129.) Carrino testified that at this point, "we took the shield; Jenkins had one end, I had the other. We went straightforward against the wall and pinned Inmate Mohammad against the wall, and the plexiglas shattered, and then we took him down to the ground." (*Id.*) However, Carrino admitted that in a post-incident report he had written that Jenkins

had handed him a plexiglass grill cover, and that at sentencing proceedings held for Khalfan Khamis Mohamed he had testified that this statement was correct. (*Id.* at 147.) Ultimately, Carrino testified that he couldn't remember whether Jenkins had handed him the shield, or whether he shared it with him. (*Id.*) Carrino also was inconsistent in his testimony as to whether Mohamed squirted red liquid on the plexiglass shield or not.[66] (*Id.* at 155–56.) Beyond these inconsistencies, Jenkins' and Carrino's testimony differ in their accounts of who was present as Mohammed allegedly began squirting them; Jenkins testified he never passed the shield to Carrino and did not mention that Carrino assisted in subduing Mohamed, (*Id.* at 110), while Carrino testified he and Jenkins subdued Mohamed together. (*Id.* at 129.)

Contradicting both officers' testimony, Agent Foelsch testified that the Government's crime scene photos showed no hot sauce on the clear, plexiglas shield in GX 18–22:

Q: Can you tell or show the judge where on [GX] 18 and 19 there are hot sauce smears on the Plexiglas shield.

A: I cannot see any on Government Exhibits 18 and 19.

Q: Is it fair to say that no hot sauce was discovered on 18 and 19, correct?

A: Could you rephrase that question?

Q: I'm sorry. No hot sauce was ever discovered on the Plexiglas shield, correct?

A: I disagree with that.

Q: When was that discovered?

A: I've seen photographs that show droplets of the rust-colored liquid that

was consistent with the hot sauce in the past.

Q: But they are not on—can you show us where they are on Exhibits 18 and 19?

A: No, sir, I cannot.

Q: Also I will show you 21, which is also a shot of part of the Plexiglas shield. Does it appear anywhere in that photograph, by that I mean hot sauce smears or stains?

A: I am going to Exhibit 21. On the right-hand side towards the center of the sound barriers, it looks like a piece of wood, the gray-colored piece of wood, right at the tip of it there seems to be some of the Plexiglas still attached. This is Government Exhibit 21. There appears to be some rust—I don't know if that is rust-colored or blood-colored.

Q: Okay.

A: And on Government Exhibit—if you want me—on Government Exhibit 22?

Q: Yes.

A: There seems to be one probably very small splash. Right at the edge of the white-colored weapon that had been manufactured, there seems to be a white-colored splash or a rust-colored splash.

Q: On the what?

A: It's on the wood. It is on the gray wood almost right even with the white weapon.

Q: But it's not on the glass, is that fair to say? You don't see it on the glass.

A: I do not see any on the Plexiglas, no.

(*Id.* at 393–94.)

In proceedings in 98–CR–1023, the FBI Case Agent who led the investigation of

---

**66.** After initially testifying that he wasn't certain if the liquid hit the plexiglass shield, (Tr. at 155.), Carrino acknowledged that, at a sentencing hearing in 98–CR–1023, he had testified that some of the liquid sprayed by Mohamed had hit the shield, and ultimately testified that it "could have" hit the plexiglass shield. (Tr. at 155–56.)

Officer Pepe's stabbing testified he did not take samples from the pieces of the plastic shield that were carried by Specialist Jenkins and/or Lieutenant Carrino, and that nothing in his report or observations indicated hot sauce had been recovered from the pieces of plastic. (98–CR–1023 Tr. at 7909, 7917.)

Under the circumstances of the events of November 1, 2000, the contradictions among the accounts of the Government's witnesses are not unexpected. Having been alerted by Officer Pepe's body alarm that Pepe might be in danger, corrections officers rushed to the scene, only to be locked outside 10–South for up to 15 minutes, unable to provide assistance or support to their comrade. Having gained entry, traumatized and concerned officers whose primary, if not only, focus was to rescue Pepe confronted first Mohamed and then Defendant, both of whom were at liberty on the maximum security floor of the MCC—with no sign of Officer Pepe. Under these stressful conditions, it is not surprising that the first-responders' recollections of what happened as they approached Cell Six are conflicting and contradicted by other record evidence.

Finally, there is evidence in the record indicating that Mohamed failed to assist Defendant with actions that Mohamed was uniquely positioned to assist with and which would have advanced a hostage-taking scheme. Defendant testified that, after Defendant stabbed Officer Pepe, Mohamed had no role at all. (Tr. at 631.) Apparently Mohamed did not unlock the doors to any of the other inmates' cells on 10–South. Specialist Jenkins testified that, after gaining entry to 10–South and proceeding toward Cell Six in pursuit of Defendant, he visually confirmed that each of the Cell doors except Cell Six was closed and locked. (*Id.* at 106–07.) Paul McAllister testified that when corrections officers entered 10–South, they "rattled each door, and that all of which appeared to be locked." (*Id.* at 503.) There is no evidence that Mohamed used the phones, which three of the Government's witnesses testified were ringing constantly, (*Id.* at 78, 101, 149, 501), to communicate demands to the MCC. And there is no evidence that Mohamed attempted to use Officer Pepe or any of lawyers on 10–South as hostages.

In sum, the evidence supports a conclusion that Mohamed left Cell Six after Defendant stabbed Officer Pepe and was locked out of Cell Six. Moreover, the Government has failed to establish by a preponderance of the evidence that Mohamed sprayed the approaching officers with hot sauce or was otherwise armed. The Government has also provided no evidence that Mohamed released other 98–CR–1023 co-defendants from their cells, and indeed there is evidence that, other than Cell Six, no other cells were unlocked. Finally, there is no evidence that Mohamed attempted to communicate demands to the MCC or otherwise further a hostage-taking scheme. Accordingly, there is insufficient evidence to establish that, after covering the video camera and grabbing Pepe's walkie-talkie, Mohamed did anything other than leave Cell Six and remain outside the cell, unarmed. In view of the foregoing, the Court has little basis for concluding that, Mohamed conspired or acted in concert with Defendant to further a hostage-taking scheme.

### b. Other 98–CR–1023 Co-defendants

The Government has produced no evidence that co-defendants other than Mohamed acted on November 1, 2000 in furtherance of a hostage-taking plan.

Co-defendant Odeh's handwriting was identified in an FBI laboratory report as one of the two scripts on GX 75. (*Id.* at

458.) However, Defendant testified, and the Government does not refute, that GX 75 was written while Defendant was confined with Odeh in May or June 2000, some five months prior to the attack on Officer Pepe. (*Id.* at 684.) Apart from GX 75, there is no evidence that any of the co-defendants, other than Odeh, were ever made aware of the other notes and lists, or that they had in any way agreed to take part in a hostage-taking plan. For example, the fingerprint report, (GX 3517–Y), showed that the documents discovered by Agent Foelsch, GX 75–80, contained no fingerprints matching any of the co-defendants. (*Id.*)

Moreover, it is apparent from the evidence that the date and time of Defendant's attack on Officer Pepe—November 1, 2000—was not of Defendant's choosing. Defendant's attorneys Charles Adler and Paul McAllister appeared on November 1, 2000 without an "appointment," and without prompting from Defendant. Paul McAllister testified:

THE COURT: ... Mr. McAllister, how did it come about that you decided to go to the MCC on November 1st?

THE WITNESS: Well, it was an ongoing thing. I had either met with or attempted to meet with Mr. Salim periodically and there wasn't anything exceptional about that date. It was just one of a number of dates that I was seeking to meet with him to prepare for trial.

THE COURT: All right. Was there any indication from Mr. Salim that he would be interested in meeting with you that day?

THE WITNESS: No, No. There wasn't any indication that he would be interested, but my colleague, Mr. Adler, and I had decided that in Mr. Salim's interest

we should certainly at least attempt to prepare for trial rather than just ignoring the fact that the trial was about to commence fairly soon.

(Tr. at 481.)

From McAllister's testimony it is evident that Defendant did not schedule a meeting with Adler and McAllister for the morning of November 1, 2000. Thus, it is not clear how Defendant could have prearranged with others the execution of a hostage-taking scheme on that particular morning. The Government has provided no evidence that, after a thorough search of each cell, any of the co-defendants possessed weapons, documents, or excessive numbers of honey-bears that would have furthered a hostage-taking plan. There is no evidence that the co-defendants had prepared to execute a hostage-taking plan on any last-minute signal.

There is no evidence that Defendant attempted to involve other co-defendants other than Mohamed once it was apparent that his lawyers were on 10–South, or that any actions were taken by the other co-defendants in furtherance of a hostage-taking plan.

The absence of evidence of actions in furtherance of a hostage-taking plan by Wadih El–Hage, who was meeting in the south recreation room with his attorneys at the time, highlights the apparent lack of knowledge of or participation in any hostage-taking scheme by the other co-defendants. Indeed, both Defendant and Paul McAllister testified that, after Officer Pepe and Defendant left the attorney-inmate room to allow Defendant to retrieve materials from Cell Six, Defendant stopped briefly to speak with El–Hage and his lawyers before he walked to Cell Six with Officer Pepe.[67] (*Id.* at 499, 803.)

---

**67.** Defendant stated that this was merely to pass time, as he knew from the video moni-

Yet there is no evidence that, during the time that Officer Pepe, the sole corrections officer on 10–South, was injured and locked in Cell Six and Defendant was roaming the corridors of 10–South with the master key, El–Hage made any attempt to attack his lawyers or otherwise assist Defendant in any hostage-taking scheme. In fact, there is no evidence or testimony that, after attacking Officer Pepe, Defendant or Mohamed attempted to contact or communicate with El–Hage or any of the other co-defendants.

Therefore, the Court finds that the Government has not established by a preponderance of the evidence that on November 1, 2000, any of the co-defendants other than Mohamed were aware that Defendant was planning to attack Officer Pepe. Furthermore, there is no evidence to establish that *any* of the co-defendants, including Mohamed, acted in furtherance of a hostage-taking scheme on November 1, 2000, or at any time.[68]

#### 4. Other Deficiencies in the Government's Case

In other ways, Defendant's own conduct on November 1, 2000 undermines the conclusion that he was attacking Officer Pepe to enable him to take hostages. After Officer Pepe was stabbed and locked in Cell Six, Defendant and his cell-mate Mohamed—both now outside the cell—were apparently free to roam 10–South with a key that provided access to the cells of all other defendants and several attorneys.

Yet there is no evidence that Defendant attempted to take as hostages his attorneys or El–Hage's attorneys, who were located in the recreation room at the time.

The Government does not dispute that, after stabbing Officer Pepe, Defendant did not attempt to use Pepe as a hostage to force the corrections officers to comply with his demands. Defendant testified, and the Government does not dispute, that once corrections officers gained access to 10–South, he made no attempt to coerce the responding corrections officers by using Officer Pepe as a hostage. (*Id.* at 972.)

The evidence shows that, while free from Cell Six after attacking Officer Pepe, Defendant and Mohamed had access to telephones. Defendant testified that, immediately after the attack on Officer Pepe the telephones were "ringing and ringing" on 10–South. (*Id.* at 807–08.) Testimony from three of the Government's witnesses corroborates Defendant's testimony on this point.[69] (*Id.* at 78, 101, 149, 501.) However, there is no evidence to suggest that Defendant answered the telephone or attempted to use the telephones to communicate demands, or to otherwise warn MCC personnel that Defendant had hostages whose safety he was threatening. The lack of evidence that Defendant and Mohamed attempted to take hostages, to contact MCC personnel, or free other co-defendants further weakens the Government's theory that Defendant attacked Of-

---

tors that Mohammed was praying in Cell 6. (Tr. at 803.)

**68.** This conclusion excludes Odeh, who Defendant testified had helped Defendant write GX 75 sometime between May and June 2000, but abandoned the scheme before November 1, 2000. (Tr. at 684, 458.)

**69.** Specialist Jenkins and Lieutenant Carrino both testified that, while they were locked

outside of 10–South, other officers attempted unsuccessfully to reach Officer Pepe by telephone. (Tr. at 78, 101, 149.) Paul McAllister testified that while he and Charles Adler were waiting for Officer Pepe and Defendant to return to the attorney-inmate visit room, "the phone on the officers' station desk began to ring and ring and ring, and Officer Pepe was not returning to answer it." (Tr. at 501.)

ficer Pepe as part of a scheme to take hostages.

The Government's theory of the case is also hamstrung by the notable lack of evidence as to what happened on 10–South on November 1, 2000 between the point when Defendant and Officer Pepe left attorneys Paul McAllister and Charles Adler in the attorney-inmate visit room, and the moment when Specialist Jenkins, having gained access to 10–South, began pursuing Defendant back toward Cell Six. The Government relies principally on documentary evidence, (GX 75–79), the testimony of corrections officers who responded to the alarm, and the testimony of FBI agents who investigated the case. But this evidence pertains to Defendant's actions before and after the most crucial period of time on November 1, 2000, and leaves unrefuted Defendant's account of what took place that day and why. Paul McAllister was present on 10–South at the time of the attack on Officer Pepe; however, McAllister was locked in one of the attorney-inmate visit rooms, (Tr. at 490), on the opposite end of 10–South from Cell Six from where Officer Pepe was attacked. (GX 10.) Absent from the record is testimony from other persons who were on 10–South when the attack on Officer Pepe took place. At the time of the attack on Officer Pepe, two other attorneys were meeting with El–Hage in one of the recreation rooms on 10–South. (Tr. at 499, 803.) The recreation room had only a wire mesh door, (Id. at 137); this presumably would have enabled people inside the recreation room to see or hear things taking place in the corridor and beyond—but they were not called by the Government to testify.

Deviations from normal MCC procedures on November 1, 2000 account for other shortcomings in the Government's evidence. Because Officer Pepe was left alone on 10–South to move Defendant from the Attorney–Inmate visit room to Cell Six, (Id. at 118), there were no corrections officers present as eyewitnesses to the attack on Officer Pepe, much less persons to assist Officer Pepe. Because videotape-recording devices on 10–South were not operational on November 1, 2000, (Id. at 140–42, 150), no videotapes of that day were available for the Government to rely upon to either confirm or refute Defendant's account of what happened on that day.

In sum, the evidence available to this Court is insufficient to support a conclusion that Defendant was acting according to the plan set forth in the notes and lists on GX 75–79. The evidence suggests Defendant was acting almost entirely by himself on November 1, 2000. There is little credible evidence that Khalfan Khamis Mohamed assisted Defendant in the attack on Officer Pepe beyond covering the video camera and grabbing Pepe's walkie-talkie. To the contrary, the evidence shows that Mohamed, who was freed from Cell Six after the attack on Officer Pepe did not free other inmates, take hostages, or make demands of MCC personnel. There is no evidence that any of the other co-defendants, including Wadih El–Hage, who by virtue of his presence in a contact-visit room with his attorneys would have been in a position to aid in a hostage-taking scheme, were armed or prepared for, or even knew about a hostage-taking scheme on 10–South on November 1, 2000. In view of the fact that the hostage-taking plan in GX 75–79 clearly contemplated concerted action by a number of participants, the dearth of evidence of actions or involvement by the other co-defendants to further a hostage-taking plan seriously undermines the Government's theory of the case. Moreover, although the only corrections officer on 10–South was seriously injured and an easy hostage mark, al-

though 10–South telephones were ringing constantly, and although Defendant was free to roam the corridors of 10–South for at least 15 minutes with Officer Pepe's master key, there is no evidence that Defendant took any steps to further a hostage taking scheme.

Because of the foregoing evidentiary deficiencies in the Government's theory of the case, the Court cannot conclude that a preponderance of the evidence shows that on November 1, 2000, Defendant was acting upon the plan detailed in GX 75–79. Accordingly, the Court rejects the Government's theory that, in attacking Officer Pepe, Defendant's intent was to affect or influence the conduct of government, or to retaliate against government conduct, by forcing the release of unspecified other persons from government custody.

### B. Defendant's Theory

■ At the *Fatico* hearing, Defendant admitted he attacked Officer Pepe to get Pepe's keys, and wanted to get the keys so he could enter the room where his attorneys were, so that he could attack them. (Tr. at 833.) Defendant testified

he wanted to attack his attorneys to force them to resign, (*Id.* at 630), even though he admitted that he knew Judge Sand, an official of government, had ultimate authority to relieve Defendant's attorneys from the case. (*Id.* at 835–36.) Defendant also admitted he knew that if, by attacking his attorneys, Defendant was successful in convincing them to resign, Judge Sand would have no choice but to relieve them from the case. (*Id.* at 840.) The Court may rely upon these admissions as a factual basis for determining Defendant's sentence.[70] Because of the "strong presumption of verity" that attaches to sworn, "[s]olemn declarations in open court," *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) (Defendant's sworn statements during plea allocution presumptively valid); *accord United States v. Maher*, 108 F.3d 1513, 1530 (2d Cir.1997), the Court is entitled to rely on these admissions as true.

While Defendant obviously is self-interested, his testimony about what happened on November 1, 2000 is not significantly contradicted by evidence offered by the Government,[71] and his explanation is also

---

**70.** *E.g. United States v. Bonilla–Montenegro*, 331 F.3d 1047, 1050 (9th Cir.2003) (admission in INS benefits application that defendant committed voluntary manslaughter supported sentence enhancement); *United States v. Saunders*, 318 F.3d 1257, 1271 (11th Cir. 2003) (facts recited by prosecution and admitted as true and correct by defendant supported finding at sentencing that defendant was in the business of selling stolen property); *United States v. Simmons*, 164 F.3d 76, 79 (2d Cir.1998) (defendant's admission at plea proceedings that he had carried a gun supported sentence enhancement); *United States v. Raposa*, 84 F.3d 502, 505 (1st Cir.1996) (signed statement by defendant, containing voluntary admission that defendant owned cocaine found in his apartment supported increase in offense level); *United States v. Medina–Estrada*, 81 F.3d 981, 986 (10th Cir.1996) (statements at plea proceedings supported enhancement of defendant's sentence); *United*

*States v. Jones*, 30 F.3d 276, 287 (2d Cir.1994) (defendant's admission to police relied on in determining sentencing); *United States v. Colon*, 961 F.2d 41, 43 (2d Cir.1992) (admissions to Probation Department were a "proper basis upon which to estimate the scope of [defendant's] sales activities"); *United States v. Brach*, 942 F.2d 141, 144 (2d Cir.1991) (defendant's admissions to probation officer, as presented in presentence report, relied on by sentencing court).

**71.** The Government's evidence conflicts with Defendant's testimony on a few points. Defendant said that, after attacking Officer Pepe, he left Cell Six with a white knife (fashioned from a brush, GX 125) in his hand, (Tr. at 807), and that he had that brush-knife in his hand as he approached the entry to 10–South. (Tr. at 808.) By contrast, Specialist Jenkins testified that when he looked into 10–South

not uncorroborated by the Government's evidence.[72] Moreover, Defendant's testimony and admissions are not exculpatory; indeed, they would support a finding by this Court that Defendant's intent in attempting to kill Officer Pepe was to influence or affect official acts of a federal judge by intimidation or coercion, or to retaliate against official acts of a federal judge.

Additionally, corroborating Defendant's admitted intent on November 1, 2000, in letters to Judge Sand between February and October 2000, (GX 4-9),[73] and in oral requests during proceedings in 98-CR-1023,[74] Defendant repeatedly attempted to replace his attorneys—at one point requested that another judge hold a hearing about the issue of substituting counsel.[75] Judge Sand referred this matter to a magistrate judge. (98-CR-1023 Tr. Oct. 18, 2000 at 29.)

Defendant also admitted that, at a hearing regarding his February 2000 letter application for a new attorney, (GX 4), Judge Sand denied Defendant's application for a new attorney. (Tr. at 676.) The

---

and saw Defendant standing at the pillar near the entrance to 10-South, he did not see anything in Defendant's hands, and that he saw both of Defendant's hands. (Tr. at 103.)

Lieutenant Carrino and Specialist Jenkins both testified that as they approached Cell Six, Defendant's cellmate Khalfan Khamis Mohamed leapt forward and began spraying them with hot sauce. (Tr. at 88, 127.) By contrast, Defendant testified that Mohamed was completely unarmed after Defendant attacked Officer Pepe. (Tr. at 808-09.)

72. Aspects of Defendant's testimony are corroborated by portions of the Government's evidence. Defendant was able to establish that the newspaper print on the back of GX 80, the weather map with accompanying drawings, was dated from 1999, (Tr. at 662-63), consistent with Defendant's claim that he wrote the note in 1999. (Tr. at 662.) The junction box, with which Defendant insists he did not tamper, had no identifiable fingerprints on it. (GX 3517-Y.) In testimony in a prior proceeding, an FBI investigator testified that no hot sauce was recovered from the broken plexiglass shield found at the crime scene, (Tr. at 1054), corroborating Defendant's claim that Mohamed did not spray Lieutenant Carrino and Specialist Jenkins with hot sauce as they approached Cell Six. (Tr. at 808-09.)

73. Defendant testified he wrote a letter dated "February 22," (GX 4), to Judge Sand, complaining about his representation by Paul McAllister, and requesting substitute counsel. (GX 4.) At a conference held on February 29, 2000, Judge Sand acknowledged to Defendant's counsel that he had received "a letter directly from Mr. Salim which relates to his relationship with counsel." (98-CR-1023 Tr. 2/29/00 at 4.) Judge Sand met with Defendant and his attorneys regarding the correspondence. (98-CR-1023 Tr. 2/29/00 at 125.) Defendant sent two more letters to Judge Sand—one with attachments in Arabic, requesting substitution of counsel. (GX 7-9.)

74. Specifically, on numerous occasions Defendant interrupted the suppression hearing, stating that his attorneys were no longer representing him, that the proceeding was not legal, that he wanted to conduct cross examination of witnesses himself, and that he had objections to raise to evidence introduced by the Government. (98-CR-1023 Tr. 10/18/00 at 28-30, 31-32; 98-CR-1023 Tr. 10/19/00 at 65, 79, 96; 98-CR-1023 Tr. 10/20/00 at 189.)

75. Defendant testified that approximately one day after his conversation with Odeh, he wrote Judge Sand a letter, dated September 23, 2000, requesting appointment of substitute counsel. (Tr. at 756-57; GX 5.) Defendant also testified that, in a letter dated October 2, (GX 6), Defendant thanked Judge Sand for listening to some of his problems with his attorneys, notified Judge Sand that he had been unable to fully disclose the problems he was having because Defendant wanted "to keep [Judge Sand] neutral," and requested that Judge Sand allow him to be heard before another judge about the specific problems he was having. (GX 6, Tr. at 758.) On October 10, 2000, Judge Sand acknowledged that earlier that morning he had received a communication directly from Defendant. (98-CR-1023 Tr. 10/10/00 at 3.)

record of the October 2000 suppression motion hearing shows Defendant's requests at the hearing for substitute counsel and attempts to proceed without counsel were also denied by Judge Sand. (98–CR–1023 Tr. 10/18/00 at 28–30, 32; 98–CR–1023 Tr. 10/19/00 at 65, 79, 96; 98–CR–1023 10/20/00 Tr. at 189.) At the October 2000 suppression motion hearing, Judge Sand informed Defendant that, in relation to the suppression hearing, Defendant did not have the right to discharge court-appointed counsel without court approval nor to compel the court to appoint him new counsel:

> Mr. Salim, you've written me a number of letters. I entered a number of orders, one of which I had delivered to you with respect to this. You have a mistaken understanding of what it is within your power to do and what it is within the Court's power to do. For example, you have appeared to believe that it was your right to discharge court-appointed counsel and compel the Court to appoint other counsel. You don't have that right.

(98–CR–1023 Tr. 10/18/00 at 29.)

At the beginning of proceedings the next day, October 19, 2000, Defendant again interrupted the hearing to protest that his lawyers were no longer representing him, and Judge Sand responded:

> THE DEFENDANT: (In English) Excuse me, Judge, again today I affirm again that the lawyer here –
> THE COURT: Mr. Salim –
> THE DEFENDANT: (In English) Just I want to, not my lawyer –
> THE COURT: I have now twice told you in a formal order that they are your attorneys. Let's proceed. Your position has been clearly known.

(98–CR–1023 Tr. 10/19/00 at 65.)

The foregoing record evidence makes clear that, only two weeks before the at-

tack on Officer Pepe, Defendant was made aware that Judge Sand had ultimate authority to replace his court-appointed attorneys, and that Judge Sand could deny, and in the proceedings had in fact denied, Defendant's application to replace his attorneys.

In addition, Defendant testified that the event that precipitated his decision to attack his attorneys was his receipt of a letter from Magistrate Judge Eaton, informing him that his request for a new attorney had been denied. (Tr. at 786.) By his own testimony, Defendant did not take action on a plan to attack his attorneys until he "lost all hope" of getting a change of attorneys from Judges Sand and Eaton. (*Id.* at 628.)

Accordingly, on the basis of Defendant's admissions and supporting record evidence, the Court finds that Defendant's attack on Officer Pepe was in furtherance of his intent to affect or influence Judge Sand's decision about substitution of counsel, and was in retaliation for judicial conduct denying Defendant's applications for substitution of counsel.

In his testimony at the *Fatico* hearing, Defendant testified that he intended to attack his attorneys to force them to resign, and not to affect Judge Sand's decision:

> Q: You expected that by attacking your attorneys, new attorneys would be appointed to represent you, correct?
>
> \* \* \* \*
>
> A: No, not like that. Because the problem did not stem from the judge. It did not stem from the magistrate judge. He had no problem giving me other lawyers, but the problem was the lawyers themselves, they didn't want to resign.
>
> \* \* \* \*

Q: You wrote those letters to Judge Sand because you knew that Judge Sand had to approve any attempt by you to change attorneys, correct?

A: Because I was aware that the judge had authority that was superior to mine and superior to the attorneys. And that if the judge so willed, he could have forced the attorneys to resign. But if the judge wanted to be polite and courteous, it would be up to them, not to me.

(*Id.* at 834–35.)

Taken as a whole, the chronology of Defendant's requests and Judge Sand's responses makes clear that Defendant's testimony that he believed substitution of counsel would have occurred but for "the lawyers themselves" is incredible. Defendant clearly did not believe his attorneys could unilaterally withdraw or resign from his case—Defendant sent letters to Judge Sand, requesting substitution of counsel and requesting that another judge hold a hearing on the issue, and Defendant repeatedly interrupted proceedings in 98–CR–1023 to address his requests to substitute counsel to Judge Sand. Moreover, at and for the suppression hearing, Defendant was directly informed that he had no authority to replace his own counsel and that Judge Sand was denying his request for new counsel. Finally, Defendant admitted that Judge Sand had at least once denied his request for new counsel. Thus, for Defendant to allege before this Court that his motive in stabbing Officer Pepe was *not* either to affect Judge Sand's deci-

sion of whether or not to substitute his counsel or to retaliate for judicial rulings is simply not credible. Accordingly, the Court finds incredible Defendant's *Fatico* testimony that Judge Sand had "no problem" giving him new attorneys, and that the "problem" Defendant was addressing by attempting to attack his attorneys did not "stem" from the judge.

Accordingly, the Court finds that Defendant's own admissions, supported by record evidence, establishes that his attack on Officer Pepe was calculated to influence or affect by intimidation or coercion Judge Sand's decision whether or not to substitute Defendant's counsel and also was calculated to retaliate against judicial recommendations and orders denying Defendant's applications for substitute counsel.[76]

## III. CONCLUSIONS OF LAW

■ Defendant pleaded guilty to Attempted Murder (18 U.S.C. § 1114) and Conspiracy to Murder a Federal Official (18 U.S.C. § 1117). (Plea Tr. at 36.) Because the two counts involve the same victim and the same conduct, they are grouped together pursuant to U.S.S.G. § 3D1.2(a). The applicable offense guideline is U.S.S.G. § 2A1.5 (Conspiracy or Solicitation to Commit Murder); however, because Defendant's offense resulted in an attempted murder, Section 2A2.1 applies. *See* U.S.S.G. § 2A1.5(a)(2). Pursuant to U.S.S.G. § 2A2.1, Defendant's Base Offense Level is 28. U.S.S.G. § 2A2.1(a). Since Defendant has no record of either

---

**76.** On October 31, 2000, Judge Sand denied Defendant's application for substitute counsel. However, whether or not on November 1, 2000 Defendant knew this decision had been made to deny his request for substitute counsel does not affect this Court's finding. If Defendant knew the October 31, 2000 ruling on the substitution issue had been made, then Defendant's admissions and reliable evi-

dence clearly support a conclusion that his actions were in retaliation for this ruling. If Defendant did not know that the October 31 ruling had been made, Defendant's admissions and reliable evidence clearly support a conclusion that his actions were intended to influence or affect determination of the counsel issue.

juvenile adjudications or adult criminal convictions, (PSR at ¶¶ 78–79), he has zero criminal history points, and accordingly is assigned an initial Criminal History Category of I. U.S.S.G. §§ 4A1.1, 4A1.2.

On the basis of the facts before the Court, the Government argues the following sentence enhancements are appropriate: 1.) a four-level sentence enhancement pursuant to U.S.S.G. § 2A2.1(b)(1)(A), because of the permanent bodily injury to Officer Pepe; 2.) a three-level enhancement pursuant to § 3A1.2(a) because Defendant attacked Officer Pepe while Pepe was performing his official duties as a corrections officer; 3.) a two-level enhancement pursuant to U.S.S.G. § 3A1.3 because Officer Pepe was physically restrained during the attack; and 4.) a 12-level enhancement and an increase in Defendant's Criminal History Category from I to VI, pursuant to U.S.S.G. § 3A1.4, because the attack on Officer Pepe was committed to promote a federal act of terrorism. (*Pimentel* letter at 2–3.)

In addition, in a letter dated September 12, 2002 and at the *Fatico* hearing, the Government argued that the following additional sentencing adjustments should apply: 1.) a two-level enhancement pursuant to U.S.S.G. § 3B1.1(C) for the recruitment and supervision of Mohamed; 2.) a two-level enhancement pursuant to U.S.S.G. § 3C1.1 for obstruction of justice; 3.) no decrease for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1;[77] and 4.) if the Court believed Defendant's intent in attacking Officer Pepe on November 1, 2000 was to allow him to attack his attorneys, an upward departure pursuant to U.S.S.G. §§ 2A2.1 and 5K2.0, because Defendant "created a substantial risk of death or serious bodily injury to more than one person." (September 12, 2002 letter; Tr. at 983–1077.)

## A. Burden of Proof

 Although the Sentencing Guidelines do not specify a burden of proof to govern the resolution of disputed sentencing factors, the Second Circuit has held that the preponderance of the evidence standard satisfies the requirements of due process in determining conduct relevant to sentencing issues under the Guidelines— even for the determination of "unconvicted conduct." *United States v. Gigante*, 94 F.3d 53, 55 (2d Cir.1996) ("[U]nconvicted conduct may be relied upon to adjust a defendant's sentence level as contemplated by the Guidelines based on proof by a preponderance of the evidence."); *United States v. Guerra*, 888 F.2d 247, 251 (2d Cir.1989) ("[T]he preponderance of the evidence standard satisfies the requisite due process in determining relevant conduct pursuant to the Sentencing Guidelines" in the calculation of offense level based on defendant's possession of uncharged narcotics), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). In making factual findings under the Guidelines, the "sentencing court remains entitled to rely on any type of information known to it." *United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir.1992) (upholding sentence where trial court referred at sentencing to conduct for which the

---

**77.** Pursuant to the plea agreement, Defendant agreed to "allocute in his plea of guilty to Counts Three and Four of the Indictment that, on November 1, 2000, at the Metropolitan Correctional Center, the defendant himself stabbed Officer Louis Pepe in the left eye with a sharpened comb." (*Plea Agreement* at 2.)

In its *Pimentel* letter, the Government informed the Defendant that a two-level downward adjustment in Defendant's Offense Level would be appropriate, pursuant to U.S.S.G. § 3E1.1, assuming Defendant allocuted to the satisfaction of the Court. (*Pimentel* letter at 3.)

defendant was acquitted) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir.1989)); *see also United States v. Franklyn*, 157 F.3d 90, 97 (2d Cir.1998) ("Disputed facts relevant to sentencing must be established by a preponderance of the evidence, and the sentencing court may rely upon any information known to it").

Accordingly, the Court evaluates the record in this case for purposes of factual determinations using a "preponderance of the evidence" standard, using all evidence known to it.[78] *Franklyn*, 157 F.3d at 97.

### B. Permanent Bodily Injury—U.S.S.G. § 2A2.1(b)(1)(A)

██ The *Pimentel* advised Defendant that the Government would seek an Offense Level increase because Officer Pepe sustained permanent or life-threatening bodily injury. (*Pimentel* letter at 2.) Defendant does not dispute application of this enhancement.

The PSR set forth detailed facts regarding the injuries to Officer Pepe, including loss of sight in one eye, substantial physical scarring, and neurological damage, resulting from the injuries sustained when Defendant stabbed Pepe in the eye. Additionally, testimony and evidence presented at the *Fatico* hearing fully support the finding necessary for the applicability of this enhancement. Accordingly, Defendant's Offense Level is increased by four levels pursuant to U.S.S.G. § 2A2.1(b)(1)(A).

### C. "Official Victim" Enhancement—U.S.S.G. § 3A1.2

██ The Government argues Defendant's Offense Level should be increased by three levels pursuant to U.S.S.G. § 3A1.2(a) because Officer Pepe, a corrections officer at a federal facility, was a Government officer and the attempted murder was motivated by Officer Pepe's official status. (Gov. August 16, 2002 at 7–9.)

The "Official Victim" enhancement at U.S.S.G. § 3A1.2(a) provides for a three-level increase in Defendant's Offense Level if:

(1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was motivated by such status . . .

U.S.S.G. § 3A1.2(a).

At the *Fatico* hearing, Defendant testified that he attacked Officer Pepe because Pepe had keys to the Attorney–Inmate rooms on 10–South. (Tr. at 833.) Defendant testified he did not know Officer Pepe would be on duty at the time his lawyers came to visit on November 1, 2000, and therefore did not know he would be trying to take the keys from Officer Pepe. (*Id.* at 824.) The Government established through the testimony of Christine Dynan that keys to doors not controlled by electronic locks were held by staff members at the MCC. (*Id.* at 15.)

Defendant interweaves two related arguments against the application of U.S.S.G. § 3A1.2(a). (Def. July 29, 2002 at 11.) First, Defendant argues the § 3A1.2(a) enhancement does not apply because Defendant's motivation in attacking Officer Pepe was only to acquire Officer Pepe's keys, and therefore Defendant "was not attempting to kill an official."

---

**78.** Defendant makes several specific arguments for a heightened burden of proof for issues of fact pertaining to the "terrorism" enhancement, U.S.S.G. § 3A1.4; these arguments are fully stated, analyzed, and addressed below.

(*Id.* at 11.) Relying on language from *United States v. Woody*, 55 F.3d 1257, 1274 (7th Cir.1995) (U.S.S.G. § 3A1.2 "requires a higher level of culpability, i.e., the defendant's actions must have been 'motivated' by the victim's official status"), Defendant argues the "motivation" required by U.S.S.G. § 3A1.2 is "a higher level of culpability" and his own motivation does not meet this standard. (Def. July 29, 2002 at 11.)

Defendant also directs the Court to *United States v. Talley*, 164 F.3d 989 (6th Cir.1999),[79] a case in which the Sixth Circuit held that the "motivated by official status" enhancement at § 3A1.2(a) applied to a defendant who was convicted of soliciting another to kill an FBI agent, in violation of 18 U.S.C. § 1114. The defendant in *Talley* made an argument similar to Defendant's here; in *Talley*, the defendant argued that his motivation in soliciting the murder of the agent was solely to eliminate the agent as a potential witness against him in a pending prosecution. Because the defendant in *Talley* knew the victim was an FBI agent when he solicited the murder, and because the sole reason the agent was a potential witness against the defendant was that he was an FBI agent, the Sixth Circuit held that the solicitation was motivated by the victim's status, and therefore held that the defendant's sentence was appropriately enhanced under U.S.S.G. § 3A1.2. *See Talley*, 164 F.3d at 1003–04. The *Talley* court's reasoning is applicable here. Defendant had regular contact with Officer Pepe as a corrections officer, (Tr. at 867–68), and there is no dispute that Defendant knew Officer Pepe was a corrections officer on November 1, 2000. Moreover,

the reason Defendant attacked Pepe was that Pepe had keys, (Tr. at 833), which were held by MCC staff members only. (Tr. at 15.)

Defendant's knowledge that Officer Pepe was a corrections officer at the time of the attack is sufficient for a finding that he was motivated by Officer Pepe's official status in attacking Pepe. *See United States v. Garcia*, 34 F.3d 6 (1st Cir.1994) (holding that the defendant's attempt to run over officers was motivated by officers' status, since defendant knew the officers were law enforcement officials); *cf. United States v. Mills*, 1 F.3d 414, 423 (6th Cir.1993) (remanding for findings on defendant's knowledge of police officer's status as a law enforcement officer where, in applying U.S.S.G. § 3A1.2, the district judge "merely noted that [the victim] is a law enforcement officer").

For purposes of U.S.S.G. § 3A1.2, the knowledge standard is well-established in this Circuit. *United States v. Castillo*, 924 F.2d 1227, 1236 (2d Cir.1991) (application of § 3A1.2(b) inappropriate where the only record evidence of defendants' knowledge of the victim's official status was the district court's statement that defendants "did believe that there was a possibility that [the victim] might be a police officer"). Here, there is no question Defendant knew Officer Pepe was an on-duty corrections officer, and Defendant testified the reason for his attack on Officer Pepe was to get keys to doors on the MCC. (Tr. at 833.) Defendant's actual knowledge of Officer Pepe's official status and his motivation to attack Officer Pepe for reasons that required his victim to be an "official" within the meaning of U.S.S.G. § 3A1.2 meets even an elevated standard for "motivated

---

**79.** Defendant quotes the following language from the case: "Talley was not motivated by mere personal animus, but specifically by the desire to eliminate an FBI agent who could

testify against him at trial." (Def. July 29, 2002 at 11, quoting *Talley*, 164 F.3d at 1003–04.)

by status" and certainly suffices by a "knowing" or "reason to know" standard. In sum, Defendant's own testimony is dispositive in establishing that his attack on Officer Pepe was motivated by Officer Pepe's official status.

■ As a second argument against the application of U.S.S.G. § 3A1.2(a), Defendant suggests that a § 3A1.2(a) enhancement might not apply to an offense like 18 U.S.C. § 1114, which "specifically incorporates the victim's status." (Def. July 29 letter at 11, citing *United States v. McNeill,* 887 F.2d 448, 454–55 (3d Cir. 1989)). At bottom, Defendant's argument is that enhancement under § 3A1.2 requires the court to "double count" impermissibly at sentencing, by applying an enhancement for conduct that is already accounted for in the Base Offense Level assigned to the substantive offense. *Cf. United States v. Napoli,* 179 F.3d 1, 12 n. 9 (2d Cir.1999) (" 'Impermissible double counting occurs when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines,' " quoting *United States v. Dudley,* 102 F.3d 1184, 1186 (11th Cir.1997)).

In support of his argument, Defendant cites *United States v. McNeill,* 887 F.2d 448 (3d Cir.1989), in which the Third Circuit rejected the defendant's argument that application of the enhancement under U.S.S.G. § 3A1.2 to his conviction for soliciting the murder of his probation officer, 18 U.S.C. § 373(a),[80] was impermissible "double-counting." In dicta, quoted by Defendant here, the *McNeill* court commented that "had McNeill been convicted of a crime which specifically incorporated official victims as an element, such as 18 U.S.C. § 1114, his argument might have greater merit." 887 F.2d at 454–55.

The *McNeill* court dicta focuses on the statute of conviction, 18 U.S.C. § 1114, in suggesting the inapplicability of the § 3A1.2 enhancement. However, what determines the applicability of the § 3A1.2(a) enhancement is not whether the statute of conviction specifically incorporates the elements of this factor (as 18 U.S.C. § 1114 clearly does) but whether the applicable *offense guideline* specifically incorporates it. *See* U.S.S.G. § 3A1.2, Application Note 3 ("Do not apply this adjustment if the offense guideline specifically incorporates this factor."). Here, U.S.S.G. § 2A2.1, the applicable offense guideline, does not incorporate official victim status. *Cf. United States v. Padilla,* 961 F.2d 322, 327 (2d Cir.1992) (no double counting where § 3A1.2 enhancement applied to a defendant who had been convicted of assaulting a federal officer, in violation of 18 U.S.C. § 111). Indeed, U.S.S.G. § 3A1.2, Application Note 2 states that "[t]he only offense guideline in Chapter 2A that specifically incorporates this factor is § 2A2.4, (Obstructing or Impeding Officers)."

---

**80.** Section 373(a) provides:

§ 373. Solicitation to commit a crime of violence

(a) Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half of the maximum fine prescribed for the punishment of the crime solicited, or both; or if the crime solicited is punishable by life imprisonment or death, shall be imprisoned for not more than twenty years.

18 U.S.C. § 373(a)

U.S.S.G. § 3A1.2, Application Note 2. Thus, here there is no double counting in applying the U.S.S.G. § 3A1.2(a) enhancement, although the statute under which Defendant was convicted may have incorporated the victim's official status. Accordingly, the Court enhances Defendant's Offense Level by three levels pursuant to U.S.S.G. § 3A1.2(a).

### D. Restraint of Officer—U.S.S.G. § 3A1.3

■ The Government argues that Defendant's Offense Level should be increased two levels pursuant to U.S.S.G. § 3A1.3 because Officer Pepe, the victim, was restrained during the offense. (Gov. August 16, 2002 at 9–12.)

Section 3A1.3 of the Sentencing Guidelines provides, "[i]f a victim was physically restrained in the course of the offense, increase by 2 levels." "Physically restrained" means "the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B.1, Application Note 1(h). A court should not apply the § 3A1.3 adjustment "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself ..." U.S.S.G. § 3A1.3, Application Note 2.

At the *Fatico* hearing, Defendant testified that Officer Pepe had been held down during the attack, that Defendant had taken one of Officer Pepe's handcuffs and attached one cuff to Pepe's left wrist, and

that after stabbing Pepe, Defendant had locked him in Cell Six. (Tr. at 806.) Specialist Jenkins testified that as he approached Defendant at Cell Six, he saw Defendant fumbling with keys, trying to enter the cell. (Tr. at 87.) Lieutenant Carrino and Specialist Jenkins both testified that when Officer Pepe was led toward the exit of the 10–south unit, they saw he was handcuffed, with one cuff attached to Officer Pepe's wrist and the other cuff hanging loose. (Tr. at 93, 135.) The Government argues this evidence supports application of U.S.S.G. § 3A1.3.

Defendant argues that a § 3A1.3 enhancement should not apply because while Officer Pepe was restrained during the attack, the forcible restraint "did not add to the basic crime." Defendant contends that "[c]ase law in our Circuit is apparently mixed" on the issue of whether an assault will *de facto* result in restraint of the victim, and directs the court to compare *United States v. Anglin,* 169 F.3d 154 (2d Cir.1999) (displaying a gun and telling people to get down in the course of a bank robbery is not "physical restraint") with *United States v. Rosario,* 7 F.3d 319 (2d Cir.1993) (upholding physical restraint enhancement for robber who stood on his victim's throat while stealing wallet and keys, because the restraint "facilitated the commission of the offense").

Defendant's own testimony brings him well within the definition of "restraint" for purposes of U.S.S.G. § 3A1.3.[81]

---

**81.** Indeed, Defendant attempted to restrain Officer Pepe with handcuffs:

Before I left, I thought that I had to do a few things before I went out. The first thing is—the first thing he would do, he would try to call some other people. Because I knew that he was not dead. I was able to speak to him and he spoke back to me. And in order for me to make sure that he would not run after me, I had to handcuff him. So I took the handcuffs from him

and I put it on I think, only God knows, in his left arm.

(Tr. at 806.)

On cross-examination, Defendant restated his intent to restrain Officer Pepe:

Q: You knew that you might have to kill Officer Pepe in order to get the keys from him? Yes or no?

A: No, I wanted to tie him up.

* * * *

This Court need not address whether or not Officer Pepe was restrained by being stabbed, since Defendant admitted he both locked Pepe into Cell Six after inflicting on him a life-threatening injury, and attempted to handcuff him. Accordingly, the Court enhances Defendant's Offense Level by two levels pursuant to U.S.S.G. § 3A1.3.

### E. Recruitment and Supervision— U.S.S.G. § 3B1.1(c)

■ In a letter to the Court dated September 12, 2002 and at the *Fatico* hearing, the Government argued that, pursuant to U.S.S.G. § 3B1.1(c), Defendant's Offense Level should be increased by two levels because in the attack on Officer Pepe, Defendant supervised or organized his cell-mate Mohamed. Defense counsel argued at the *Fatico* hearing that he would "leave that to the Court's discretion." (Tr. at 1079.)

Taking Defendant's testimony as true, the record supports application of the enhancement under U.S.S.G. § 3B1.1(c). At the *Fatico* hearing Defendant stated he had two conversations with Mohamed, arranging for Mohamed's assistance in the attack on Officer Pepe. In these conversations, Defendant clearly organized and led Mohamed, by telling him what he should do, and by defining the scope and limit of Mohamed's involvement. Defendant testified that on October 30, 2000, after receiving the letter from Magistrate Judge Eaton denying Defendant's request for substitute counsel, Defendant asked Mohamed for help in attacking his attorneys, and Mohamed agreed to help. (*Id.* at 794.) Defendant further testified that on

Q: So isn't it a fact that you were prepared to do everything possible to get those keys away from Officer Pepe? Yes or no?
A: Now we have jumped to a new stage. If I along with Khalfan were able to tie him up, we would have been able to take the keys because he would have been tied up.
* * * *
Q: Well, you knew that once you started the attack on Officer Pepe, you had to do whatever was necessary to get those keys, correct?
A: I was convinced that with the hot sauce in his eyes and with him lying on the floor, and the fact that we were two, we would have been able to take the keys. We would have been able to tie him up and take the keys.
(Tr. at 895–97.)

Defendant testified further about his intent and attempt to restrain Officer Pepe:
... even at the point when I could not control [Officer Pepe], and he was on the floor and I was fighting with him, I did not stab him in that moment, because there is still a step before I got to that other decision. That's why I asked Khalfan to help me subdue him. That is why they found the long strips of pillow case, because I wanted to tie up the guard and not kill him.
(Tr. at 950–51.)

On redirect examination, Defendant specifically admitted he attempted to handcuff Officer Pepe, and also that he locked Officer Pepe in Cell Six:
Q: Now, incidentally, after you stabbed Officer Pepe, you locked that room, correct?
A: (In English) I closed the camera, separate the walkie talkie, tried the key, find the correct key, then I locked it.
Q: Then is it fair to say that before you locked the door, you tried to take the handcuffs and put them on -
A: (In English) Yeah. I already said -
A: I mean that after I stabbed him, I did not want to give him the opportunity to communicate by phone or by walkie-talkie. In order to get to that aim, I found it that the easiest thing was to handcuff him.
Q: Okay. Now -
A: It was easy for me to put one of the handcuffs in one of the hands. But when he felt that I was taking his hand to put it— to handcuff the other hand too, he started kicking and using even the hand with the handcuff on to hit me with it. That is why I stopped. He said, I want to stand. And I said No, you stay where you are. And I left and I locked.
(Tr. at 954.)

November 1, 2000, after telling Pepe that he would meet the attorneys, Defendant instructed Mohamed to cover the video camera and to help Defendant get the keys from Officer Pepe. (*Id.* at 798.) Defendant also testified that he told Mohamed that Mohamed should have no other role, aside from getting the keys. (*Id.* at 797.)

Mohamed was a "participant" within the meaning of U.S.S.G. § 3B1.1, Application Note 1; he agreed to assist with a forcible attempt to take keys from Officer Pepe and then acted in furtherance of that agreement. Defendant testified that Mohamed grabbed Pepe's walkie-talkie and covered the video camera with toilet paper. (*Id.* 804–05.) However, even if by grabbing Pepe's walkie-talkie and covering the video camera, Mohamed was not a direct participant in the attack on Officer Pepe, it was foreseeable that taking keys from a corrections officer in a maximum security unit of a federal facility would result in physical violence. Therefore, Mohamed was criminally responsible for the assault on Officer Pepe under a theory of co-conspirator liability, and was a "participant" who was supervised and organized by Defendant. U.S.S.G. § 3B1.1, Application Note 1. Accordingly, the Court increases Defendant's Offense Level by two levels, pursuant to U.S.S.G. § 3B1.1(c).

### F. Obstruction of Justice—U.S.S.G. § 3C1.1

The U.S. Sentencing Guidelines direct that:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, *or sentencing of the instant offense of conviction,* and (B) the obstructive conduct related to (i) the de-

fendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1 (emphasis added).

The Guidelines provide that the "conduct to which this adjustment applies is not subject to precise definition," U.S.S.G. § 3C1.1, Application Note 3, and provide a "non-exhaustive" list of conduct to which the adjustment is intended to apply, U.S.S.G. § 3C1.1, Application Note 4, including, *inter alia,* "providing materially false information to a judge or magistrate," U.S.S.G. § 3C1.1, Application Note 4(f), and "providing materially false information to a probation officer in respect to a pre-sentence or other investigation for the court." U.S.S.G. § 3C1.1, Application Note 4(h).

 The Government argues three statements made by defense counsel in a letter to the Court, dated July 29, 2002, (the "July 29 letter"), justify application of U.S.S.G. § 3C1.1. In the July 29 letter, in objecting to the PSR's statement that Defendant devised a plan to take hostages, defense counsel alleged "Salim's plan was to try to escape;" defense counsel also alleged that tools found in Cell Six were not crafted for taking hostages but were instead "crafted to help Salim escape from the MCC;" and defense counsel alleged that ropes found in Cell Six "were fashioned in connection with *his* escape attempt, not hostage-taking." (Def. July 29, 2002 at 5, 7, 8.) However, at the *Fatico* hearing, Defendant testified his intent in attacking Officer Pepe was to get the master key to doors on 10–South, and that his motive was to attack his attorneys so that they would resign, so that new counsel would be assigned to represent him.[82] De-

---

**82.** On the last day of the *Fatico* hearing, De- fendant withdrew completely the "escape" ex-

fendant admitted he knew of the content of the July 29 letter when it was sent to the Court but did nothing to correct the letter. (Tr. at 932.)

The Government argues that the three statements in the July 29 letter were "material misrepresentations" that were wilfully made to the Probation Department and to the Court. (Gov. September 12, 2002, Tr. at 1002–5; U.S.S.G. § 3C1.1, Application Note 4(f), 4(h)). Defendant objects generally to application of this enhancement. (Tr. at 1080–81.)

Since defense counsel's statements about Defendant's intent in the July 29 letter were made in reliance on representations made by Defendant (Tr. at 852–53), Defendant is "accountable" for inclusion of the escape allegations in defense counsel's submission, which Defendant "counseled . . . [or] induced." U.S.S.G. § 3C1.1, Application Note 9.

### 1. Materiality

█ Both Application Note 4(f) and Application Note 4(h), upon which the Government apparently relies in arguing for a § 3C1.1 enhancement, require that the misrepresentations in defense counsel's July 29th letter be "material." U.S.S.G. § 3C1.1, Application Notes 4(f) and 4(h). For the three statements to be "material," they must be information that, "if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, Application Note 6; see also United States v. McKay, 183 F.3d 89, 93 (2d Cir.1999) (defendant's statement in pre-sentence interview that he was a peripheral participant—when in fact he was the leader of a narcotics ring, which resulted in an erroneous Probation report—was material because it could have impeded imposition of an appropriate sentence); United States v. Johns, 27 F.3d 31, 34 (2d Cir.1994) ("Under the law of this Circuit . . . we look to the defendant's representations in deciding the issue of materiality. If those representations could affect the sentence (if believed), then it is irrelevant that the government has possession of other information that rebuts the defendant's representations."); United States v. Rodriguez, 943 F.2d 215, 218 (2d Cir.1991) ("The definition of a 'material' statement embraces all false statements that would tend to affect a defendant's sentence, whether or not discovery of the falsity of the statement is inevitable.").

However, in Second Circuit cases upholding application of U.S.S.G. § 3C1.1 wherein a defendant made false statements, it is apparent that the defendant's false statements would have improved the defendant's position with respect to the proceeding—either by minimizing or mitigating the defendant's potential sentence.[83]

planation contained in defense counsel's letter, (Tr. at 1083), and on September 17, 2002, submitted an Amended Letter in Opposition, which conformed to the explanation given in his testimony at the Fatico hearing.

**83.** United States v. McLeod, 251 F.3d 78, 82 (2d Cir.2001) (Defendant repeatedly lied at sentencing after fraud conviction "in his attempts to disclaim responsibility" for fraudulent documents); United States v. Lincecum, 220 F.3d 77, 80–81 (2d Cir.2000) (Defendant's false representations in affidavit in support of motion to suppress post-arrest statements would have resulted in granting of defendant's motion to suppress); United States v. Ahmad, 202 F.3d 588, 593 (2d Cir.2000) (Defendant's affidavit in support of motion to suppress, prior to trial on firearms possession charges, stated he "never received any guns or gun paraphernalia which I placed into a closet, nor did I keep any guns inside that same closet"); United States v. McKay, 183 F.3d 89, 92 (2d Cir.1999) (Prior to sentencing on money laundering and drug conspiracy conviction, Defendant told probation officer he was a peripheral participant in and benefitted only in small part from a narcotics ring, when in fact he was the leader of and benefit-

Defendant here initially counseled his attorney that his intent in attacking Officer Pepe was to escape from the Metropolitan Correctional Center, a maximum security federal prison. In contrast to the cases considered and upheld by the Second Circuit, it is not clear at all that Defendant's statements in this case, if believed, would have mitigated or minimized his sentence. Thus, the facts of this case clearly distinguish it from cases wherein application of U.S.S.G. § 3C1.1 was upheld.

The Government argues the proceedings were "influenced or affected" within the meaning of U.S.S.G. § 3C1.1, Application Note 6, because the Government would have allegedly employed a different strategy in its examination of witnesses at the *Fatico* hearing if it had known Defendant was going to testify to the "attorney attack" theory. However, the Government does not specify how its strategy would have differed. Moreover, the idea that the veracity of defense counsel's pre-hearing submission sabotaged the Government's ability to examine effectively the witnesses in this case is unsupported by the record and history of this case. The Court afforded the Government ample opportunity to examine its own witnesses to support its arguments for the enhancements recommended in the PSR. The Government was afforded ample time to cross-examine Defendant,[84] upon whose testimony the "attorney attack" theory depends.[85] More-

ted principally from the scheme); *United States v. Kelly,* 147 F.3d 172, 179 (2d Cir. 1998) (district court found defendant's false testimony at trial for tax fraud was given "to confuse the jury" and "to prevent the jury from finding him guilty concerning the charges in the indictment"); *United States v. Ventura,* 146 F.3d 91, 98 (2d Cir.1998) (Defendant's false statements about his age, accompanied by fraudulent or forged documents, were made "in order to secure a more favorable sentence," "caused considerable delay" in sentencing, "and required investigation by a number of officials of the United States and Honduran governments."); *United States v. Washington,* 48 F.3d 73, 81 (2d Cir. 1995) (At trial, defendant denied selling cocaine to anyone and denied any awareness of co-defendant's drug activities "in an attempt to escape a finding of culpability."); *United States v. Hendron,* 43 F.3d 24, 25–26 (2d Cir.1994) (Prior to sentencing for arms exporting without a valid export license to the court, defendant gave false oral and written statements that during sting operation he in fact had been knowingly cooperating with the United States government); *United States v. Mafanya,* 24 F.3d 412, 415 (2d Cir.1994) ("Common sense suggested" defendant misrepresented his identity, nationality prior arrests, and financial status to a magistrate judge in hopes of being released on bail); *United States v. Onumonu,* 999 F.2d 43, 47 (2d Cir.1993) (Defendant gave perjured testimony that he thought he was ingesting dia-

monds rather than heroin prior to conviction for heroin possession); *United States v. Shonubi,* 998 F.2d 84, 88 (2d Cir.1993) (Defendant gave sworn testimony that heroin-filled balloons had not come from his body and that he had not used multiple passports in travel to and from Nigeria at trial for heroin importation and possession); *United States v. Johnson,* 994 F.2d 980, 982–83 (2d Cir.1993) (Defendant gave perjured testimony at trial for attempted murder and firearms charges, that he was in a "disassociative state" that led him to believe he was in a firefight in Vietnam, thus vitiating the *mens rea* element of the charges); *United States v. Rodriguez,* 943 F.2d 215, 218 (2d Cir.1991) (Defendant stated falsely to probation officer that he had no prior record, when in fact he had been arrested and convicted six times previously).

**84.** Additionally, the Court allowed the Government an opportunity to re-open cross-examination of Defendant after the Government objected that a section of Defendant's testimony on redirect exceeded the scope of the direct examination. (Tr. at 946.)

**85.** The Court also allowed the Government to be heard when, on direct examination, Defendant began to embark on his explanation of the events of November 1, 2000. The Government did not object, instead stating, "I don't have an objection to [defense counsel] going into some of this. I suspect that in a different way we will be questioning the defendant about it as well." (Tr. at 638.)

over, the Government made no attempt to recall witnesses who had testified prior to Defendant's testimony, nor to call new witnesses to disprove Defendant's story. Accordingly, the Court is unconvinced that the Government can now claim it was disadvantaged by representations made in the July 29 letter.[86]

The Government also argues that the "escape" theory, if believed, would have affected or influenced the Probation Department's sentencing recommendations to the Court, and accordingly was "materially false information provided to a probation officer in respect to" the Probation Department's pre-sentence investigation. U.S.S.G. § 3C1.1, Application Note 4(h). There is simply no evidence to support an allegation that the Probation Department's determination of Defendant's sentence was in any way affected or influenced by the July 29 letter. The PSR did not reflect any reliance on the "escape" theory, and the PSR was drafted well before the July 29 letter. Thus, with respect to the Probation Department, Defendant's July 29 letter was not "materially false." U.S.S.G. § 3C1.1, Application Notes 4(h) and 6.

In sum, the Government has not shown that the "escape" theory contained in de-

fense counsel's July 29 letter materially influenced or affected the determination of Defendant's sentence.

### 2. Willfulness

■■■■■ Enhancement of Defendant's sentence under U.S.S.G. § 3C1.1 is also inappropriate because the Court finds no evidence that, in counseling or inducing submission by defense counsel of the July 29th letter, Defendant intended to obstruct justice. The Second Circuit has "repeatedly held that 'an enhancement under § 3C1.1 is appropriate only if the district court makes a finding that the defendant had the specific intent to obstruct justice, i.e., that the defendant consciously acted with the purpose of obstructing justice.'" *United States v. Brown*, 321 F.3d 347, 352 (2d Cir.2003)(U.S.S.G. § 3C1.1 improperly applied where District Court failed to conduct a hearing to resolve the question whether the defendant fled the jurisdiction while out on bail to obstruct justice), (quoting *United States v. Woodard*, 239 F.3d 159, 162 (2d Cir.2001)).[87]

This Court does not find the evidence to establish by a preponderance that, by allowing his counsel to submit the July 29th

---

**86.** The Government's inability to show how its case was altered by defense counsel's submission, in conjunction with the ample opportunity afforded the Government to respond to the July 29th letter, further supports the Court's conclusion that the factual statements in defense counsel's letter were not material.

**87.** In this Circuit, U.S.S.G. § 3C1.1 contains a "clear *mens rea* requirement that limits its scope to those who 'willfully' obstruct or attempt to obstruct the administration of justice." *United States v. Stroud*, 893 F.2d 504, 507 (2d Cir.1990) (finding that " 'willfully,' as used in section 3C1.1, requires that the defendant consciously act with the *purpose* of obstructing justice"); *see also United States v. Lincecum*, 220 F.3d 77, 80 (2d Cir.2000) (Application of U.S.S.G. § 3C1.1 not clearly erroneous where district court found defendant

knowingly made false statements under oath expressly for the purpose of supporting a motion to suppress, and those statements if credited would have led to the suppression of evidence.); *United States v. Case*, 180 F.3d 464, 467 (2d Cir.1999) (Before imposing an adjustment under § 3C1.1, a district court must find that the defendant " 'consciously act[ed] with the purpose of obstructing justice ...' ")(quoting *Stroud*, 893 F.2d at 507); *United States v. Reed*, 49 F.3d 895, 901–02 (2d Cir.1995)(Section 3C1.1 adjustment remanded for findings as to Defendant's intent, where the record was unclear as to whether Defendant intended to obstruct or impede the administration of justice by failing to appear for sentencing, attempting to escape from arresting officers, and violating bail conditions.).

letter, Defendant's specific intent was to obstruct or attempt to obstruct the administration of justice. At the *Fatico* hearing, Defendant gave four reasons why he counseled and induced defense counsel to submit the July 29th letter. (Tr. at 931–38.) Defendant testified that he was afraid Mr. Lind would resign from representing Defendant if he knew Defendant had tried to assault his former attorneys,[88] (Tr. at 933), that he was afraid revelation of his intention to attack his attorneys in 98–CR–1023 would similarly compromise his relations with Mr. Haber, the attorney who was assigned in 98–CR–1023 after Defendant's attack on Officer Pepe, (Tr. at 933), that he was afraid knowledge of his intention to attack his attorneys would prevent him from getting "any sympathy" from the prosecution and the Court,[89] (Tr. at 933–34), and that he was ashamed to have the public learn he had wanted to attack attorneys that had been appointed for him.[90] (Tr. at 934.)

Given Defendant's recent and involved relationship with the legal system and his stormy attorney-client relationship in 98–

CR–1023, his hesitation to jeopardize his relationship with his new attorney is certainly prudent, as well as credible. Moreover, the Government has offered nothing to support its claim that Defendant's stated reasons are implausible and has provided no support for a finding that Defendant specifically intended to obstruct or impede the administration of justice by allowing his attorney to submit the July 29th letter to the Court.[91]

Having found defense counsel's factual statements in the July 29 letter not material, and having found no evidence that, by counseling or allowing these statements, Defendant intended to obstruct or impede the administration of justice, the Court declines to enhance Defendant's sentence pursuant to U.S.S.G. § 3C1.1.

### G. Acceptance of Responsibility—U.S.S.G. § 3E1.1

 Based on Defendant's plea allocution, the PSR recommended that the Court reduce the offense two levels pursuant to U.S.S.G. § 3E1.1 because defendant showed recognition of responsibility for

---

88. In response to a question from his counsel, Defendant testified:

 In other words, if I told you that I wanted to assault my defense attorney, you may think that what would stop me from assaulting you as well. And I was afraid that you would lose the motive to represent me and defend me. I thought that because of the pride and the dignity that you do have, that you may resign as well. And if you decided to remain on my case, you may not perform well.
 (Tr. at 933.)

89. Defendant testified:

 I would be standing before people in the legal field. Your are a lawyer, the prosecutor is a lawyer, the judge some day used to be a lawyer but now he or she is a judge, but all of them are legal experts. So I would not be getting any sympathy from any of you if I said I wanted to assault my defense attorney.
 (Tr. at 933.)

90. Defendant said:

 When people attend this trial or read in the newspapers that Mamdouh wanted to assault the defense attorney, the attorney that was appointed to represent him and defend him, Mamdouh wanted to assault that attorney, it would be an act of shame and embarrassment for me.
 (Tr. at 934.)

91. At the *Fatico* hearing, the Government brushed past the "willfulness" requirement for enhancement under 3C1.1, stating that "[i]n any event, simply by causing materially false information to be submitted to the Court and the probation department, Salim obstructed justice and his offense level should be increased 2 levels under Section 3C1.1." (Tr. at 1005.)

the offense. However, at the *Fatico* hearing, the Government argued that, because Defendant lied to his lawyer about his intent to escape from the MCC, he demonstrated his denial of responsibility, and accordingly the Court should decline to decrease Defendant's Offense Level pursuant to § 3E1.1. (Tr. at 1006.) At the *Fatico* hearing, Defense counsel argued that his guilty plea demonstrates his acceptance of responsibility for his crime, and that it would be unfair to expect him to take responsibility for "acts of terrorism" in light of the fact that he has consistently denied all such allegations. (Tr. at 1082.)

Section 3E1.1(a) of the Sentencing Guidelines provides: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a). Application Note 1 to U.S.S.G. § 3E1.1 provides that, in determining if Defendant qualifies under § 3E1.1(a), a court may consider, *inter alia:*

(a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.

U.S.S.G. § 3E1.1, Application Note 1.

 In compliance with the Plea Agreement,[92] Defendant pleaded guilty on April 3, 2002 to the crimes of conspiracy to murder federal officials and attempted murder of a federal official prior to the commencement of any trial in his case, and at all points denied the "relevant conduct" relating to the terrorism enhancement. Although Defendant testified that the theory of "intended escape" he proffered in the July 29, 2002 submission was "false" and the "attorney attack" theory, about which he testified at the *Fatico* hearing, was true, (Tr. at 932), his admission of guilt for the crimes to which he pleaded guilty has remained steadfast and consistent. The change in Defendant's explanation of his motive on November 1, 2000 does not contradict his admissions of the elements of the charges to which Defendant pleaded guilty on April 3, 2002.[93]

**92.** The April 2, 2002 Plea Agreement required that Defendant agree to "allocute in his plea of guilty to Counts Three and Four of the Indictment that, on November 1, 2000, at the Metropolitan Correctional Center, the defendant himself stabbed Officer Louis Pepe in the left eye with a sharpened comb." (Plea Agreement at 2.) Nowhere in the agreement was Defendant required to admit at sentencing to specific facts regarding his intent in attacking Officer Pepe.

**93.** The elements of the charge of conspiracy to murder a federal official, to which Defen-

dant pleaded guilty on April 3, 2002 are: 1.) Existence of a conspiracy to murder a federal official in October and November of 2000; 2.) Defendant knowingly became a member of the conspiracy; 3.) Either defendant or a co-conspirator knowingly committed at least one overt act in furtherance of the conspiracy during the life of the conspiracy. (April 3, 2002 Plea transcript, at 14.) The elements of the charge of attempted murder of a federal official, to which Defendant also pleaded guilty on April 3, 2002 are: 1.) Defendant intended to commit the crime of murdering a federal official; 2.) Defendant willfully took

That Defendant has consistently refused to accept responsibility for a "federal crime of terrorism" cannot form the basis for a denial of the credit under U.S.S.G. § 3E1.1. *United States v. Oliveras*, 905 F.2d 623, 628 (2d Cir.1990) (requiring a defendant to accept responsibility for crimes to which he did not plead guilty violates the Fifth Amendment, because "[t]o require a defendant to accept responsibility for crimes other than those to which he has pled guilty or of which he has been found guilty in effect forces defendants to choose between incriminating themselves as to conduct for which they have not been immunized or forfeiting substantial reductions in their sentences to which they would otherwise be entitled to consideration."). Accordingly, this Court finds Defendant fully recognized responsibility for the offenses charged, and accordingly reduces the Offense Level by two, pursuant to U.S.S.G. § 3E1.1.

**H. Upward Departure: U.S.S.G. § 2A2.1, Application Note 3**

 At the *Fatico* hearing the Government argued in the alternative that, if the Court believes Defendant's "attorney attack" story, pursuant to U.S.S.G. § 2A2.1, Application Note 3 and U.S.S.G. § 5K2.0, the Court should depart upward because Defendant "created a substantial risk of death or serious bodily injury" not just to Officer Pepe, but also to Defendant's attorneys. (Tr. at 1090.)

Section 2A2.1, Application Note 3 provides that "[i]f the offense created a substantial risk of death or serious bodily injury to more than one person, an upward departure may be warranted." U.S.S.G. § 2A2.1, Application Note 3.

At the *Fatico* hearing, counsel for Defendant argued that § 2A2.1, Application Note 3 does not cover conduct like Defendant's because this provision is intended to cover cases in which bystanders are put at risk by a defendant's attempts to injure an intended victim and does not apply where a defendant intended to injure multiple victims. (Tr. at 1085, citing *United States v. Malpeso*, 115 F.3d 155 (2d Cir.1997), *cert. denied*, 524 U.S. 951, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998)).

In *Malpeso*, a defendant was convicted of conspiracy to murder and of multiple assault and attempted murder counts. 115 F.3d at 161. At sentencing the district court increased the defendant's base offense based on injuries sustained by a bystander, who was struck by a bullet and wounded when the defendant shot at, but missed, his intended victim. *Id.* The Second Circuit upheld the departure and held that U.S.S.G. § 2A2.1, Application Note 3 was a proper grounds for upward departure for bystander injuries; in so doing, the court construed Application Note 3 as providing "a departure based on a risk to a bystander ..." *Id.* at 170.

At the *Fatico* hearing, the Government conceded that a departure for a risk of bystander injury is "clearly the heartland of what Application Note Three stands for." (Tr. at 1090.) On the basis of this concession and the reading given Application Note Three by the Second Circuit in *Malpeso*, the Court here declines to find that Defendant's intent to attack his attorneys brings him within the sweep of Application Note 3.

 However, the Government also argues that, if Defendant's intent to attack

some action that was a substantial step in an effort to bring about or accomplish the crime. (April 3, 2002 Plea transcript, at 14.) Thus, whether Defendant's motive for attacking Of-

ficer Pepe on November 1, 2000 was to attack his attorneys or to escape from the MCC is not relevant to his acceptance of responsibility for the crimes charged.

his attorneys is not within U.S.S.G. § 2A2.1, Application Note 3, the Court should depart upward pursuant to U.S.S.G. § 5K2.0, since Defendant's conduct was not taken into account by the guidelines at the time. (*Id.* at 1091.)

The circumstances under which a court may depart from the Guideline range pursuant to Policy Statement U.S.S.G. § 5K2.0 cannot "be comprehensively listed and analyzed in advance." U.S.S.G. § 5K2.0. However, the Commentary to § 5K2.0 cautions that the Supreme Court directed in *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) that

> ... before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in the criminal sentencing.

U.S.S.G. § 5K2.0, Commentary (quoting *Koon v. United States*, 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)).

The Commentary further cautions that while the "Commission does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the "heartland" cases covered by "the guidelines," the Commission "believes that such cases will be extremely rare." U.S.S.G. § 5K2.0, Commentary.

To the extent that the facts of any case can be thought of as "ordinary," this case has distinguished itself as extraordinary in many respects; however, the Court does not find the fact that Defendant attacked Officer Pepe with the intention of committing further attacks on other persons sufficiently extraordinary to warrant an upward departure under U.S.S.G. § 5K2.0. From this Court's "vantage point and day-to-day experience in criminal sentencing," *Koon*, 518 U.S. at 98, 116 S.Ct. 2035, a defendant who attacks a victim with the object of carrying out further assaults on other victims is unfortunately not so unique as to place him beyond the heartland of the Sentencing Guidelines. Accordingly, the Court declines to depart upward under § 5K2.0.

## I. Terrorism Enhancement—U.S.S.G. § 3A1.4

The Government argues that, pursuant to U.S.S.G. § 3A1.4, the Court should increase Defendant's Offense Level by 12 and increase Defendant's Criminal History Category from I to VI, because the attempted murder to which Defendant pleaded guilty "involved, or was intended to promote, a federal crime of terrorism." (*Pimentel* letter at 2; Gov. August 16, 2002 at 26–27.) In its submissions and in argument at the *Fatico* hearing, the Government has consistently argued Defendant pleaded guilty to conduct that was part of a "single course of conduct" to take hostages and coerce the government, and therefore Defendant's conduct falls within the definition of a "federal crime of terrorism," 18 U.S.C. § 2332b(g)(5).[94]

---

94. The Government argues:
Indeed, as charged in the Indictment, Salim and his co-conspirators were engaged in a single course of conduct that was intended to culminate, on November 1, 2000, with the attack on Officer Pepe, the taking of numerous hostages on Unit 10–South, and

the escape of Salim and his accomplices from the MCC. In the end, because of Officer Pepe's heroic attempt to fight off the attack by Salim and Mohamed, and because of the quick response by other corrections officers and personnel at the MCC, the plan formulated by Salim and his co-conspira-

Section 3A1.4 of the U.S. Sentencing Guidelines provides:

§ 3A1.4. *Terrorism*

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4.

The Commentary to U.S.S.G. § 3A1.4 directs that "Federal crime of terrorism is defined at 18 U.S.C. § 2332b(g)(5)." U.S.S.G. § 3A1.4, Application Note 1. A "Federal crime of terrorism" as defined at 18 U.S.C. § 2332b(g)(5) is "an offense that -

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is a violation of—

i) ... [numerous sections, including] § 1114 (relating to killing or attempted killing of officers and employees of the United States) ..."

18 U.S.C. § 2332b(g)(5).

Defendant makes a number of legal arguments against the application of the terrorism enhancement to his sentence. Defendant argues: (1) in promulgating U.S.S.G. § 3A1.4, the Sentencing Commission exceeded its authority and contra-

vened the intent of Congress; (2) because there is insufficient evidence in the trial record to support the requirements of § 2332b(g)(5)(A), an evidentiary hearing must be held; (3) the "motivational" requirement of 18 U.S.C. § 2332b(g)(5)(A) must be proven by the Government by a heightened standard of proof; (4) application of § 3A1.4 here would violate *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986); and (5) the Government seeks enhancement under § 3A1.4 solely on the basis of allegations of Defendant's claimed links to terrorism. (Def. July 29, 2002 at 19.) Additionally, at the *Fatico* hearing, defense counsel argued: (1) the Rule of Lenity prevents application of U.S.S.G. § 3A1.4 on a theory that Defendant's intent to attack his attorneys meets the requirements of 18 U.S.C. § 2332b(g)(5)(A), (Tr. at 1089), and (2) U.S.S.G. § 3A1.4 should not apply here because Defendant's conduct on November 1, 2000 did not amount to "terrorism" or "terrorist activity." (Tr. at 1083–84.)

### 1. Sentencing Commission's Authority to Promulgate U.S.S.G. § 3A1.4

Defendant pleaded guilty to attempted murder of a federal official, 18 U.S.C. § 1114, which is one of the offenses enumerated at 18 U.S.C. § 2332b(g)(5)(B). Pursuant to U.S.S.G. § 3A1.4, the terrorism enhancement applies if the Court is convinced by a preponderance of the evidence that Defendant's conduct, having

---

tors never made it past the attempted murder of Officer Pepe. However, as the record demonstrates, and as the Government will prove at the hearing scheduled by the Court, the attempted murder of Officer Pepe was motivated by the single hostage taking and escape plan created by Salim and his accomplices. Accordingly, because Salim and his accomplices intended to

force the United States to release them and possibly others by threatening to harm the people taken hostage on Unit 10–South of the MCC, the attempted murder of Officer Pepe was clearly "calculated to influence or affect the conduct of government by intimidation or coercion." 18 U.S.C. § 2332b(g)(5)(A).

(Gov. August 16, 2002 at 33.)

met the requirements 18 U.S.C. § 2332b(g)(5)(B), "involved or tended to promote a federal crime of terrorism." U.S.S.G. § 3A1.4.

A review of the history of U.S.S.G. § 3A1.4 is helpful to its analysis. In 1994, Congress directed the Commission to provide an appropriate enhancement for any felony that "involved or is intended to promote international terrorism." Violent Crime Control and Law Enforcement Act of 1994, Pub L. No. 103–322, § 120004, 108 Stat. 1796, 2022 (1994). The Sentencing Commission responded by replacing the then existing "Terrorism" upward departure provision, U.S.S.G. § 5K2.15,[95] with a new "International Terrorism" enhancement at § 3A1.4. U.S.S.G., Appendix C, Amdt. 526. Section 3A1.4 of the United States Sentencing Guidelines took effect on November 1, 1995.

This first version of U.S.S.G. § 3A1.4 read as follows:

Section 3A1. 4—Terrorism:

(a) If the offense is a felony that *involved, or was intended to promote, international terrorism*,[96] increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4 (1995) (emphasis added).

Section 730 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provided in full:

The United States Sentencing Commission shall forthwith, in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that section had not expired, amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code.[97]

**95.** The "Terrorism" policy statement at U.S.S.G. § 5K2.15 provided for the following upward departure: "[i]f the defendant committed the offense in furtherance of a terroristic action, the court may increase the sentence above the authorized guideline range." U.S.S.G. § 5K2.15 Terrorism (Policy Statement) (promulgated by Amendment 292, and effective November 1, 1989). The § 5K2.15 policy statement was promulgated to address conduct that previously had been "included in the broader policy statement at § 5K2.9 (Criminal Purpose) and other policy statements." U.S. Sentencing Guidelines Manual, Appendix C, Amdt. 292 (effective November 1, 1989).

**96.** For a definition of "International Terrorism," U.S.S.G. § 3A1.4, Application Note 1 referred to 18 U.S.C. § 2331 (1996), which reads in pertinent part:

As used in this chapter -
(1) the term "international terrorism" means activities that—
(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of

any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
(B) appear to be intended—
(i) to intimidate or coerce a civilian population;
(ii) to influence the policy of a government by intimidation or coercion; or
(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum
. . .
18 U.S.C. § 2331 (1996).

**97.** The Conference Report to AEDPA, H.R. 104–518, explained Section 730 as follows:

In amendments to the Sentencing Guidelines that become effective November 1, 1996, a new provision substantially increas-

Pub.L. No. 104–132, § 730, 104th Cong., 2d Sess., 110 Stat. 1214, 1303 (1996).

In response to this Congressional directive, the Sentencing Commission promulgated Amendment 539, amending § 3A1.4:

Section 3A1.4 is amended in the title by deleting "International". Section 3A1.4(a) is amended by deleting "international" and inserting in lieu thereof "a federal crime of". The Commentary to § 3A1.4 captioned "Application Notes" is amended in Note 1 in the first sentence by deleting "international" and inserting in lieu thereof "a federal crime of"; and in the second sentence by deleting "International" and inserting in lieu thereof "Federal crime of", and by deleting "2331" and inserting in lieu thereof "2332b(g)".

This amendment implements section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1303. That section requires the Commission to amend the sentencing guidelines so that the adjustment in § 3A1.4 (relating to international terrorism) applies more broadly to a "Federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g), and provides that the Commission shall have the authority to promulgate this amendment as an emergency amendment under procedures set forth in section 21(a) of the Sentencing Act of 1987. The effective date of this amendment is November 1, 1996.

United States Sentencing Guidelines Manual, Appendix C, Amdt. 539 (effective Nov. 1, 1996).[98]

On November 1, 2002, without explanation or direction from Congress, the Sentencing Commission amended U.S.S.G. § 3A1.4, Note 1 to read as follows:[99]

es jail time for offenses committed in connection with a crime of international terrorism. This section of the bill will make that new provision applicable only to those specifically listed federal crimes of terrorism, upon conviction of those crimes with the necessary motivational element to be established at the sentencing phase of the prosecution, without having to wait until November 1996 for the change to become law. H. Conf. Rep. 104–518, at 123, 104th Cong., 2d Sess., reprinted in 1996 U.S.C.C.A.N. 944, 956.

98. One year later, in Amendment 565, the Commission made Amendment 539 permanent. United States Sentencing Commission, U.S. Sentencing Guidelines Manual, Appendix C, Amdt. 565 (effective Nov. 1, 1997).

99. In Amendment 637, the Commission also added a new Note 2 to the Commentary accompanying U.S.S.G. § 3A1.4:

Harboring, Concealing, and Obstruction Offenses.—For purposes of this guideline, an offense that involved (A) harboring or concealing a terrorist who committed a federal crime of terrorism (such as an offense under 18 U.S.C. § 2339 or § 2339A); or (B) obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism. United States Sentencing Commission, U.S. Sentencing Guidelines Manual, Appendix C, Amdt. 637 (effective Nov. 1, 2002).

Amendment 637 also added a new Note 4 to the Commentary accompanying U.S.S.G. § 3A1.4:

Upward Departure Provision.—By the terms of the directive to the Commission in section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, the adjustment provided by this guideline applies only to federal crimes of terrorism. However, there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B); or (B) the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of govern-

1. "Federal Crime of Terrorism Defined." — For purposes of this guideline, "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5).

U.S. Sentencing Guidelines Manual, Supplement to Appendix C, Amendment 637 (effective November 1, 2002).

Comparing the prior versions of U.S.S.G. § 3A1.4 with the version at issue here, it is clear that the Sentencing Commission interpreted the directive of Section 730 of AEDPA as instructing the Commission to substitute the term "federal crime of terrorism" for "international terrorism," while leaving the rest of U.S.S.G. § 3A1.4 untouched. Defendant argues that, because U.S.S.G. § 3A1.4 applies to any offense that "involved, or was intended to promote, a federal crime of terrorism," instead of limiting application to offenses enumerated at 18 U.S.C. § 2332b(g)(5)(B), the Sentencing Commission exceeded its authority and contravened the intent of Congress by promulgating U.S.S.G. § 3A1.4, and therefore the enhancement cannot apply to Defendant. (Def. July 29, 2002 at 13–15.)

Defendant argues further that the legislative history of Section 730 of AEDPA, in response to which the United States Sentencing Commission promulgated U.S.S.G. § 3A1.4, indicates that Congress clearly intended for the terrorism enhancement to apply *only* to offenses enumerated at § 2332b(g)(5)(B). This question is a matter of first impression in this Circuit.[100]

Defendant relies heavily upon arguments articulated in Judge Cohn's dissenting opinion in *United States v. Graham,* a Sixth Circuit decision. *See generally United States v. Graham,* 275 F.3d 490, 529–37 (Cohn, J., dissenting), *cert. denied,* 535 U.S. 1026, 122 S.Ct. 1625, 152 L.Ed.2d 636 (2002). In *Graham,* the Sixth Circuit held that application of U.S.S.G. § 3A1.4 to crimes not enumerated at 18 U.S.C. § 2332b(g)(5)(B) was consistent with the text of U.S.S.G. § 3A1.4, so long as in sentencing the defendant the district court "identif[ies] which enumerated 'Federal crime of terrorism' the defendant intended to promote, satisf[ies] the elements of 18 U.S.C. § 2332b(g)(5)(A), and support[s] its conclusions by a preponderance of the evidence with facts from the record."[101] *Graham,* 275 F.3d 490, at 517 (6th Cir. 2001). The *Graham* majority addressed neither the question of the Sentencing Commission's authority nor the proper scope of U.S.S.G. § 3A1.4 in light thereof. However, in a lengthy dissent, Judge Avern Cohn concluded that application of U.S.S.G. § 3A1.4 to offenses of conviction that are not enumerated at 18 U.S.C. § 2332b(g)(5)(B) exceeds the authority of the United States Sentencing Commission. *See Graham,* 275 F.3d at 537.

---

ment by intimidation or coercion, or to retaliate against government conduct. In such cases an upward departure would be warranted, except that the sentence resulting from such a departure may not exceed the top of the guideline range that would have resulted if the adjustment under this guideline had been applied.

United States Sentencing Commission, U.S. Sentencing Guidelines Manual, Appendix C, Amdt. 637 (effective Nov. 1, 2002).

**100.** In *United States v. Meskini,* 319 F.3d 88 (2d Cir.2003) the Second Circuit did not ad-

dress the arguments raised by Defendant here. *Meskini,* 319 F.3d at 91–92 (holding that U.S.S.G. § 3A1.4 does not violate a defendant's right to due process, and legitimately considers a single act of terrorism for both the Offense Level and the Criminal History Category).

**101.** One district court has criticized this conclusion as "questionable redrafting of § 2332b(g)(5)." *United States v. Arnaout,* 282 F.Supp.2d 838 (N.D.Ill.2003)

Even if this Court were to follow the reasoning in Judge Cohn's dissenting opinion, his argument would not control the facts of this case. Defendant here pleaded guilty to an offense that is specifically enumerated at 18 U.S.C. § 2332b(g)(5)(B)—specifically, attempted murder of officers and employees of the United States in violation of 18 U.S.C. § 1114. Because Defendant was convicted of an offense enumerated at 18 U.S.C. § 2332b(g)(5)(B), this Court need not reach the question whether the Sentencing Commission exceeded its authority by expanding the application of U.S.S.G. § 3A1.4 to offenses of conviction that are not enumerated at 18 U.S.C. § 2332b(g)(5)(B).

### 2. Hearing Requirement

■■■ The term "Federal crime of terrorism" is defined at 18 U.S.C. § 2332b(g)(5) as an offense that:

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is a violation of—

i) . . . [numerous sections, including] § 1114 (relating to killing or attempted killing of officers and employees of the United States) . . .

18 U.S.C. § 2332b(g)(5).

In his July 29, 2002 submission prior to the *Fatico* hearing, Defendant argues that courts outside this circuit that have analyzed § 3A1.4 have held that a necessary condition for the application of § 3A1.4 is proof that the defendant satisfied 2332b(g)(5)(A), the so-called "motivational prong" of the definition. *Graham*, 275 F.3d at 517 (holding that district court must "satisfy the elements of § 2332b(g)(5)(A)"); *United States v. Leahy*, 169 F.3d 433, 446 (7th Cir.1999) (vacating sentence where district court had used 3A1.4 as an analogous sentencing factor for possession of a deadly toxin in violation of 18 U.S.C. § 175(a), because there was "absolutely no evidence in the record that Leahy sought to influence or affect the conduct of the government").

In his submission Defendant emphasized that the record does not contain evidence that the offenses to which Defendant pleaded guilty were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and argued that "an evidentiary hearing is plainly mandated." (Def. July 29, 2002 at 19–20.) Of course, an evidentiary hearing was held on precisely this issue. At the *Fatico* hearing, Defendant not only cross-examined the Government's witnesses at length, he offered evidence of his own and testified at length before the Court. Thus, the *Fatico* hearing satisfies Defendant's claim for an evidentiary hearing.

### 3. Standard of Proof for U.S.S.G. § 3A1.4

■■■ Defendant argues that because the enhancement under U.S.S.G. § 3A1.4 will "exponentially" increase his sentence, the court should require the Government to establish the motivational prong of U.S.S.G. § 3A1.4 by clear and convincing evidence. (Def. July 29, 2002 at 20.) Defendant notes that where an enhancement is grossly disproportionate to the base sentence for the substantive offense, district courts in the Third Circuit impose upon the Government an evidentiary burden higher than a preponderance of the evidence. *United States v. Kikumura*, 918 F.2d 1084 (3d Cir.1990). Defendant acknowledges the Second Circuit has not adopted such a rule but argues that: 1) the Second Circuit has never confronted "such an exponentially increased" sentence as this one; 2) the Second Circuit has

"indicated that it might follow" *Kikumura* in an appropriate case, *United States v. Concepcion,* 983 F.2d 369, 390 (2d Cir. 1992); and 3) in view of the dramatic sentence increase here, this court should apply the rule in *Kikumura.* (Def. July 29, 2002 at 21.)

Citing *United States v. Cordoba–Murgas,* 233 F.3d 704, 708–09 (2d Cir.2000), the Government argues that Defendant's reliance on *Kikumura* is "entirely misplaced, as the Second Circuit has explicitly rejected the reasoning in *Kikumura.*" (Gov. Aug. 16, 2002 at 29.)

In *United States v. Murgas,* 31 F.Supp.2d 245 (N.D.N.Y.1998), defendant Cordoba,[102] having been convicted on drug conspiracy charges in violation of 21 U.S.C. § 846, faced sentencing with a Sentencing Guidelines Base Offense Level of 34 and a Criminal History Category of I, which subjected him to a potential term of imprisonment of 151 to 188 months. 31 F.Supp.2d at 248. Prior to Cordoba's sentencing, the Government presented evidence suggesting he had been involved in the murder of two individuals, and pursuant to U.S.S.G. §§ 2D1.1(d)(1) and 2A1.1, asked the district judge to depart upward nine levels under the Guidelines to a Base Offense Level of 43. Having determined that the upward departures would have resulted in a life sentence, the District Judge applied a clear and convincing standard to the evidence relating to the homicides, and finding that the Government had failed to meet that burden, denied the request to depart upward. *United States v. Murgas,* 31 F.Supp.2d at 257–58.

The Second Circuit, noting that "[t]his circuit has not adopted the holding of *Kikumura,*" vacated and remanded for re-sentencing, holding that the district court was "required to employ the preponder-

ance of the evidence standard rather than the 'clear and convincing' standard." *Cordoba–Murgas,* 233 F.3d at 709.

As compared to the nine-level upward departure in *Cordoba Murgas,* Defendant's Offense Level under U.S.S.G. § 3A1.4 would depart upward by twelve, and his Criminal History Category would increase from I to VI. Defendant is correct in his characterization of this enhancement as "exponential." Nonetheless, the Second Circuit's unequivocal language on the requisite burden of proof leaves this court no discretion to require the Government to meet a higher burden than a preponderance of the evidence.

### 4. Factual Determinations Under U.S.S.G. § 3A1.4 in light of Apprendi and McMillan

■ Defendant argues that enhancement under § 3A1.4 is impermissible under the rule in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Defendant notes that conspiracy to murder (18 U.S.C. § 1117) carries a statutory maximum of life imprisonment, while attempted murder (18 U.S.C. § 1114) carries a statutory maximum of 20 years imprisonment; Defendant further notes that the terrorism enhancement, U.S.S.G. § 3A1.4, applies to offenses enumerated at 18 U.S.C. § 2332b(g)(5)(B). Defendant argues that because 18 U.S.C. § 1117 is not an offense enumerated at 18 U.S.C. § 2332b(g)(5)(B), the enhancement cannot apply to that count, and therefore, as to his offenses of conviction, the enhancement can *only* be applied to 18 U.S.C. § 1114. Since application of U.S.S.G. § 3A1.4 here would result in a life sentence—well beyond the 20–year statutory maximum for 18 U.S.C. § 1114—De-

---

**102.** Although there were three defendants in *Cordoba Murgas,* the facts pertaining to defen-

dant Raul Cordoba are the most instructive to this case.

fendant argues that under *Apprendi,* the facts supporting the § 3A1.4 enhancement must be proven to a jury beyond a reasonable doubt. (Def. July 29, 2002 at 21–22 (citing *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348).)

In short, Defendant's argument is that the terrorism enhancement increases his sentence beyond the statutory maximum for 18 U.S.C. § 1114. However, because Defendant also pleaded guilty to 18 U.S.C. § 1117, which has a statutory maximum of life imprisonment and is "grouped" with the 18 U.S.C. § 1114 count, Defendant's argument fails under the rule in *United States v. Feola,* 275 F.3d 216, 220 (2d Cir.2001).

In *Feola,* the defendant was convicted of tax fraud, 26 U.S.C. § 7203, which carries a statutory maximum sentence of 12 months, and bank fraud, 18 U.S.C. § 1344, which carries a statutory maximum sentence of 360 months. On the basis of facts pertaining to the magnitude of the tax loss, the District Court assigned defendant an Offense Level of 19, and after departing downward by 3 for acceptance of responsibility, sentenced the defendant to a 24–

month sentence of imprisonment. *Feola,* 275 F.3d at 219–20.

On appeal, the defendant in *Feola* argued that the district court violated the holding of *Apprendi* because conduct relevant to his tax offense resulted in a concurrent sentence that exceeded the one year statutory maximum for the tax count. The Second Circuit rejected the defendant-appellant's argument.[103]

As the Second Circuit explained, although the District Court's sentence of 24 months imprisonment exceeded the 12–month statutory maximum for the tax fraud count, the sentence

> … was required to be imposed on the bank fraud count, for which the statutory maximum was 360 months. The minimum sentence in that range, 24 months, was imposed on the bank fraud count to run concurrently with the 12–month sentence on the tax count.

*Id.*

Here, since 18 U.S.C. § 1114 and 18 U.S.C. § 1117, to which Defendant pleaded guilty, involve "substantially the same harm," they are "grouped" together. U.S.S.G. § 3D1.2. For a defendant who faces sentencing on only one group of

---

**103.** The court explained its method for arriving at the defendant's sentence under the Guidelines:

> Understanding appellant's argument and ultimately its lack of merit requires some explanation of the Guidelines' provisions for sentencing a defendant convicted on multiple counts. First, counts "involving substantially the same harm" are "grouped" together. Next, an offense level for each group is determined either by using the offense level, enhanced by relevant conduct, for the most serious offense within the group, or, if counts involving drugs or money are within the group, using the offense level for the aggregate quantity of drugs or money, enhanced by relevant conduct. Next, a combined offense level is determined by using the offense level for the group with the highest level and then adjusting upward depending on the offense levels of the other groups. Next, a total punishment is selected, using the sentencing range prescribed for the combined offense level and the appropriate criminal history category. Finally, sentences are imposed by sentencing the defendant to the prescribed total punishment on each count, *up to the statutory maximum for that count;* if at least one count carries a statutory maximum greater than the prescribed total punishment, the sentences are concurrent, but if the total punishment exceeds the statutory maximums on all counts, the sentences are imposed consecutively to the extent necessary to achieve the prescribed total punishment.

*Feola,* 275 F.3d at 219 (internal citations omitted).

counts, under the applicable Guidelines Rules a combined sentence is determined for the group. U.S.S.G. § 3D1.5. Since the aggregate maximum sentence for the "group" of counts underlying Defendant's Base Offense Level is life imprisonment, *Apprendi* does not bar application of U.S.S.G. § 3A1.4 to Defendant's case, even though application of U.S.S.G. § 3A1.4 will result in a sentence in excess of the 20 year maximum under 18 U.S.C. § 1114. *Feola*, 275 F.3d at 220.

▪ Defendant also argues that application of U.S.S.G. § 3A1.4 to these facts would violate the rule of *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). Defendant argues that in *McMillan*, the Supreme Court upheld Pennsylvania's Mandatory Minimum Sentencing Act, "only because the statute in question 'neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion.'" (Def. July 29, 2002 at 22, (quoting *McMillan*, 477 U.S. at 87–88, 106 S.Ct. 2411).)

In *McMillan*, defendants sentenced under Pennsylvania's Mandatory Minimum Sentencing Act (the "Act") challenged the Act, alleging violations of the Due Process Clause of the Fourteenth Amendment and the jury trial guarantee of the Sixth Amendment. 477 U.S. at 80, 106 S.Ct. 2411. Under the Act, if after considering evidence introduced at trial and at a sentencing hearing, a sentencing judge found that a preponderance of the evidence established that the defendant "visibly possessed a firearm" during the commission of the offense of conviction, the judge was required to sentence the defendant to a minimum of five years' imprisonment. The Supreme Court acknowledged that, as recognized in *Patterson v. New York*, 432 U.S. 197, 210, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), in certain circumstances, the reasonable doubt requirement stated in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), applies to facts not formally identified as elements of the offense charged. *McMillan*, 477 U.S. at 86, 106 S.Ct. 2411. However, the Supreme Court upheld the Act because the court was "persuaded by several factors that" the statute at issue did not exceed the constitutional limits articulated in *Winship*, based on its findings that the statute: (1) did not allow impermissible burden shifting, (2) resulted from a choice by the legislature to take "one factor that has always been considered by sentencing courts to bear on punishment and dictated the weight to be given that factor ...", and (3) did not create a separate offense calling for a separate penalty.[104] *McMillan*, 477 U.S. at 89–90, 106 S.Ct. 2411.

Applying the *McMillan* analysis here, U.S.S.G. § 3A1.4 does not discard the presumption of innocence; neither does it "relieve the prosecution of its burden of proving guilt," *McMillan*, 477 U.S. at 87, 106 S.Ct. 2411; instead, U.S.S.G. § 3A1.4 "only becomes applicable after a defendant has been duly convicted of the crime for which he is to be punished." *Id.* The terrorism enhancement at U.S.S.G. § 3A1.4 is applicable here only at sentencing, after Defendant pleaded guilty to 18 U.S.C. § 1114 and 18 U.S.C. § 1117, and therefore allows no impermissible burden-shifting. *Id.*

Analysis of the second *McMillan* factor provides no stronger basis for finding U.S.S.G. § 3A1.4 violates the commands of

---

**104.** This holding of *McMillan* has been limited to cases "that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict—a limitation identified in the McMillan opinion itself." *Apprendi v. New Jersey*, 530 U.S. 466, 486 n. 13, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

*Winship.* Like the Pennsylvania statute considered by the Supreme Court in *McMillan,* Section 3A1.4 merely takes "one factor that has always been considered by sentencing courts to bear on punishment"—here, the motivation of the Defendant in the commission of a crime, with particular attention to crimes against the United States—"and dictate[s] the precise weight to be given that factor." *McMillan,* 477 U.S. at 89–90, 106 S.Ct. 2411.

The third factor affords Defendant's argument little support, since on the facts of this case and in light of the construction given the provision by this Court, U.S.S.G. § 3A1.4 does not "create a separate offense calling for a separate penalty." As construed by this Court, U.S.S.G. § 3A1.4 only applies to violations of the offenses enumerated at § 2332b(g)(5)(B).[105] On the facts presented here, the substantial upward Offense Level adjustment, the increase in Criminal History Category, and the mandatory minimum sentence under § 3A1.4 are nonetheless within the statutory maximum life sentence for the offenses to which Defendant pleaded guilty. As noted, application of § 3A1.4 does not increase Defendant's sentence beyond the statutory maximum; instead, it increases it to a sentence within the Offense Level range established for the group of crimes to which Defendant pleaded guilty—a range which is determined by the most serious offense in the group. U.S.S.G. § 3D1.3(a).

Thus, as construed by this Court and on the facts presented here, U.S.S.G. § 3A1.4 "neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty."

*McMillan,* 477 U.S. at 87–88, 106 S.Ct. 2411. Instead, the enhancement at § 3A1.4 only "operates to limit the sentencing court's discretion" within the statutory maximum for Defendant's offenses of conviction, *id.,* and accordingly does not violate the Constitutional requirements set forth in *Winship.*

### 5. Governmental Bias

Defendant makes the "self-evident" point that the Government would not be seeking the 3A1.4 enhancement if "Mike Smith" were being sentenced, and that this enhancement is being sought only because of "prejudicial, unproven 'terrorist allegations.'"

Defendant Salim was in the MCC because he was charged with acts of terrorism in another, still outstanding Indictment. Throughout the instant case the Court has been vigilant in its effort to avoid tainting the crimes charged in this case, S1 01–CR–002 (DAB), with those crimes charged but not yet proven against the Defendant in 98–CR–1023. As soon as Defendant began testifying at the *Fatico* hearing about his difficulties with his attorneys in 98–CR–1023, the Court cautioned defense counsel that the charges in that case were still pending. (Tr. at 635, 639.) The court repeated this admonition later, as Defendant gave his account of further conflicts with his attorneys. (*Id.* at 672–74.) Defendant's current attorneys in 98–CR–1023 were present at the *Fatico* hearing, (*Id.* at 639), and at one point at the sidebar were permitted to present to the Court their concerns about Defendant's potential waivers of rights under the

---

**105.** *But see United States v. Graham,* 275 F.3d 490, 529–37 (6th Cir.2001) (application of U.S.S.G. § 3A1.4 to crimes not enumerated at 18 U.S.C. § 2332b(g)(5)(B) is consistent with the text of U.S.S.G. § 3A1.4, so long as at sentencing the district court "identif[ies] which enumerated 'Federal crime of terrorism' the defendant intended to promote, satisf[ies] the elements of 18 U.S.C. § 2332b(g)(5)(A), and support[s] its conclusions by a preponderance of the evidence with facts from the record.").

Fifth Amendment. (*Id.* at 641–44.) When defense counsel interrupted Defendant's testimony about his conversation with Mohamed about facts relevant to 98–CR–1023, the Government objected:

MR. BUEHLER [the Government]: Your Honor, my concern is, this is obviously an important conversation. Mr. Lind has asked a question. His client is in the middle of answering it and Mr. Lind now has attempted to stop his client from answering and consult with him right in the middle of direct.

THE COURT: Which is better than on cross isn't it?

Mr. Buehler: I don't know that I understand.

THE COURT: It's better that he consult with him on direct than when he is on cross.

MR. BUEHLER: I guess that's right, your Honor. In the middle of an answer, I just think I am concerned. I think it's inappropriate.

THE COURT: Under these circumstances, I think it's extremely appropriate. You recall when we first came up here, when I asked you to come up, when he started testifying, I guess it was on Wednesday, I was very concerned that he get into matters that dealt with the other case. It seems to me that what he is talking about now has nothing to do with this case; and, therefore, I think it is appropriate for Mr. Lind to stop him. And, indeed, I would permit Mr. Lind to lead him to the part of the conversation that he thinks is relevant to this case.

MR. BUEHLER: Your Honor, I would like to be heard a bit more.

THE COURT: Go right ahead.

MR. BUEHLER: Your Honor, Mr. Lind asked a typical direct question, it was an open-ended question. Mr. Salim, who appears to be an intelligent person, fully understands what he wants to communicate to the Court and what he doesn't want to, has decided to answer the question in a way that he obviously feels is responsive to it.

THE COURT: No. Come on, Mr. Buehler.

MR. BUEHLER: Your Honor, obviously what he is doing, he is getting into how he was able to convince Mr. Mohamed to become a part of this conspiracy, and therefore while it may touch a little bit on the other case, it seems to be very relevant to here. This is how we are learning how Salim was able to get his apparently only co-conspirator involved in the very act that we are trying to determine what his motivation—to determine his motivation. I just think we should be able to get that answer, and if it impinges on his other case, we know from what Mr. Lind said on Wednesday, and when his other attorneys came up here, and they are in court today, he has certainly been advised over and over again about the pitfalls of that and he has made the decision to testify.

THE COURT: The man is an electrical engineer; he is not a lawyer. I think there are a lot of people who graduated from law school and actually practice who would have difficulty knowing when the line is crossed from this case to the next case. That is why I am giving Mr. Lind a lot of leeway here, because I don't want to go into it. I don't want anything that will impinge on his other case, unless you're going to tell me that you're going to drop these charges, and then I will let you go ahead. Are you going to do that?

MR. BUEHLER: No, your Honor.

THE COURT: That's the point. Then he has not waived his Fifth Amendment

rights in relation to that case, and I am going to do everything I can to protect them.

(*Id.* at 789–91.)

In a similar colloquy, the Court admonished the Government for pursuing a line of questioning with Defendant about the content of the indictment in 98–CR–1023. (*Id.* at 840–42.) Defendant's guilty plea in the matter now before this Court did not address in any way the charges still pending in 98–CR–1023. Accordingly, the Court finds that the matter before it has not been tainted by 98–CR–1023, nor has that case been compromised by the proceedings before this Court.

### 6. The Rule of Lenity

██ In its letter of September 12, 2002 and at the *Fatico* hearing, the Government argued in the alternative that, even if the Court accepts Defendant's theory of the case, Defendant's "attempt to force Judge Sand to appoint new lawyers to represent him and to sever his trial from the trial of his co-defendants in the embassy bombing case" was a Federal crime of terrorism within the meaning of 18 U.S.C. § 2332b(g)(5), since Defendant's actions were calculated to influence or affect Judge Sand's decision as to Defendant's counsel. The Government argued that the term "government" in 18 U.S.C. § 2332b(g)(5) was not limited to any particular branch of government, that because of Defendant's actions Judge Sand had no

alternative but to substitute counsel in 98–CR–1023, contrary to his prior rulings, and that this was the "very definition of coercion." (*Id.* at 1089.)

In response to the Government's alternative argument, Defendant argues there is no legal support for the application of 18 U.S.C. § 2332b(g)(5) to conduct intended to influence judicial officers, and that the Rule of Lenity prevents the application of a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. (Tr. at 1083) (citing *United States v. Cohen,* 260 F.3d 68, 76 (2d Cir.2001) and *United States v. Lanier,* 520 U.S. 259, 266–67, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

Defendant's arguments founder on the fact that it is hardly a novel construction of law to conclude that the "conduct of government" embraces the substitution of assigned counsel by federal district judges.[106] In the 98–CR–1023 proceedings, Defendant applied for and was represented by assigned counsel. 18 U.S.C. § 3006A(c) provides by statute clear judicial authority to substitute Defendant's appointed counsel "at any stage in the proceedings." [107]

Moreover, Judge Sand's oral orders at the suppression hearing on October 18–20, 2000, denying Defendant's requests at the hearing to substitute counsel and to delay the hearing, and delaying disposition of the substitution issue until Judge Eaton could

---

**106.** From the *Fatico* hearing:

> MR. LIND [for the Defendant]: Now let me go to ... [the government's] alternative theory for application of 3A1.4, in which they mention in the letter was trying to force Judge Sand to appoint new lawyers and to sever Salim's case. There are a number of reasons why that requested application alternative version should be denied. First of all, your Honor, the government does not and indeed cannot cite any, it's not in the statute first of all, that it applies to influenc-

> ing a—the government, that that also applies to the judicial officers.
> THE COURT: Wait a second. The last time I took a civics lesson there were three branches of government, and I am in one of them.

(Tr. at 1082.)

**107.** Defendant does not claim Congress was without authority to grant such power by statute.

hold a hearing on the matter, were judicial actions that were clearly within Judge Sand's discretion. *See, e.g., United States v. Scopo,* 861 F.2d 339, 344 (2d Cir.1988) (upholding denial of adjournment of trial, where Defendant was warned that counsel would be unable to represent him at trial, the court repeatedly made it clear that it would not adjourn, and ordered defendant to find new counsel, but defendant failed to do so); *United States v. Marcus Schloss & Co., Inc.,* No. 88–CR–896, 1988 WL 140794 (S.D.N.Y. Dec.20, 1988) (imposing trial calendar and motion schedule over the objections of two co-defendants' counsel, and requiring any attorney who was unavailable for trial to "advise his client to begin the process of securing alternative representation," to avoid prejudice to co-defendants and conserve scarce judicial resources).

 Further, Defendant misconstrues the Rule of Lenity itself. The Rule of Lenity is only of interpretive value where a statute is ambiguous. *United States v. Concepcion,* 983 F.2d 369, 380 (2d Cir. 1992). In *United States v. Cohen,* 260 F.3d 68 (2d Cir.2001), cited by Defendant, the Second Circuit set forth the conditions under which the Rule of Lenity applies:

> The rule of lenity applies where there exists a "grievous ambiguity" in a statute, such that after seizing everything from which aid can be derived, [a court] can make no more than a guess as to what Congress intended. The rule exists to prevent courts from "applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."

*United States v. Cohen,* 260 F.3d 68, 76 (2d Cir.2001) (internal quotation marks and citation omitted).

Here, Defendant has identified no "grievous ambiguity" in the sentencing provisions at issue, and has not shown how this Court's construction of "conduct of government" to include Judge Sand's refusal to substitute counsel is novel.

Accordingly, neither argument presented by Defendant on the Government's alternative theory has any merit.

### 7. Definition of "Terrorism"

Defendant argues that U.S.S.G. § 3A1.4 is not applicable on the instant facts because Defendant's conduct on November 1, 2000 did not amount to "terrorism" or "terrorist activity." (Tr. at 1083–84.) Specifically, Defendant cites a House Judiciary Committee report, which accompanied a draft of legislation that directed the Sentencing Commission to promulgate the applicable version of U.S.S.G. § 3A1.4, and which states that the purpose of the sentencing enhancement was to "establish significant and meaningful penalties for those who undertake criminal activities in the name of political change." (Tr. at 1083–84, *citing* H.R.Rep. No. 104–383 at 38 (1995)). Also citing definitions of terrorism contained in other statutory and regulatory provisions, 28 CFR § 0.85 (FBI definition), 22 U.S.C. § 2656(f) (State Department), Defendant argues that "political change" is the "touchstone" of terrorism, and that since Defendant had no intention to effect "political" change in attacking Officer Pepe, his sentence should not be increased under the "terrorism" enhancement at U.S.S.G. § 3A1.4. (Tr. at 1084.)

The authorities upon which Defendant relies do not support his argument. The House Judiciary Committee's stated purpose in drafting the sentencing provisions in H.R. 1710 is at best a weak guide in interpreting the meaning of "Federal crime of terrorism." To begin, H.R. 1710 was never passed; instead, on the same day the House Judiciary Committee re-

ported its amendments to H.R. 1710, Representative Henry Hyde introduced in the House of Representatives H.R. 2703, a new version of the Anti–Terrorism and Effective Death Penalty Act. Furthermore, while H.R. 1710 contained a definition of terrorism that specifically referred to conduct with social and political "ends," [108] and may have reflected a desire by its drafters to reach defendants who "undertake criminal activities in the name of political change," the enacted version of the Anti–Terrorism and Effective Death Penalty Act ("AEDPA") contained no such reference. Instead, as enacted, AEDPA provided a definition of "federal crime of terrorism" within a newly-created 18 U.S.C. § 2332b.

More to the point, while the legislative history, statutes and code sections to which Defendant refers might inform a general discussion about "terrorism," U.S.S.G. § 3A1.4 specifically provides that "Federal crime of terrorism" is defined at 18 U.S.C. § 2332b(g)(5). Thus, whether or not Defendant's conduct falls outside the definitions of terrorism provided at 22 U.S.C. § 2656(f) or 28 C.F.R. § 0.85 is irrelevant to a determination of whether or not Defendant's conduct constitutes a "Federal crime of terrorism." Since the

Sentencing Commission has directed the Court to refer to 18 U.S.C. § 2332b(g)(5) for a definition of "Federal crime of terrorism," speculation about what is or is not a "touchstone" of terrorism is immaterial. Accordingly, the Court declines to construe a "Federal crime of terrorism" to require political or social ends.

## IV. APPLICATION OF U.S.S.G. § 3A1.4 TO SOLELY DOMESTIC CONDUCT

Section 3A1.4 of the U.S. Sentencing Guidelines provides:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4.

The Commentary to § 3A1.4 explains that "[s]ubsection (a) increases the offense level if the offense involved or was intended to promote a Federal crime of terror-

---

**108.** Section 315 of H.R. 1710 provided:

Section 2331 of title 18, United States Code, is amended—

(1) so that paragraph (1) reads as follows:

'(1) the term 'terrorism' means the use of force or violence in violation of the criminal laws of the United States or of any State, or that would be in violation of the criminal laws of the United States or of any State if committed within the jurisdiction of the United States or that State that appears to be intended to achieve political or social ends by—

'(A) intimidating or coercing a segment of the population;

'(B) influencing or coercing a government official or officials; or

'(C) affecting the conduct of a government through assassination or kidnapping;';

(2) by inserting after paragraph (1) the following:

(2) the term 'international terrorism' means terrorism that occurs primarily outside the territorial jurisdiction of the United States, or transcends national boundaries in terms of the means by which it is accomplished, the persons it appears intended to intimidate or coerce, or the locale in which its perpetrators operate or seek asylum;'; and

(3) by redesignating existing paragraphs (2) through (4) as paragraphs (3) through (5), respectively.

H.R. 1710, 104th Cong., § 315 (1995).

ism as defined at 18 U.S.C. § 2332b(g)(5)." U.S.S.G. § 3A1.4, Application Note 1.

Section 3A1.4 of the United States Sentencing Guidelines was the Sentencing Commission's mandated response to Section 730 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), in which Congress directed that:

> The United States Sentencing Commission shall forthwith, in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that section had not expired, amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code.

Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104–132, § 730, 104th Cong., 2d Sess., 110 Stat. 1214, 1303 (1996).

The Sentencing Commission responded with Amendment 539 to the U.S. Sentencing Guidelines, which resulted in the text of U.S.S.G. § 3A1.4 that is applicable in this case. Appendix C, Amend. 539.[109] Subsequently, on November 1, 2002, without explanation, the Sentencing Commission amended U.S.S.G. § 3A1.4, Note 1 to read as follows: [110]

1. "Federal Crime of Terrorism Defined." --- For purposes of this guideline, "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5).

U.S. Sentencing Guidelines Manual, Supplement to Appendix C, Amendment 637 (effective November 1, 2002).

Section 2332b(g)(5) of Title 18 provides: the term "Federal crime of terrorism" means an offense that -

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is a violation of -

... [numerous enumerated sections, including] 18 U.S.C § 1114 (relating to killing or attempted killing of officers and employees of the United States) ...

18 U.S.C. § 2332b(g)(5).

 Because " '[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole,' " *Desiderio v. National Ass'n of Securities Dealers, Inc.,* 191 F.3d 198, 204 (2d Cir.1999) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)), and because "the 'meaning of a word [or phrase] cannot be determined in isolation, but must be drawn from the context in which it is

---

**109.** The commentary to Amendment 539 states:

This amendment implements section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1303. That section requires the Commission to amend the sentencing guidelines so that the adjustment in § 3A1.4 (relating to international terrorism) applies more broadly to a "Federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g), and provides that the Commission shall have the authority to promulgate this amendment as an emergen-

cy amendment under procedures set forth in section 21(a) of the Sentencing Act of 1987. The effective date of this amendment is November 1, 1996.

U.S. Sentencing Guidelines Manual, Supplement to Appendix C, Amendment 538 (effective November 1, 1996).

**110.** As noted *supra,* note 99, Amendment 637 also added two new Notes to the Commentary accompanying U.S.S.G. § 3A1.4. However, neither of the two added Notes are pertinent to the discussion in this section.

used,'" *Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 146 (2d Cir.1999) (quoting *Deal v. United States,* 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993)), we look to 18 U.S.C. § 2332b, wherein the definition of "Federal crime of terrorism" occurs.

Section 2332b is entitled "Acts of terrorism transcending national boundaries," and consists of seven subsections. Subsection "(a)" enumerates "Prohibited acts;" subsection "(b)" details "Jurisdictional bases;" subsection "(c)" lists "Penalties" for violations of the section; subsection "(d)" states the "Proof requirements" for prosecutions under the section; subsection "(e)" states offenses over which there is "Extraterritorial jurisdiction;" subsection "(f)" provides the Attorney General with "Investigative authority" with respect to "all Federal crimes of terrorism;" subsection "(g)" provides "Definitions" for terms, "As used in [Section 2332b]."

Apart from the definition contained at 18 U.S.C. 2332b(g)(5), the term "Federal crime of terrorism" appears only at 18 U.S.C. § 2332b(f).[111] In its entirety, the applicable version of § 2332b(f) provides:

> Investigative authority.—In addition to any other investigative authority with respect to violations of this title, the Attorney General shall have primary investigative responsibility for all Federal crimes of terrorism, and any violation of section 351(e), 844(e), 844(f)(1), 956(b), 1361, 1366(b), 1366(c), 1751(e), 2152, or 2156 of this title, and the Secretary of the Treasury shall assist the Attorney General at the request of the Attorney

General. Nothing in this section shall be construed to interfere with the authority of the United States Secret Service under section 3056.

18 U.S.C. § 2332b(f).

There is no consideration in the case law of the limits on the Attorney General's "primary investigative responsibility" with respect to "Federal crimes of terrorism" pursuant to § 2332b(f).

Whether Defendant's conduct, involving solely domestic activities, falls within the scope of the term "Federal crime of terrorism" is a question this Court considers according to standard principles of statutory interpretation.[112] To aid in its analysis of this question, by Order of December 19, 2002 the Court directed the parties to brief the question whether Defendant's conduct, a solely domestic crime, fell within the definition of the term "Federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g). Pursuant to the Court's Order, the Government submitted a Memorandum of Law, (Gov. January 31, 2003); Defendant submitted a responsive brief, (Def. February 21, 2003); the Government replied (Gov. February 28, 2003); and Defendant submitted a two-paragraph "surreply," (Def. March 3, 2003), to address issues Defendant claims were raised for the first time in the Government's Reply brief.

The Government argues that the definition of a "Federal crime of terrorism" found at 18 U.S.C. § 2332b(g)(5) applies to offenses enumerated in Section 2332b(g)(5)(B) without regard to the location where the offense was committed, "so

---

**111.** Indeed, 18 U.S.C. § 2332b(f) is the only place the term is used in the entire United States Code.

**112.** In accord with the practice of courts in this Circuit, the Court applies standard principles of statutory construction to the provisions of the United States Sentencing Guide-

lines and accompanying Commentary. *See, e.g. United States v. Hendrickson,* 26 F.3d 321 (2d Cir.1994) (applying plain meaning, grammatical canons, and the avoidance of subversion of purposes canon to Guideline provisions and accompanying Application Notes).

long as the factual predicate contained in Section 2332b(g)(5)(A) is met." (Gov. January 31, 2003 at 1.) Specifically, the Government argues that the plain language of Section 2332b(g)(5) does not distinguish between domestic and international conduct, and that the list of predicate offenses at 2332b(g)(5)(B) includes laws prohibiting criminal acts that are "primarily domestic, primarily international, and both domestic and international in their likely place of commission." (*Id.* at 4.) The Government argues that because the plain language of the statute is clear, the title of 18 U.S.C. § 2332b, "Acts of terrorism transcending national boundaries," has "no bearing on, and does not affect, the plain language of" the statute. (*Id.* at 6.) [113] The Government further argues that 18 U.S.C. § 2332b(g)(5) is, like § 2332b(f), "completely unrelated to" the title of the section, "Acts of terrorism transcending national boundaries," because if Congress had intended to require conduct transcending national boundaries for these sections, it would have specifically set this forth, by referring explicitly in the text of 2332b(g) and 2332b(f) to § 2332b(g)(1), which provides a definition of "conduct transcending national boundaries." (*Id.* at 8–9.)

The Government further argues that the legislative history of 18 U.S.C. § 2332b indicates that Congress removed the limitation on the sweep of § 2332b to solely international conduct, and the final draft included no such limitation. (*Id.* at 10–14.)

The Government also notes that AEDPA was passed in 1996 in response to a bombing of the federal building in Oklahoma City, "a purely domestic crime of terrorism," and that upon signing the legislation, President Clinton acknowledged that AEDPA resulted from his requests to Federal law enforcement officials to assess tools needed to help them meet the challenge of domestic terrorism. (Id. at 14.) [114] The Government further argues that references to later bills and amendments to § 2332b show that the intent of Congress was not to limit the definition of "Federal crime of terrorism" to conduct with an "international dimension." (*Id.* at 15.) [115]

Additionally, the Government argues that the history of U.S.S.G. § 3A1.4 and application of the enhancement in cases show that a "Federal crime of terrorism" can be an offense involving solely domestic conduct. (*Id.* at 1.) Specifically, the Government argues that Congress intended that the current U.S.S.G. § 3A1.4 to apply to crimes of terrorism without regard to whether they were international or domestic, as evident from Congress' direction to the Sentencing Commission to amend the existing U.S.S.G. § 3A1.4, which applied to "International terrorism," so that it would apply "more broadly" to a Federal crime of terrorism. (*Id.* at 18–20.) Finally, the Government argues that other courts have applied § 3A1.4 to purely domestic offenses. (*Id.* at 20.) [116]

---

113. The Government cites in support *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); *Brotherhood of Railroad Trainmen v. Baltimore and Ohio R.*, 331 U.S. 519, 528–29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947); *United States v. Roemer*, 514 F.2d 1377, 1380 (2d Cir.1975).

114. *See* Statement by President of the United States, 1996 U.S.C.C.A.N. 961–1, 1996 WL 517206 (Apr. 24, 1996).

115. *See* National Cemeteries Sanctity Act, 143 Cong. Rec. S5791–02, S5792 (Statements of Senator Toricelli) (June 17, 1997); USA PATRIOT Act, Pub.L. No. 107–56, § 115 Stat. 378.

116. The Government cites in support *United States v. Meskini*, 319 F.3d 88 (2d Cir.2003); *United States v. Graham*, 275 F.3d 490 (6th Cir.2001); *United States v. Nichols*, 169 F.3d 1255, 1270, n. 3 (10th Cir.1999); *United States v. Leahy*, 169 F.3d 433, 445–46 (7th Cir.1999).

Defendant argues the Government's plain-meaning interpretation of 18 U.S.C. § 2332b is flawed because it fails to read the definition of "Federal crime of terrorism" as set forth at 18 U.S.C. § 2332b(g)(5) in context. (Def. February 21, 2003 at 3.) Defendant argues that reading 2332b(g)(5) in isolation, as the Government does, "not only offends common sense, it violates fundamental canons of statutory construction," including the "Whole Act" rule. (*Id.* at 5–7, 9.) Defendant argues that statutory construction is a "holistic endeavor," [117] and a court should endeavor to avoid reading a statute in a manner that renders provisions superfluous.[118] (*Id.* at 8.) Defendant argues further that, because the title of § 2332b is "Acts of Terrorism Transcending National Boundaries," and the phrase "conduct transcending national boundaries" is defined at 18 U.S.C. § 2332b(g)(1), it is "obvious that the prohibited conduct under the entire Statute" must be transnational. (*Id.* at 4–5.)

Defendant also argues that the Government's review of the legislative history is inadequate, as it does not take account of the Conference Committee to the final version of AEDPA or the House Judiciary Committee Report that accompanied an earlier version of AEDPA. (Id. at 13.) Defendant notes that the House Judiciary Report, H.R. 104–383, which accompanied an early version of AEDPA, stated that the version of 18 U.S.C. § 2332b contained therein was limited to crimes "committed in a manner transcending national boundaries." (*Id.* at 11.) [119] Defendant also notes that the Conference Committee Re-

port that accompanied the final version of AEDPA, H.R. 104–518, contains language that limits the jurisdiction of courts over cases brought under § 2332b, and also notes that Section 2332b "creates a new federal criminal prohibition on acts of terrorism transcending national boundaries." (*Id.* at 12–13.) [120] Defendant argues that these reports "unequivocally demonstrate[ ] that Congress intended to limit a 'Federal crime of terrorism' to *trans-national* conduct." (*Id.* at 10 (emphasis in original)).

Defendant argues that the Government has provided no evidence to support its argument that § 2332b(g)(5) is intended to be read "in isolation" from the rest of section 2332b, and further argues that debates on other bills and the statements of former President Clinton on signing AEDPA are not authority upon which the Court can rest its determination of whether the statute was intended to apply to solely domestic conduct. (*Id.* at 14.)

Defendant argues further that neither the history of U.S.S.G. § 3A1.4 nor case law on § 3A1.4 demonstrates that a "Federal crime of terrorism" as defined at § 2332b(g) applies to a solely domestic crime. (*Id.* at 15, 18.) Defendant notes that a prior version of U.S.S.G. § 3A1.4 applied to international terrorism, and that Congress directed the Sentencing Commission to amend the enhancement to apply "only to Federal crimes of terrorism," and that this amendment reflected "the realization that the sentencing enhancement provision needed to be equally applicable to trans-national as to international

---

**117.** Defendant cites in support *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

**118.** Defendant cites in support *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir.2000).

**119.** Defendant cites in support H.R. Rep. 104–383 at 83.

**120.** Defendant cites in support H.R. Conf. Rep. No. 104–518 at 120; reprinted at 1996 U.S.S.C.A.N. 944, 953.

terrorism," as well as the belief that Section 3A1.4 should "not sweep too broadly." (*Id.* at 17.) [121] Defendant also notes that in passing the USA PATRIOT Act, Pub. L.No. 107–56, 107th Cong., 1st Sess., 115 Stat. 376 (2001), Congress created a defini-. tion for "domestic terrorism" at 18 U.S.C. § 2331(5)(C) that prohibits terrorist activities that "occur primarily within the territorial jurisdiction of the United States," but did not amend U.S.S.G. § 3A1.4 to apply to "domestic terrorism." (*Id.* at 19.)

In its reply, the Government argues Defendant's statutory interpretation fails because reference to headings, titles, and the "Whole Act" rule are only of use where the statute is ambiguous, and here the statute is unambiguous. (Gov. February 28, 2003 at 4.) [122] The Government also argues that Defendant has failed to identify any language that the Government's interpretation would render "superfluous," since the Government's only reads § 2332b(f) and § 2332b(g) in isolation from the rest of § 2332b, but does not strip the provisions of meaning. (*Id.* at 6.) The Government further argues that reading §§ 2332b(f) and 2332b(g) to reach more broadly than the rest of § 2332b to international and domestic conduct is "sensible," since § 2332b(f) provides the Attorney General with investigative authority, which "would not contain a geographical limitation of any kind." (*Id.* at 8.)

The Government also argues that language in the Committee Reports upon which Defendant relies pertain to criminal prohibitions contained in § 2332b, but that since § 2332b(g)(5) does not set forth a criminal offense, the sections of the Committee Reports relied upon by Defendant are irrelevant. (Id. at 4.) Finally, the Gov-

ernment argues that the only conclusion to be drawn from the fact that, in the USA PATRIOT Act, Congress amended Title 18 to include a definition of "domestic terrorism" but did not amend U.S.S.G. § 3A1.4 to apply to "domestic terrorism" is that Congress did not believe it had to amend § 3A1.4 because § 3A1.4 already applied to "domestic terrorism."

The Court has carefully reviewed, analyzed and considered the merits of the arguments of both parties. While helpful, the submissions have prompted and in some cases supported, the analysis that follows.

## A. Plain Language Analysis

"As in all statutory construction cases, we begin with the language of the statute." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). The first step in interpreting § 2332b(g)(5) is "to determine whether the language at issue has a plain and unambiguous meaning," *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Whether the definition of "Federal crime of terrorism" is ambiguous or plain is determined by "reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341, 117 S.Ct. 843.

The meaning of a statutory word or phrase cannot be determined in isolation, but must be drawn from the context in which it is used. *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (finding no limit on the length of military service after which a member of the Armed Services

---

121. Defendant cites in support S. 2703, 104th Cong. (1995); H.R. Rep. 104–383.

122. The Government cites in support *Brotherhood of R.R. Trainmen v. Baltimore and Ohio R.*, 331 U.S. 519, 529–30, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947).

might retain a right to re-employment, where it could be inferred that no such limit was implied from other provisions in the same statute that contained such limits) (citations omitted); *Holloway v. United States,* 526 U.S. 1, 6, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999) ("[i]n interpreting the statute at issue, '[w]e consider not only the bare meaning' of the critical word or phrase 'but also its placement and purpose in the statutory scheme.' ") (quoting *Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)); *United States v. Dauray,* 215 F.3d 257 (2d Cir. 2000); *Strom v. Goldman, Sachs & Co.,* 202 F.3d 138 (2d Cir.1999). Thus, a provision's plain meaning is itself best understood by looking to the statutory scheme as a whole, with reference to the specific context in which the provision is used, and the broader context of the statute as a whole. *See United States v. Gayle,* 342 F.3d 89, 2003 WL 22016807, *3 (2d Cir. 2003); *Saks v. Franklin Covey, Co.,* 316 F.3d 337, 345 (2d Cir.2003) ("The text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute."); *Auburn Housing Authority v. Martinez,* 277 F.3d 138, 144 (2d Cir.2002) ("The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another."); *Rock of Ages Corp. v. Secretary of Labor,* 170 F.3d 148, 156 (2d Cir.1999) ("[T]he meaning of a word (or phrase) cannot be determined in isolation, but must be drawn from the context in which it is used."); *Castellano v. City of New York,* 142 F.3d 58, 67 (2d Cir.1998); *National Foods, Inc. v. Rubin,* 936 F.2d 656 (2d Cir.1991).

■ Moreover, the "whole act" rule of statutory construction "exhorts us to read a section of a statute … 'in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part.' " *United States v. Pacheco,* 225 F.3d 148, 154 (2d Cir.2000) (holding that for purposes of sentencing, the definition of "aggravated felony" should not be limited by the general definition of "felony" as used elsewhere in federal law, but instead should be read consistent with the statutory scheme of which it is a part) (quoting *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20, 24 (2d Cir. 1989)). Thus, for this Court to interpret the term "Federal crime of terrorism" in a manner consistent with 18 U.S.C. § 2332b is supported by the plain-meaning interpretation principle of construing provisions by reference to their context, and by application of the "whole act" rule.

■ As noted, Section 2332b is entitled "Acts of terrorism transcending national boundaries." Apart from the definition contained at 18 U.S.C. § 2332b(g)(5), the term "Federal crime of terrorism" appears only at 18 U.S.C. § 2332b(f). How the term "Federal crime of terrorism" is used in § 2332b(f) is relevant to a definition of the term, since "[t]he normal canons of statutory construction counsel that 'identical words used in different parts of the same act are intended to have the same meaning.' " *United States v. George,* 266 F.3d 52, 58 (2d Cir.2001) (finding that use by Congress of the term "willful and knowingly" in immigration crimes provision required a finding of specific intent, in light of Supreme Court's construction of the same phrase in a different portion of the statute) (quoting *Sullivan v. Stroop,* 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990)); *see also Drescher v. Shatkin,* 280 F.3d 201, 205–06 (2d Cir.2002) ("[I]t would be needlessly untidy and confusing, absent good reason, to have one term

mean two different things in a single statutory scheme.")

Subsection 2332b(f) provides the Attorney General with "primary investigatory authority for all Federal crimes of terrorism," and this authority is explicitly "[i]n addition to any other authority with respect to violations of this title." "The term 'in addition to' is defined as 'over and above.'" *United States v. Battle,* 289 F.3d 661, 666 (10th Cir.2002) (punishment imposed "in addition to" that provided for crime of violence or drug trafficking, pursuant to 18 U.S.C. § 924(c), was "over and above" that of the punishment for violent crime) (citing Webster's Third International Dictionary 24 (1976)); *National Broiler Council v. Voss,* 44 F.3d 740 (9th Cir.1994) (Poultry Products Inspection Act, which preempted state labeling requirements if they were "in addition to" the Act's requirements, therefore pre-empted state requirements that were "not identical" or "different than".); *Government of Virgin Islands v. Douglas,* 812 F.2d 822, 832 (3d Cir.1987) (construing "in addition to" in a sentencing statute to mean "over and above," which is not inconsistent with the phrase "not in lieu of"); *Greater New York Metropolitan Food Council v. McGuire,* 815 F.Supp. 706 (S.D.N.Y.1993) (reading provisions of state milk pricing statute that provided, "in addition to" other provisions, specific evidence was required for a *prima facie* case of unconscionability, as providing a separate means of establishing a *prima facie* case).

Thus, whatever the scope of authority provided the Attorney General to investigate "Federal crimes of terrorism" pursuant to 2332b(f), such authority must be "over and above" the authority already available to the Attorney General under the provisions of Title 18 of the United States Code. Pursuant to 28 U.S.C. § 509, "all functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General." [123] The Federal Bureau of Investigation is an organizational unit within the Department of Justice. 28 C.F.R. § 0.1.

The investigatory authority of the Federal Bureau of Investigation pursuant to Title 18 of the U.S.Code includes the authority to "make seizures under warrant for violation of the laws of the United States," 18 U.S.C. § 3107, and to "carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony." 18 U.S.C. § 3052.

Since the FBI, a bureau within the Department of Justice, 28 C.F.R. § 0.1, has broad authority to investigate offenses against federal law, 18 U.S.C. §§ 3107 and 3052, and since the Attorney General is vested with all functions of the FBI, 28 U.S.C. § 509, the Attorney General was already vested with broad authority to investigate violations of Title 18 prior to passage of 18 U.S.C. § 2332b. Thus, if 18 U.S.C. § 2332b(f) extends to the Attorney General investigatory authority "in addition"—i.e. "over and above"—that already available to the Attorney General under Title 18, the extended authority must be in areas not before authorized.

**123.** "Except those functions vested in administrative law judges, the Federal Prison Industries, Inc., and the Board of Directors and officers of the Federal Prison Industries, Inc." 28 U.S.C. § 509.

■ From the plain text of 18 U.S.C. § 2332b, the following is clear: 1.) Section 2332b(g), which *inter alia,* sets forth a definition for "Federal crime of terrorism," explicitly directs this definition to be construed "As used in this section;" 2.) Section 2332b(f), wherein the term "Federal crime of terrorism" is used, vests the Attorney General with authority to investigate Federal crimes of terrorism, with such authority being "in addition" to that already available under Title 18; 3.) the Attorney General already has broad authority to investigate crimes under Title 18; 4.) Section 2332b is entitled and addresses "Acts of terrorism *transcending national boundaries*" (emphasis added); and 5.) Section 2332b(g)(1) recites that "conduct transcending national boundaries" means conduct occurring outside of the United States in addition to the conduct occurring in the United States. From the foregoing, it is apparent that a "Federal crime of terrorism" is one that meets the requirements at § 2332b(g)(5) and involves "conduct transcending national boundaries."

This definition of a "Federal crime of terrorism" reconciles the textual directives of the different subsections of 18 U.S.C. § 2332b, as well as the specific and broad context in which the term "Federal crime of terrorism" occurs. First, by defining the term by reference to its usage in § 2332b, the Court adheres to the textual direction at 18 U.S.C. § 2332b(g) that "Federal crime of terrorism" is defined by reference to its usage "in this section," and to the principal of statutory construction that provisions are construed by reference to the specific and broad context in which they occur. *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Second, construing "Federal crime of terrorism" to require "conduct transcending national boundaries" provides the Attorney General with authority to investigate offenses involving conduct occurring outside the United States as well as within the United States, 18 U.S.C. § 2332b(g)(1), authority which is indeed "in addition to" other investigative authority provided under Title 18, as required by 18 U.S.C. § 2332b(f). Third, construing the definition of "Federal crime of terrorism" at 2332b(g)(5) to require conduct transcending national boundaries, allows the term to have a single meaning in 18 U.S.C. § 2332b. *Drescher v. Shatkin,* 280 F.3d 201 (2d Cir.2002). Finally, defining a "Federal crime of terrorism" to involve conduct transcending national boundaries harmonizes the definition, and the resulting scope of investigative authority of the Attorney General, with the focus of 18 U.S.C. § 2332b as a whole—which is "Acts of terrorism transcending national boundaries."

Accordingly, the Court finds the plain meaning of the statutory language to require that a "Federal crime of terrorism," as defined at 18 U.S.C. § 2332b(g), is one that involves conduct transcending national boundaries.

### B. Legislative History

Insofar as it is relevant, *O'Gilvie v. United States,* 519 U.S. 79, 89–90, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996) (finding further support in legislative history after drawing conclusions on the basis of a plain-meaning interpretation); *Linea Area Nacional de Chile S.A. v. Meissner,* 65 F.3d 1034, 1039–41 (2d Cir.1995) (referring to the legislative history as further support after finding Congressional intent to be "clear" from the "statutory language"), the legislative history of § 2332b lends further support to the Court's conclusion that a "Federal crime of terrorism" is an offense that requires conduct transcending national boundaries.

### 1. Legislative History of Section 730 of AEDPA and 18 U.S.C. § 2332b

The most authoritative and reliable materials of legislative history include the conference committee report, congressional committee reports, sponsor/floor manager statement and floor and hearing colloquy; the conference report is the most persuasive evidence of congressional intent, next to the statute itself. *See Disabled in Action of Metropolitan New York v. Hammons,* 202 F.3d 110, 124 (2d Cir. 2000); *see also Auburn Housing Authority v. Martinez,* 277 F.3d 138, 147–49 (2d Cir.2002) (analyzing Conference Report and floor debate).[124] In interpreting statutory language a court may consider the history of the language as it finally evolved, with particular reference to the language used in earlier statutes, and may also search for policy intended to be enacted. *Israel–British Bank Ltd. v. FDIC,* 536 F.2d 509, 512 (2d Cir.1976). The policy Congress intended to be enacted may be traced through the legislative history of AEDPA, through its evolution from earlier drafts of the statute. *Id.*

#### a. Creation of 3A1.4

It is apparent that U.S.S.G. § 3A1.4 was initially created to address acts of international terrorism. In 1994, Congress directed the Commission to provide an appropriate enhancement for any felony that "involved or is intended to promote international terrorism." Violent Crime Control and Law Enforcement Act of 1994, Pub L. No. 103–322, § 120004, 108 Stat. 1796, 2022. The Sentencing Commission

responded by replacing the existing "Terrorism" upward departure provision, U.S.S.G. § 5K2.15,[125] with a new "International Terrorism" enhancement at § 3A1.4. U.S.S.G., Appendix C, Amdt. 526. Section 3A1.4 of the United States Sentencing Guidelines took effect on November 1, 1995. This first version of U.S.S.G. § 3A1.4 read as follows:

> Section 3A1.4 Terrorism:
> (a) If the offense is a felony that involved, or was intended to promote, international terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4 (1995).

For a definition of "International Terrorism," U.S.S.G. § 3A1.4, Application Note 1 referred to 18 U.S.C. § 2331.[126]

Thus, as of 1995, the text of the enacting legislation, the language of the enhancement and the Sentencing Commission's Amendment notes make clear that both Congress and the Sentencing Commission intended U.S.S.G. § 3A1.4 to apply to crimes of international terrorism.

#### b. House Bill H.R. 104–896 and Senate Bill S.104–390

On February 10, 1995, the Omnibus Counterterrorism Act of 1995 was introduced in the House, as H.R. 104–896, and simultaneously in the Senate, as S. 104–390. Over the next two years, the Omnibus Counterterrorism Act eventually

---

**124.** Consistent with *Auburn Housing Authority v. Martinez,* 277 F.3d 138, 147 (2d Cir. 2002), and *Disabled in Action of Metropolitan New York v. Hammons,* 202 F.3d 110 (2d Cir.2000), the Court has analyzed and accorded the proper weight to materials appropriate for legislative history analysis. However, for

organizational purposes here, because the Conference Committee Report is not helpful, this Opinion is organized differently.

**125.** *See supra* note 95 and accompanying text.

**126.** *See supra* note 96 and accompanying text.

evolved into the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which directed the Sentencing Commission to amend U.S.S.G. § 3A1.4 to its current form, created a new 18 U.S.C. § 2332b, and set forth at 18 U.S.C. § 2332b(g) a definition of "Federal crime of terrorism" to be used in the new U.S.S.G. § 3A1.4.

Section 101 of the Omnibus Counterterrorism Act amended Chapter Three of Title 18 of the United States Code by adding a new § 2332b, entitled "Acts of Terrorism Transcending National Boundaries." The draft version of § 2332b detailed a statement of Congressional findings and purpose, which noted the need for a federal criminal statute that would address offenses that "involve international associations, communication, and mobility which often can be addressed effectively only at the federal law enforcement level." [127] H.R. 104–896, 104th Cong., § 101(a) (1995).

The bill stated that "The purpose of this section is to provide federal law enforcement the fullest possible basis allowed under the Constitution to address acts of international terrorism occurring within the United States." *Id.*

A Section–By–Section Analysis of the Omnibus Counterterrorism Act of 1995 by the Senate Judiciary Committee, reprinted in the Congressional Record on introduction of the bill in the Senate, echoed this focus on international terrorism:

> This statute is aimed at those terrorist acts that take place within the United States but which are in some fashion or degree instigated, commanded, or facilitated from outside the United States. It does not encompass acts of street crime or domestic terrorism which are in no way connected to overseas sources.

141 Cong. Rec. S2493–01 at S.2516.

The bill set forth prohibited acts to be included in a newly-created 18 U.S.C. § 2332b:

> (1) Whoever . . .
>
> (A) kills, kidnaps, maims, commits an assault resulting in serious bodily injury, or assaults with a dangerous weapon any individual within the United States; or
>
> (B) destroys or damages any structure, conveyance or other real or personal property within the United States, in violation of the laws of any State or the United States shall be

---

**127.** The statement of findings and purpose in Section 101 provided:

(A) international terrorism is a serious and deadly problem which threatens the interests of this nation not only overseas but also within our territory;

(B) international terrorists have demonstrated their intention and capability of carrying out attacks within the United States by, for example, bombing the World Trade Center in New York and undertaking attacks, including assassinations, against former colleagues and opponents who have taken up residence in this country;

(C) United States foreign policy interests are seriously affected by terrorist acts within the United States directed against foreign governments and their people;

(D) such offenses place innocent lives in jeopardy, endanger national security, affect domestic tranquility, and gravely impact on interstate and foreign commerce;

(E) such offenses involve international associations, communication, and mobility which often can be addressed effectively only at the federal law enforcement level; and

(F) there previously has been no federal criminal statute which provides a comprehensive basis for addressing acts of international terrorism carried out within the United States.

H.R. 104–896, 104th Cong., § 101(a) (1995).

punished as prescribed in subsection (d).

(2) Whoever threatens to commit an offense under subsection (b)(1), or attempts or conspires so to do, shall be punished as prescribed in subsection (d). H.R. 104–896, 104th Cong., § 101(a) (1995).

However, the bill limited the application of these prohibitions to cases that fell within a list of jurisdictional requirements that were already generally "utilized in federal statutes and which ha[d] been approved by the courts," 141 Cong.Rec. at S.2516. The possible jurisdictional bases included:

(1) any of the offenders travels in commerce with the intent to commit the offense or to escape apprehension after the commission of such offense;

(2) the mail, or any facility utilized in any manner in commerce, is used in furtherance of the commission of the offense or to effect the escape of any offender after the commission of such offense;

(3) the offense obstructs, delays or affects commerce in any way or degree or would have so obstructed, delayed or affected commerce if the offense had been consummated;

(4) the victim, or intended victim, is the United States Government or any official, officer, employee or agent of the legislative, executive or judicial branches, or of any department or agency, of the United States;

(5) the structure, conveyance or other real or personal property (A) was used in commerce or in any activity affecting commerce, or (B) was in whole or in part owned, possessed, or used by, or leased to (I) the United States, or any department or agency thereof, or (II) any institution or organization receiving Federal financial assistance or insured by any department or agency of the United States;

(6) any victim, or intended victim, of the offense is, at the time of the offense, traveling in commerce;

(7) any victim, intended victim or offender is not a national of the United States;

(8) the offense is committed in the territorial sea (including the airspace above and the seabed and subsoil below, and artificial islands and fixed structures erected thereon) of the United States; or

(9) the offense is committed in those places within the United States that are in the special maritime and territorial jurisdiction of the United States. Jurisdiction shall exist over all principals and coconspirators of an offense under subsection (b), and accessories after the fact to any offense based upon subsection (b), if at least one of the above circumstances is applicable to at least one offender.

*Id.*

The bill also detailed the limits of the United States government's extraterritorial jurisdiction,[128] and set forth penalties for offenses under the proposed 18 U.S.C. § 2332b.[129]

---

128. (h) EXTRATERRITORIAL JURISDICTION—There is extraterritorial Federal jurisdiction (1) over any offense under subsection (b), including any threat, attempt, or conspiracy to commit such offense, and (2) over conduct which, under section 3 of this title, renders any person an accessory after the fact to an offense under subsection (b). H.R. 104–896, 104th Cong., § 101(a) (1995).

129. d) PENALTIES—Whoever violates this section shall, in addition to the punishment provided for any other crime charged in the indictment, be punished—

(1) for a killing or if death results to any person from any other conduct prohibited by this section by death, or by imprisonment for any term of years or for life;

Finally, the version of 18 U.S.C. § 2332b proposed in H.R. 896 and S.390 specified the scope of prosecutorial authority and investigative authority by the United States Attorney General. In particular, Section 101 provided:

(e) LIMITATION ON PROSECU-TION.-No indictment for any offense described in this section shall be sought by the United States except after the Attorney General, or the highest rank-ing subordinate of the Attorney General with responsibility for criminal prosecu-tions, has made a written certification that, in the judgment of the certifying official, such offense, or any activity pre-paratory to its commission, transcended national boundaries and that the offense appears to have been intended to coerce, intimidate, or retaliate against a govern-ment or a civilian population, including any segment thereof.

H.R. 104–896, 104th Cong., § 101(a) (1995).

The Senate Analysis of this sub-section noted that the limitation on prosecution under Section 101 meant that

... the Attorney General must conclude that some connection exists between the activities and some person or entity out-side the United States. Moreover, the certification must find that the offense appears to have been intended to coerce, intimidate, or retaliate against a govern-ment or civilian population. The certifi-

cation requirement ensures that the statute will only be used against terror-ists with overseas connections. Section 2332b is not aimed at purely domestic terrorism or against normal street crime as current law, both federal and state, appears to adequately address these ar-eas. The certification of the Attorney General is not an element of the offense and, except for verification that the de-termination was made by an authorized official, is not subject to judicial review.

141 Cong. Rec. S2493–01 at S.2516.

As to limitations on the federal investi-gative authority, Section 101 provided that under the new § 2332b:

(f) INVESTIGATIVE RESPONSIBIL-ITY.-Violations of this section shall be investigated by the Attorney General. Assistance may be requested from any Federal, State or local agency, including the Army, Navy, and Air Force, any statute, rule, or regulation to the con-trary notwithstanding.

H.R. 104–896, 104th Cong., § 101(a) (1995).

Again, the Senate Analysis explained the intent of this provision:

This latter provision, also found in sev-eral other statutes, see e.g., 18 U.S.C. §§ 351(g) and 1751(i), is intended to overcome the restrictions of the posse comitatus statute, 18 U.S.C. § 1385. It is not intended to give intelligence agen-

(2) for kidnapping, by imprisonment for any term of years or for life;

(3) for maiming, by imprisonment for not more than thirty-five years;

(4) for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than thirty years;

(5) for destroying or damaging any struc-ture, conveyance or other real or personal property, by imprisonment for not more than twenty-five years;

(6) for attempting or conspiring to commit an offense, for any term of years up to the

maximum punishment that would have ap-plied had the offense been completed; and

(7) for threatening to commit an offense under this section, by imprisonment for not more than ten years. Notwithstanding any other provision of law, the court shall not place on probation any person convicted of a violation of this section; nor shall the term of imprisonment imposed under this section run concurrently with any other term of imprisonment.

H.R. 104–896, 104th Cong., § 101(a) (1995).

cies, such as the Central Intelligence Agency, any mission that is prohibited by their charters.

Pursuant to 28 C.F.R. § 0.85(a), the Attorney General automatically delegates investigative responsibility over this offense to the Director of the Federal Bureau of Investigation (FBI). Moreover, under 28 C.F.R. § 0.85(1) the FBI has been designated as the lead federal law enforcement agency responsible for criminal investigation of terrorism within the United States.

While local and state authorities retain their investigative authority under their respective laws, it is expected that in the event of major terrorist crimes such agencies will cooperate, consult, coordinate and work closely with the FBI, as occurred in the investigation of the World Trade Center bombing in New York City.

141 Cong. Rec. S2493–01 at S.2516.

*c. House Bill H.R. 104–1710*

On May 25, 1995 a revised bill, H.R. 104–1710, was introduced in the House. Three sections of H.R. 104–1710—Sections 206, 104 and 315—are pertinent here.

Section 206 of H.R. 104–1710 directed the Sentencing Commission to amend the Sentencing Guidelines "so that the chapter 3 adjustment relating to international terrorism also applied to domestic terrorism."

Section 104 of H.R. 1710 set forth a revised version of the new 18 U.S.C. § 2332b. In the new § 2332b, the investigative authority of the Attorney General was revised to the following:

No indictment shall be sought nor any information filed for any offense described in this section until the Attorney General, or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions,

makes a written certification that, in the judgment of the certifying official, such offense, or any activity preparatory to or meant to conceal its commission, is terrorism, as defined in section 2331 of this title.

H.R. 1710, 104th Cong., § 104 (1995).

The definition of "terrorism" to which the provision above referred was set forth in Section 315 of H.R. 1710, which amended the definition of terrorism in 18 U.S.C. § 2331 to read:

(1) the term "terrorism" means the use of force or violence in violation of the criminal laws of the United States or of any State, or that would be in violation of the criminal laws of the United States or of any State if committed within the jurisdiction of the United States or that State that appears to be intended to achieve political or social ends by—

(A) intimidating or coercing a segment of the population;

(B) influencing or coercing a government official or officials; or (C) affecting the conduct of a government through assassination or kidnapping.

H.R. 1710, 104th Cong., § 104 (1995).

*d. Senate Bill—S.735*

Meanwhile, work had progressed on the Senate version of the Omnibus Counterterrorism Act of 1995, culminating in passage of S.735 on June 7, 1995. Section 102 of S.735 provided a different draft version of 18 U.S.C. § 2332b, "Acts of terrorism transcending national boundaries." Like the version in H.R. 896, the version of § 2332b in S.735 provided a list of enumerated substantive offenses, which if coinciding with one of the listed jurisdictional bases, would constitute a "prohibited act" under

§ 2332b.[130] The jurisdictional bases included use of the mails or interstate commerce, foreign commerce, involvement of a federal employee or property, or conduct occurring within the federal maritime jurisdiction or within the territorial seas of the United States.[131] S. 735, 104th Cong., § 102 (1995).

In addition, S.735 provided for extraterritorial federal jurisdiction:

(g) EXTRATERRITORIAL JURISDICTION—There is extraterritorial Federal jurisdiction over—

(1) any offense under subsection (a); and

(2) conduct that, under section 3, renders any person an accessory after the fact to an offense under subsection (a).

*Id.*

Like H.R. 896, S.735 also contained sections providing for limitations on prosecution and investigative responsibility. Prosecutions under § 2332b as set forth in S.735 were limited to indictments that were certified as having involved conduct that transcended national boundaries, and appeared "to have been intended to coerce, intimidate, or retaliate against a government or a civilian population, including any segment thereof." [132] *Id.*

**130.** As set forth in S.735, 18 U.S.C. § 2332b(a) provided for the following "Prohibited Acts":

(1) Whoever, in a circumstance described in subsection (b), commits an act within the United States that if committed within the special maritime and territorial jurisdiction of the United States would be in violation of section 113(a), (1), (2), (3), (6), or (7), 114, 1111, 1112, 1201, or 1363 shall be punished as prescribed in subsection (c).

(2) Whoever threatens, attempts, or conspires to commit an offense under paragraph (1) shall be punished under subsection (c).

S. 735, 104th Cong., § 102 (1995).

**131.** (b) JURISDICTIONAL BASES-

(1) This section applies to conduct described in subsection (a) if—

(A) the mail, or any facility utilized in interstate commerce, is used in furtherance of the commission of the offense;

(B) the offense obstructs, delays, or affects interstate or foreign commerce in any way or degree, or would have obstructed, delayed, or affected interstate or foreign commerce if the offense had been consummated;

(C) the victim or intended victim is the United States Government or any official, officer, employee, or agent of the legislative, executive, or judicial branches, or of any department or agency, of the United States;

(D) the structure, conveyance, or other real or personal property was in whole or in part owned, possessed, or used by, or

leased to the United States, or any department or agency thereof;

(E) the offense is committed in the territorial sea (including the airspace above and the seabed and subsoil below, and artificial islands and fixed structures erected thereon) of the United States; or

(F) the offense is committed in places within the United States that are in the special maritime and territorial jurisdiction of the United States.

(2) Jurisdiction shall exist over all principals, coconspirators, and accessories after the fact, of an offense under subsection (a) if at least one of the circumstances described in paragraph (1) is applicable to at least one offender.

S. 735, 104th Cong., § 102 (1995).

**132.** S.735, Section 102 provided:

(d) LIMITATION ON PROSECUTION—No indictment for any offense described in this section shall be sought by the United States except after the Attorney General, or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions, has made a written certification that, in the judgment of the certifying official—

(1) such offense, or any activity preparatory to its commission, transcended national boundaries; and

(2) the offense appears to have been intended to coerce, intimidate, or retaliate against a government or a civilian population, including any segment thereof.

As set forth in S.735, violations of 18 U.S.C. § 2332b were to "be investigated by the Federal Bureau of Investigation," without limitation on the authority of the Secret Service.[133]

Finally, S.735 provided that, "[i]n a prosecution under this section, the United States shall not be required to prove knowledge by any defendant of a jurisdictional base alleged in the indictment." *Id.*

This bill was received in the House two days later.[134]

e. *Revised H.R. 104–1710*

On December 5, 1995 the House Judiciary Committee reported to the full House a new version of H.R. 1710. Sections 104 and 206 remained unchanged from the original H.R. 1710. However, the House Judiciary Committee amended the definition of "terrorism" in Section 315 by incorporating a definition from Section 212(a)(3)(B)(ii) of the Immigration and Naturalization Act, 8 U.S.C. § 1182.[135] H.R. 1710, 104th Cong., § 315 (1995).

In the House Report that accompanied the new version of AEDPA, the House Judiciary Committee stated generally that:

Title III also establishes a new definition of terrorism that will apply to international and domestic terrorist offenses

. . . .

It simply categorizes certain existing federal crimes as "terrorist" if motivated to affect the conduct of government or social policy.

H.R.Rep. No. 104–383, at p. 53 (1995).

In explaining the new definition of terrorism in Section 315, the Judiciary Committee stated:

This section provides a statutory definition of "terrorism", and does so without federalizing any state crimes, and expanding the reach of the federal police power. It does not make any crime

---

S. 735, 104th Cong., § 102 (1995).

**133.** S.735, Section 102 provided:
(e) INVESTIGATIVE RESPONSIBILITY— Violations of this section shall be investigated by the Federal Bureau of Investigation. Nothing in this section shall be construed to interfere with the authority of the United States Secret Service under section 3056, or with its investigative authority with respect to sections 871 and 879.
S. 735, 104th Cong., § 102 (1995).

**134.** Having passed the Senate, S.735 sat in the House for eight months until March 14, 1996, when the House "amended" it by striking everything but its enacting clause, inserted new text that had passed the House, and sent it back to the Senate for consideration.

**135.** Section 1182 of Title 8 provides, in pertinent part: As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

(I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).
(II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.
(III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.
(IV) An assassination.
(V) the use of any—
(a) biological agent, chemical agent, or nuclear weapon or device, or
(b) explosive or firearm (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.
(VI) A threat, attempt, or conspiracy to do any Of the foregoing.
8 U.S.C. § 1182 (1995).

"terrorist" over which the federal government does not possess jurisdiction.

First, this definition acts as a significant limitation on the Government to prosecute individuals who might violate section 104 of this bill, when enacted. To prosecute someone under that section, the Attorney General would first have to certify that the crime was one of terrorism, as defined under this section.

Secondly, the definition of terrorism is also important in the sentencing phase of a prosecution of federal law. The U.S. Sentencing Guidelines, in calculating the appropriate sentence to be imposed upon a convicted criminal therefore, authorizes the sentencing judge to consider the nature of the offense, and the motivation of the crime.

So, in order to keep a sentencing judge from assigning a terrorist label to crimes that are truly not terrorist, and to adequately punish the terrorist for his offense, it is appropriate to define the term.

*Id.* at 114.

The Committee Report also provided an explanation for the function of Section 206, which remained as it was introduced:

This section gives the U.S. Sentencing Commission amendment authority to expand the scope of its Chapter 3 enhancement for "international terrorism offenses" under the U.S. Sentencing Guidelines to include all terrorism offenses. In amendments to the Sentencing Guidelines that became effective November 1, 1996 a new provision that substantially increases jail time for offenses committed in connection with a crime of international terrorism [sic]. This section of the bill will make that new provision applicable to all terrorist offenses whether international or domes-

tic, without having to wait until November 1996 for the change to become law. *Id.* at 109.

### f. H.R. 104–2703

However, on December 5, 1995, the very same day that the Judiciary Committee reported its amended version of H.R. 1710, Judiciary Committee Chairman Henry Hyde introduced a new bill, H.R. 2703. In a floor statement Representative Hyde noted that his new bill "[d]eletes the overly broad definition of terrorism." 141 Cong. Rec. H13976–02, at H13977 (daily ed. Dec. 5, 1995) (statement of Rep. Hyde).

H.R. 2703 retained some of the language of section 206 from H.R. 1710, directing the Sentencing Commission to create a new enhancement for terrorism. However, while under H.R. 1710 the Guidelines would have been amended "so that the chapter 3 adjustment relating to international terrorism also applied to domestic terrorism," under H.R. 2703, the Guidelines would be amended "so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code." H.R. 2703, 104th Cong., § 206 (1995).

H.R. 2703 revised section 104 of H.R. 1710, introducing a new version of 18 U.S.C. § 2332b that defined "Federal crime of terrorism" as follows:

(5) the term "Federal crime of terrorism" means an offense that—

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is a violation of—

[numerous federal statutes]

*Id.*

The new 18 U.S.C. § 2332b, as set forth in section 104 of H.R. 2703, used this new

definition of a "Federal crime of terrorism" in two places. First, a certification requirement limited the federal government's authority to prosecute acts of terrorism:

(d) LIMITATION ON PROSECUTION—No indictment shall be sought nor any information filed for any offense described in this section until the Attorney General, or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions, makes a written certification that, in the judgment of the certifying official, such offense, or any activity preparatory to or meant to conceal its commission, is a Federal crime of terrorism.

*Id.*

Second, H.R. 2703 gave the Attorney General "primary investigative responsibility for all Federal crimes of terrorism, and the Secretary of the Treasury shall assist the Attorney General at the request of the Attorney General." *Id.*

On March 14, 1996 the House of Representatives "amended" S.735, which had passed in the Senate and was sent to the House for consideration eight months earlier on June 7, 1995, by striking the language of the entire Senate bill (except the enacting clause), and inserting in its place the entire language of H.R. 2703. The House approved a motion that the House insist upon its amendments to the Senate bill. The Senate disagreed with the House amendment, and ultimately a Conference Committee was appointed.

### g. Conference Bill

The Conference Committee revised the bill, and issued a Conference Committee Report. H.R. Conf. Rep. No. 104–518 (1996), U.S.Code Cong. & Admin. News 1996, p. 944 (1996). In the end the Conference bill, still identified as S.735 although in substance much closer to the House bill, was adopted by both Houses and signed into law as the Antiterrorism and Effective Death Penalty Act of 1996 by President Clinton on April 24, 1996.

Section 730 of the final Conference bill directed that:

The United States Sentencing Commission shall forthwith, in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that section had not expired, amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code.

Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 730, 104th Cong., 2d Sess., 110 Stat. 1214, 1303 (1996).

The Conference Committee Report stated as to Section 730:

Section 730–Senate recedes to House amendment sections 206 and 207. This section gives the U.S. Sentencing Commission amendment authority to expand the scope of its Chapter 3 enhancement for "international terrorism offenses" under the U.S. Sentencing Guidelines, to apply only to federal crimes of terrorism as defined in section 2332b(g). In amendments to the Sentencing Guidelines that became effective November 1, 1996, a new provision that substantially increases jail time for offenses committed in connection with a crime of international terrorism [sic]. This section of the bill will make that new provision applicable only to those specifically listed federal crimes of terrorism, upon conviction of those crimes with the necessary motivational element to be established at the sentencing phase of the prosecution, without having to wait until November 1996 for the change to become law.

H.R. Conf. Rep. No. 104–518, at 123 (1996), *reprinted in* 1996 U.S.S.C.A.N. 944, 956.

The final version of § 2332b, contained in section 702 of S.735,[136] set forth a definition of "Federal crime of terrorism" that was identical to that contained in the earlier H.R. 2703. However, the final § 2332b did not include the certification requirement that had been contained in previous versions of § 2332b. Antiterrorism and Effective Death Penalty Act of 1996, § 702.

Thus, the sole usage of the term "Federal crime of terrorism" was in 18 U.S.C. § 2332b(f), the final version of which provided:

(f) INVESTIGATIVE AUTHORITY— In addition to any other investigative authority with respect to violations of this title, the Attorney General shall have primary investigative responsibility for all Federal crimes of terrorism, and the Secretary of the Treasury shall assist the Attorney General at the request of the Attorney General. Nothing in this section shall be construed to interfere with the authority of the United States Secret Service under section 3056.

*Id.*

### 2. *Analysis of Legislative History*

From the foregoing, it is clear that in passing AEDPA, Congress intended to broaden the application of a terrorism enhancement beyond only acts of "international terrorism," by applying the terrorism enhancement to acts transcending national boundaries, that is, offenses for which conduct occurred "outside of the United States in addition to the conduct occurring in the United States." 18 U.S.C. § 2332b(g)(1). It is also apparent that there was concern in Congress about avoiding the federalization of crimes the enforcement of which were more appropriately state or local responsibilities. Finally, it is perhaps less immediately obvious but nonetheless apparent that, in adopting the final version of AEDPA, Congress did not intend to bring within the sweep of its definition of a "Federal crime of terrorism" conduct that was purely domestic. This is apparent from the consistent focus throughout successive versions of the bill on crimes of terrorism that had an international component, from the rejection of a version that had applied to solely domestic conduct, and from the consistent placement of the term "Federal crime of terrorism" within a section entitled "Acts of terrorism transcending national boundaries."

 a. *International focus in original drafts of the provisions that eventually became 18 U.S.C. § 2332b and U.S.S.G. § 3A1.4.*

In its earliest draft versions, H.R. 104–896 and S.104–390, the stated purpose of

---

**136.** The Conference Committee Report for section 702 (18 U.S.C. § 2332b) explained:
 Section 702—Senate section 102 recedes to House amendment section 104 with modifications. This section creates a new federal criminal prohibition on acts of terrorism transcending national boundaries. It will be a violation of this provision to kill, kidnap, maim, or seriously injure any person in the United States, or to create substantial risk of injury to any person by damaging or destroying property in the United States.

There will be federal jurisdiction over the offense if the offender uses facilities of interstate commerce, the offense interferes with interstate commerce, the victim is the United States or any employee of the United States, or the offense takes place in U.S. territorial jurisdiction, and at least part of the conduct occurred outside of the United States.
H.R. Conf. Rep. No. 104–518, at 120 (1996), *reprinted in* 1996 U.S.S.C.A.N. 944, 953.

the proposed 18 U.S.C. § 2332b was to allow for "the fullest possible basis allowed under the Constitution to address acts of international terrorism occurring within the United States." H.R. 104–896, 104th Cong., § 101(a) (1995). The Section–By–Section Analysis of the Omnibus Counter-terrorism Act of 1995 by the Senate Judiciary Committee reinforces that the focus of 18 U.S.C. § 2332 was international terrorism:

"This statute is aimed at those terrorist acts that take place within the United States but which are in some fashion or degree instigated, commanded, or facilitated from outside the United States. It does not encompass acts of street crime or domestic terrorism which are in no way connected to overseas sources."

141 Cong. Rec. S2493–01 at S.2516.

Thus, the purpose and focus of the initial version of 18 U.S.C. § 2332b was to combat acts of terrorism that were in some way connected to *international* conduct; moreover, Congress explicitly sought to except from the sweep of the new provision acts of terrorism that were unconnected to conduct overseas.

The Section–by–Section Analysis also stated that a "limitation on prosecution" under 18 U.S.C. § 2332b to those offenses for which the Attorney General provided "written certification that, in the judgment of the certifying official, such offense, or any activity preparatory to its commission, transcended national boundaries," was in-

tended to "ensure that the statute [would] only be used against terrorists with overseas connections." 141 Cong. Rec. S2493–01 at S.2516. This explanation reinforces that at this stage in the legislative history, Congress was concerned with limiting the scope of investigations under 18 U.S.C. § 2332b to offenses involving some sort of international conduct.

*b. Rejection of draft sentencing enhancement provisions that would have swept in solely domestic acts of terrorism.*

The next version of AEDPA, H.R. 1710, defined for the first time the scope of the terrorism enhancement under the U.S. Sentencing Guidelines by reference to a definition of "terrorism" contained in the United States Code, and explicitly authorized a sentence enhancement for acts of both domestic *or* international terrorism. In addition, H.R. 1710 defined the scope of the investigatory authority of the Attorney General over "terrorism" offenses by reference to a definition of "terrorism" in the Immigration and Naturalization Act. If signed into law, this bill would have made conduct "terrorism" without regard to the place of occurrence—and so would have swept in solely domestic conduct.

But H.R. 1710 never even passed in the House of Representatives. Instead, Representative Hyde, the House Judiciary Committee Chair, introduced H.R. 2703, a new bill.[137] The new version differed sub-

---

**137.** In H.R. 104–383, the Judiciary Committee Report accompanying H.R. 1710, dissenting members of the House Judiciary Committee noted the likely introduction of a "substitute" bill that replaced substantial portions of H.R. 1710 and that was apparently drafted without input from the full Judiciary Committee:

We would also note that we have recently learned that the Majority is planning to offer a comprehensive substitute amend-

ment to H.R. 1710 during floor consideration of the legislation. This substitute has been negotiated behind closed doors without any input from Members of the Minority. According to a 'Dear Colleague' letter circulated by Chairman Hyde and Mr. Barr on November 30, 1995, it appears that in addition to deleting various provisions of H.R. 1710 as reported by the Committee, the substitute will add several important new sections-most notably changes in Ha-

stantially from its precursor, H.R. 1710. Like H.R. 1710 before it, the new H.R. 2703 directed the Sentencing Commission to amend the Guidelines to include a terrorism enhancement. However, the scope of the applicability of the terrorism enhancement was more narrow under H.R. 2703. Whereas under H.R. 1710 "the chapter 3 adjustment relating to international terrorism also applied to domestic terrorism," under H.R. 2703, the Guidelines would be amended "so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code." In addition, H.R. 2703 created a definition of "Federal crime of terrorism," residing within 2332b(g), itself a definitional subsection for Section 2332b.

Although H.R. 2703 was not accompanied by a Committee Report, it is apparent that the purpose of altering the definition of "terrorism" in H.R. 1710, which swept in both domestic and international crimes, to the more modest "Federal crime of terrorism" was an attempt to *narrow* the range of conduct defined as "terrorism" under the Act. In a brief floor statement on introducing H.R. 2703, Representative Hyde drew attention to the fact that H.R. 2703 "[d]elete[d] the overly broad definition of terrorism." 141 Cong. Rec. H13976–02, at H13977 (daily ed. Dec. 5, 1995) (statement of Rep. Hyde). Thus, the new version, H.R. 2703 "deleted the overly broad" definition of terrorism and replaced it with a version that enhanced sentences for "Federal crimes of terrorism"—in a manner nearly identical to that in the final draft.

### c. Placement of "Federal crime of terrorism" within § 2332b

In the new H.R. 2703, the term "Federal crime of terrorism" was placed within a section whose focus was "Acts of terrorism transcending national boundaries." A neighboring provision, 18 U.S.C. § 2331 was added to Title 18 in 1992, Pub.L. 102–572, Title X, § 1003(a)(3), and existed at the time H.R. 2703 was drafted. Section 2331 was a definitional section for the Chapter on "terrorism." At the time AEDPA was being drafted, § 2331 contained a definition of "international terrorism." Had the drafters of H.R. 2703 intended to create a definition of terrorism that was unconstrained by the scope of § 2332b's limitation to "Acts of terrorism transcending national boundaries," they would have placed the new term "Federal crime of terrorism" in the generic definition section created simultaneously at 18 U.S.C. § 2331. The fact that the new definition of "Federal crime of terrorism" was instead placed within a more specific subsection focused on and limited to "conduct transcending national boundaries" supports the conclusion that a definition within that subsection would also be so limited. Moreover, it is unlikely that limiting the application of the Sentencing Guidelines enhancement by placing it within 18 U.S.C. § 2332b was inadvertent, since the very same members of the 104th Congress that drafted the term "Federal crime of terrorism" within AEDPA also

beas Corpus. No showing has been made that there is any relationship between death row appeals and the problem of terrorism, and the issue was not subject to any hearing, debate or amendment as part of the process of considering H.R. 1710. This substitute will come to the House floor on a 'take it or leave it' basis, without the benefit of any Minority input or reaction. The Majority has apparently foregone the opportunity to seek a genuine bipartisan response to the problem of terrorism, and opted instead to alter the debate to reflect their own narrow ideological agenda derived from the "Contract with America."
H.R.Rep. No. 104–383, at p. 177 (1995).

created Section 2332b and the Sentencing enhancement directives in the same bill.

#### d. Conference Committee Report

■ In general, the Conference report is the most authoritative piece of legislative history for a given statute, "because it represents the final statement of the terms agreed to by both houses." *Auburn Housing Authority v. Martinez*, 277 F.3d 138, 147 (2d Cir.2002); *see also Disabled in Action of Metropolitan New York v. Hammons*, 202 F.3d 110, 124 (2d Cir.2000). However, there is no interpretive guidance provided by the Conference Report accompanying the final version AEDPA on the definition of "Federal crime of terrorism." [138]

#### e. USA PATRIOT Act

On October 26, 2001, Congress passed the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001. Pub.L. No. 107–56, 115 Stat. 272 (2001). Section 802(a)(2) to (4) of the USA PATRIOT Act added a new subsection (5) to 18 U.S.C. § 2331, the Definitional section for "Chapter 113B—Terrorism" of Title 18:

(5) the term "domestic terrorism" means activities that—

(A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;

(B) appear to be intended—

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily within the territorial jurisdiction of the United States.

18 U.S.C. § 2331(5).

■ The Supreme Court has cautioned that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Product Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 117–18, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (finding unpersuasive petitioners' reliance upon statements in a conference committee report concerning 1976 amendments to an act when interpreting a 1972 act) (internal citations omitted); *Lander v. Hartford Life & Annuity Insurance Co.*, 251 F.3d 101, 112 (2d Cir. 2001) (noting that "as a general matter, legislative acts that are subsequent to the statute to be interpreted provide little evidence of the intentions of the earlier Congress."). However, subsequent congressional action should not be rejected out of hand as a source that a court may consider in the search for legislative intent. *Andrus v. Shell Oil Co.*, 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980).

The views of the Congress that enacted the USA PATRIOT Act "cannot control the interpretation of an earlier enacted statute." *O'Gilvie v. United States*, 519 U.S. 79, 90, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996) (refusing to find that Congress' 1989 amendment of the tax code to exclude punitive damages from gross income controlled the question whether punitive damages were excluded under an earlier law). However, the fact that a subsequent Congress interpreted its existing provisions

---

**138.** *See* H.R. Conf. Rep. No. 104–518, at 123 (1996), *reprinted in* 1996 U.S.S.C.A.N. 944, 956, *quoted supra*, p. 348.

within Chapter 113B, including the definition of "Federal crime of terrorism" at 2332b(g), as not providing a satisfactory means of reaching "domestic terrorism" is further evidence that the term "Federal crime of terrorism" cannot be construed to include "domestic terrorism." *See Smith v. Socialist People's Libyan Arab Jamahiriya,* 101 F.3d 239, 244 (2d Cir.1996) (finding a later amendment, providing for a waiver of sovereign immunity because of specific conduct by a state, to be evidence relevant to interpretation of the meaning of "implied waiver," as drafted by an earlier Congress in the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602, *et seq.*).

Accordingly, without resting its findings of law thereupon, the Court notes in passing the 107th Congress' interpretations of provisions enacted by the 104th Congress, which would tend to support the conclusion that the term "Federal crime of terrorism" requires conduct that transcends national boundaries.

## C. The Whole Act Rule

Apart from support found in the legislative history, the Court's plain language reading of "Federal crime of terrorism," which requires conduct transcending national boundaries finds support in application of the Whole Act Rule. From its earliest cases, the Supreme Court has followed the whole act rule in construing statutes. *E.g., United States v. Fisher,* 6 U.S. (2 Cranch) 358, 2 L.Ed. 304 (1805); *Priestman v. United States,* 4 U.S. (Dall.) 28, 29, 1 L.Ed. 727 (1800) (per curiam). "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantial effect that is compatible with the rest of the law." *United*

*Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

Here, the focus of 18 U.S.C. § 2332b is the prohibition, investigation, prosecution and punishment of acts of terrorism "transcending national boundaries." 18 U.S.C. § 2332b. Since § 2332b(f) provides the Attorney General with primary investigative authority for all Federal crimes of terrorism, a coherent reading of the statute requires that a "Federal crime of terrorism" be a crime that "transcends national boundaries."

Conversely, to read the definition of "Federal crime of terrorism" to include solely domestic conduct renders 18 U.S.C. § 2332b incoherent. Section 2332b(f) provides that, "[i]n addition to any other investigative authority with respect to violations of" Title 18, the Attorney General "shall have primary investigative responsibility for all Federal crimes of terrorism." 18 U.S.C. § 2332b(f). Title 18 vests the Attorney General with broad authority, through the authority extended to agents and principals of the Department of Justice, to investigate all federal crimes. 18 U.S.C. § 3107; 18 U.S.C. § 3052; 28 U.S.C. § 509.

Pursuant to 18 U.S.C. § 2332b(g)(5), the term "Federal crime of terrorism" means an offense that -

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is a violation of -

... [numerous enumerated sections of Title 18, including] 18 U.S.C § 1114 (relating to killing or attempted killing of officers and employees of the United States) ...

18 U.S.C. § 2332b(g)(5).

Thus, the definition of "Federal crime of terrorism" cannot be construed to include

solely domestic conduct in violation of the sections listed in § 2332b(g)(5)(B), since then the investigative authority provided the Attorney General under 18 U.S.C. § 2332b(f) would no longer be "in addition" to other authority with respect to violations of Title 18.

D. The Title of Section 2332b

 Finally, the title of 18 U.S.C. § 2332b is of some support to the Court's plain language construction of the definition of a "Federal crime of terrorism." While "the title of an act cannot be held to contradict the more specific language contained in the body of the Act," *Mohegan Tribe v. State of Connecticut,* 638 F.2d 612, 620 (2d Cir.1980), "[i]t is well established that the title of a statute or a section is an indication of its meaning." *Bell v. Reno,* 218 F.3d 86, 91 (2d Cir.2000); *Cf. Mohegan Tribe,* 638 F.2d at 620 (the title can be "useful in interpretation of ambiguous provisions").

Thus, though not determinative, that Section 2332b, the context in which "Federal crime of terrorism" is defined and used, is entitled "Acts of terrorism transcending national boundaries" supports a reading of the term "Federal crime of terrorism" that requires some conduct beyond the borders of the United States. Conversely, construing the term "Federal crime of terrorism" to embrace conduct that is solely domestic is directly at odds with the title of § 2332b, which seems explicitly to require conduct "transcending national boundaries." 18 U.S.C. § 2332b.

 This Court has found that Defendant's attack on Officer Pepe was calculated to influence or affect the conduct of government by intimidation or coercion, and was also calculated to retaliate against government conduct.[139] However, because there is no evidence that Defendant's attack on Officer Pepe involved conduct transcending national boundaries, the Court finds that the Government has not established by a preponderance that Defendant's relevant conduct included a "Federal crime of terrorism." As defined at 18 U.S.C. § 2332b(g)(5), a "Federal crime of terrorism" is one that meets the two prongs set forth at 18 U.S.C. §§ 2332b(g)(5)(A) and (B), and that involves conduct that transcends national boundaries. There is no evidence in the record that Defendant's relevant conduct involved *any* conduct transcending national boundaries. The attack on Officer Pepe occurred at the MCC, in New York, New York. Defendant testified, and the Government does not dispute, that while Defendant was incarcerated at the MCC prior to November 1, 2000, he wrote the notes and lists discovered after the attack. (Tr. at 689–90, 695–97.) There has been no allegation, nor any evidence offered, that shows Defendant was acting in concert with persons outside of the United States.

In view of this deficiency, the Court finds insufficient evidence to conclude Defendant's conduct amounted to a "Federal crime of terrorism," as defined at 18 U.S.C. § 2332b(g)(5). Accordingly, the Court declines to apply the sentence enhancement at U.S.S.G. § 3A1.4 to Defendant's sentence.

## V. CONCLUSION

On the basis of the foregoing analysis under the November 1, 2002 version of the United States Sentencing Guidelines and all applicable laws, the Court finds the following calculation of Defendant's Offense Level appropriate:

---

139. *See supra,* p. 304.

## A. OFFENSE LEVEL CALCULATION

### 1. Base Offense Level

Pursuant to the Grouping Rules contained in § 3D1.1, Count 3 (Conspiracy to Murder a Federal Official) and Count 4 (Attempted Murder of a Federal Official) are grouped together because the counts involve the same victim and the same act, pursuant to § 3D1.2(a). The guideline for violations of 18 U.S.C. § 1117, 1114, and 1113 are found in U.S.S.G. §§ 2A2.1, 2A1.1, 2A1.2, and 2A1.5. The guideline most appropriate based on the conduct charged in the instant offense of conviction is § 2A2.1, which provides for a Base Offense Level of 28, pursuant to U.S.S.G. § 2A2.1(a)(1). 28

### 2. Specific Offense Characteristic

Permanent Bodily Injury: Defendant stabbed Officer Pepe in the eye and brain, thus causing him permanent bodily injury. Therefore, pursuant to § 2A2.1(b)(1)(A), Defendant's Offense Level is increased by four levels. +4

### 3. Victim–Related Adjustments

#### a. Official Victim

Officer Pepe was a federal corrections officer, employed by the Bureau of Prisons, and was performing official duties when Defendant attempted to murder him. When he attempted to murder Officer Pepe, Defendant knew Officer Pepe was a corrections officer; moreover, he attacked Officer Pepe because of Pepe's official status. Accordingly, pursuant to § 3A1.2, three levels are added. +3

#### b. Physical Restraint

During the attack, Officer Pepe was physically restrained; thus, pursuant to § 3A1.3, two levels are added. +2

### 4. Adjustments for Role in the Offense:

Defendant recruited and supervised his cellmate, Khalfan Khamis Mohamed, to assist in the attack on Officer Pepe. Accordingly, pursuant to U.S.S.G. § 3B1.1(c), Defendant's Offense Level is increased by two levels. +2

### 5. Adjustment for Obstruction of Justice: (NONE)

*Adjusted Offense Level (Subtotal):* 39

### 6. Adjustment for Acceptance of Responsibility:

Based on the Defendant's plea allocution in the April 3, 2002 plea proceedings, Defendant has shown recognition of responsibility for the offense. Pursuant to U.S.S.G. § 3E1.1(a), the Offense Level is reduced two levels. –2

*Adjusted Offense Level:* 37
*TOTAL OFFENSE LEVEL:* 37
*B. CRIMINAL HISTORY CATEGORY:* I

Since Defendant has no record of juvenile adjudications or adult criminal convictions, pursuant to U.S.S.G. Chapter 4, Part A, his Criminal History Category is I.

Accordingly, the Guideline Range for Defendant's term of imprisonment is 210 to 262 months. Upon receipt and review by the Court and the parties of the report of the Special Master, Dr. Conrad Berenson, and an opportunity for the parties to comment on the report, the Court shall set a date for sentencing in this matter.

SO ORDERED.